UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT A. SPELKE,                              )
        Plaintiff,                           )
                           )
v.                                             )    Civil Action No. 06-1887 (RJL)
                           )
ALBERTO R. GONZALES,                           )
        Defendant.                           )

MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO MOTION TO DISMISS OR,
<u>IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>

Pursuant to LCvR 7, Plaintiff Robert Andrew Spelke hereby files his opposition to the Defendant's Motion to Dismiss, or in the Alternative, for Summary Judgment. In opposition to this motion, your Plaintiff states as follows:

<u>INTRODUCTION</u>

Plaintiff, Robert A. Spelke is a long term employee of various components of the Department of Justice, including the U.S. Attorneys Office for the District of Columbia, the Drug Enforcement Administration and the Department of Justices Narcotics and Dangerous Drugs Division.

In July 2004, upon hearing of openings in the Civil Division of the U.S. Attorneys Office for the District of Columbia (USAO-DC) Mr. Spelke submitted an application for employment. At the time he submitted the application, Mr. Spelke was over forty years old. Additionally, Mr. Spelke had previously survived cancer while employed as an Assistant United States Attorney in the USAO-DC's Criminal Division. The fact of Mr. Spelke's fight with cancer was well known in the USAO-DC. Pl. Ex. A, M.

From July 2004 until December 7, 2005 Mr. Spelke patiently awaited news on his application. In July 2004 he was interviewed by members of the USAO-DC and

informed them he was excited about the prospect of rejoining the USAO-DC, that he wanted to work on civil matters and that he had ample trial experience before most of the judges now serving on both the Superior Court and Federal Court in the District of Columbia.

Between July, 2004 and December 7, 2005, the USAO-DC selected seven individuals for positions in the USAO-DC, Civil Division. All such persons were well under 40. All such individuals apparently neither had nor were perceived to have a disability. Indeed comments from interviewers and senior officials indicate that these seven candidates who were selected were lauded for their youth and vigor.

On December 7, 2005, after inquires by Spelke and his counsel, Channing Phillips advised Mr. Spelke his application was rejected. Def. Ex. 13. At the time he was non-selected Mr. Spelke had raised the specter that the delay in hiring had a basis in his age and prior disability. Mr. Spelke apparently remained open for consideration, and as the size and nature of the USAO-DC provide for a continuing selection process for periodic openings, Mr. Spelke had no reason to believe he was rejected for a position until Mr. Phillips letter.

The position of Assistant United States Attorney (AUSA) requires litigation experience and an ability to try cases as a core area of performance. Undisputed Facts ¶ 25, 26. The defense acknowledges that Mr. Spelke was superiorly qualified in these areas. Pl. Undisputed Fact ¶ 5; See Def. Ex. 3 at ¶ 9.

Mr. Spelke's Complaint alleges that his non-selection was a direct result of his age, actual and/or perceived disability and the fact that he raised the specter of discrimination to the USAO-DC when no action was taken on his application. Def. Ex.

13. The undisputed facts establish that on a *prima facie* level Mr. Spelke's claims have merit. All selected applicants were under forty years old, had no actual or perceived disability, and had not engaged in EEO protected activity. None of the applicants had Mr. Spelke's level of trial experience litigation, knowledge of the judiciary or familiarity with the Department of Justice.

To date the Agency has offered no explanation as to Mr. Spelke's non-selection, why that decision took *eighteen* months and why the selection occurred some two months after Mr. Spelke's counsel raised the issue of discrimatory animus in a letter concerning the USAO-DC's failure to act on the application. Def. Ex. 12, 13. Indeed, the only explanation disingenuously provided rather wryly by the USAO-DC on December 7, 2005 was that there were no openings in the Civil Division of the office "at this time". Def. Ex. 13.

### STANDARD OF REVIEW AND UNFAIR PREJUDICE TO PLAINTIFF

Hoping to avoid not only a trial but even discovery on the issue, the USAO-DC had filed a combination Motion to Dismiss, Motion for Summary Judgment. This curious device seeks to invade the province of the trier of fact by asking the Court to rule on the merits of the case prior to the taking of evidence. The USAO-DC relies on the supposition that its jaundiced view of the facts should be accepted and that Mr. Spelke has no operative set of facts or law, by which to proceed. Aside from the lach of substantive merits to these arguments, the Court should see the ploy for what it is, a method to deny Mr. Spelke the right to even have evidence gathered to support his case and therefore deny him his day in county by fiat. While it may be true that there is merit to addressing issues not supportable or in dispute at the outset of litigation, it certainly

cannot be the case that the government can now simply say what believes are the facts, so as to effectively deprive a litigant an impartial fact finder and possible redress.

## I.    <u>MOTION TO DISMISS UNDER RULE 12(b)(6)</u>

The Federal Rules do not favor dismissals based solely on the perception of a case's merits from the Complaint.  "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" <u>Prince v. Rice,</u> 453 F.Supp.2d 14, 19 (D.D.C. 2006) <u>citing</u> <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 514, 122 S.Ct. 992 (2002) (<u>quoting</u> <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73, 104 S.Ct. 2229, (1984)).

The Defendant's motion attempts to conflate two separate standards, one of proof and one of pleading, to achieve its ends.  However, under <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973) a *prima facie* case is "an evidentiary standard, not a pleading requirement" <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 509, 122 S.Ct. 992 (2002).  This being said, a 12(b)(6) motion is improper when it is based, as is Defendant's, on a claim that Plaintiff has either failed to offer evidentiary proof of a *prima facie* case or, alternatively that Plaintiff has failed to plead a *prima facie* case.

To blunt a Motion to Dismiss on 12(b)(6) grounds, a Plaintiff need only make a "short and plaint statement" of facts establishing entitlement to relief.  As a pleading, the Complainant does not need, and is not designed to prove facts on its own right.  Instead the Plaintiff merely gives notice to the Defendant of the claims on which the Complaint is precedented and the relief sought.  <u>See</u> Fed, Rule Civ. Pro., Rule 9(a)(2) and (3).

Under Rule 12(b)(6) a motion seeking to dismiss a claim must establish "beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The Court must take care not to weigh the evidence. Legally a Plaintiff's theory need not be substantial. As this Circuit has held:

> "'I was turned down for a job because of my race' is all a complaint has to say "to survive a motion to dismiss under Rule 12(b)(6)." See Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1115 (DC. Cir. 2000).

The instant Complaint clearly meets and exceeds the standard Rule 12(b)(6). Thus, the Defendant's Motion to dismiss is without legal support.

## II.    MOTION FOR SUMMARY JUDGMENT UNDER RULE 56

Generally speaking summary judgment "should be awarded only when the truth is quite clear." Weiss v. Kay Jewelry Stores, Inc., 470 F.2d 1259, 1262 (D.C.Cir.1972) (internal citations omitted) and where there is no dispute as to material facts at issue. See Fed. R. Civ. P. 56(c); Celotex Corp. v Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). For a Defendant to prevail on a summary judgment motion "the record must show the movant's right to [summary judgment] "with such clarity as to leave no room for controversy," and must demonstrate that his opponent "would not be entitled to [prevail] under any discernible circumstances.'" Williams v. WMATA, 721 F.2d 1412, 1415 (D.C.Cir.1983) quoting Nat'l Ass'n of Gov't Employees v. Campbell, 593 F.2d 1023, 1027 (D.C.Cir.1978). It goes without saying that there is no "record" in this case, because as yet discovery has not even commenced.

A.    <u>Motion for Summary Judgment is Procedurally Improper</u>

On a 12(b)(6) motion to dismiss, when matters outside the pleading are presented

to the Court, and not excluded by the Court, the motion may be treated as one for

summary judgment and disposed of as provided in Rule 56. <u>Neal v. Kelly,</u> 963 F.2d 453,

455-56 (D.C. Cir. 1992).

> Under the Rule, the motion is to be disposed of as provided in Rule 56 only after
> *"all parties [are] ⋯ given reasonable opportunity to present all material made*
> *pertinent to such a motion by Rule 56."* <u>Id</u>. at 456 <u>citing</u> <u>Lewis v. Faulkner,</u> 689
> F.2d 100, 101 (7th Cir.1982) (emphasis in original.)

The Defendant's Motion is in function a motion for summary judgment.  The Agency has

declared that "the standards governing disposition of motions under Rule 56 apply" to

their Motion, without reference to any authority, the discretion of the court, or even the

applicable rule of law in this circuit.  <u>See</u> p. 4 of Motion.

This "conversion" of a motion to dismiss to a summary judgment motion is a

functional exercise, resting within the discretion of the Court, [1] it is not a procedural loop-

hole to be exploited by defendants.  A federal courts' ability to consider extraneous

exhibits in a motion to dismiss, and convert the matter to a Rule 56 motion, should not be

exercised at this time because doing so would require the court to conflate a variety of

standards, to the unfair prejudice of the Plaintiff.

Because there has been no answer filed in this case, under Fed. R. Civ. P. Rule

8(d), the allegations contained in the Complaint are considered true.  Thus, procedurally,

---

[1] <u>Id.</u> <u>see also</u>, <u>Vega-Rodriguez v. Puerto Rico Tel. Co.,</u> 110 F.3d 174, 177 (1st Cir. 1997);
<u>Garita Hotel Ltd. Partnership v. Ponce Fed. Bank</u>, 958 F.2d 15, 18-19 (1st Cir. 1992);
<u>Whiting v. Maiolini</u>, 921 F.2d 5 (1st Cir.1990) <u>Lewis v. Faulkner,</u> 689 F.2d 100, 101 (7th
Cir.1982); <u>Roseboro v. Garrison</u>, 528 F.2d 309, 310 (4th Cir.1975); <u>Hudson v. Hardy</u>,
412 F.2d 1091, 1094 (D.C.Cir.1968).

because the Defendant has elected to file a motion for summary judgment rather than answer the complaint, the Court must take into account all of the Complaint's allegations as true, while attempting to view all disputed facts in a light most favorable to the Plaintiff.  Fed. Rule Civ. P., Rule 56 <u>compare</u> Rule 8(d).  Under this two-tiered analysis, the Defendant has thrust upon itself an impossible double-burden, whereby its own "evidence" must be viewed with judicial skepticism.

    B.    <u>Motion for Summary Judgment Denies Plaintiff Right to Conduct Discovery</u>

      The timing of the summary judgment motion is no accident.  The Agency seeks to exacerbate the unfair prejudice of an unmanageable standard of proof while denying the Plaintiff the opportunity to test the Agency's proof at trial, or, a minimum, develop and investigate this proof through ordinary discovery.[2]  The Defendant relies exclusively upon a record its own investigation for its "uncontested facts."  This record is does not permit the Plaintiff to test the real motivations of the jaundiced affidavits submitted by the discriminatory actors.  This record is in fact simply the Agency's own compilation of self serving hearsay which was drafted in response to the Complainant's charges.  Since the Plaintiff cannot adequately respond to the Agency's motion for summary judgment because no discovery has commenced, and because the Plaintiff has not been entitled to depose a single witness whose statements are before the Court, the Plaintiff requests that this motion be denied, *at least until discovery may begin*.  Fed. R. Civ. Pro. Rule 56(f).[3]

---

[2] For instance, the Agency refused to provide a copy of the application and interview materials for Megan Rose, 28 years old, and Kathleen Konopka, 35 years old when it produced other applications to Plaintiff's counsel on December 20, 2006.  Pl. Ex. K; Pl. Undisputed Fact ¶ 28.  Fed. Rule Civ. Pro., Rules 34 and 39 would have assured access to these records.

[3] It should be noted that this is not a typical situation for a Rule 56 (f) motion, where the Plaintiff or his counsel has somehow failed to complete discovery in time, and seeks a

This is a case of employment discrimination against the government, and the prejudice to the plaintiff is heightened by this inability to conduct discovery from the Agency who is by operation of law the custodian of records, and the employer of the main witnesses.  Courts recognize the difficulty in obtaining direct evidence of a discriminatory motive, and thus cross-examination and impeachment of a Defendant's statements have special application under anti-discrimination laws.  In addition, this Circuit has repeatedly directed that because it is difficult for a plaintiff to establish proof of discrimination, courts should view summary judgment motions with special caution. Aka v. Washington Hosp. Ctr., 116 F.3d 876, 879-80 (D.C.Cir. 1997) rev'd on other ground, 156 F.3d 1284 (D.C. Cir. 1988)(en banc); see also Johnson v. Digital Equip Corp., 836 F.Supp. 14, 18 (D.DC. 1993).

The rationale for judicial caution for these summary judgment motions is implicit in the manner in which employment discrimination claims are proven. The burden-shifting framework of McDonnell Douglas, and the pretext analysis used by employee litigants, necessitates that discovery be made available.  In fact, this case, like the majority of employment discrimination cases, will be based upon the probative value of circumstantial evidence, which is intrinsically no different from testimonial evidence and affidavits.  Court recognize that often, circumstantial evidence is often *more* certain, satisfying and persuasive than direct evidence in discrimination cases, because a defendant's malignant state of mind, and facile explanations for conduct, are typically established and rebutted by the circumstantial evidence and impeachment of these witnesses.

---

continuance based upon some good cause shown.  In this case, the Agency has aggressively sought to preempt the discovery proves entirely.

C.    <u>Agency Fails to Show Lack of Evidence</u>

The burden on a party moving for summary judgment is affirmative:

"[t]he party seeking summary judgment has the burden of showing there is no genuine issue of material fact, even on issues where the other party would have the burden of proof at trial, and even if the opponent presents no conflicting evidentiary matter." <u>McKinney v. Dole</u>, 765 F.2d 1129, 1135 (D.C. Cir. 1985) <u>citing</u> <u>Weisberg v. U.S. Dep't of Justice</u>, 627 F.2d 365, 368 (D.C.Cir.1980); <u>see also</u> <u>Catrett v. Johns-Manville Corp.</u>, 756 F.2d 181, 185 n. 5 (D.C.Cir.1985).

In this case, the Defendant seeks summary judgment by showing there is *no* evidence to support essential elements of the Plaintiff's claims; simultaneously, the Defendant seeks to deprive the Plaintiff the right to conduct any discovery on the matters presented in the Defendant's Motion.

The Agency contends that "[b]y point[ing] out the *absence* of evidence" it can demonstrate that there is no genuine issue of material fact.  <u>See</u> Def. Motion at p. 5 <u>citing</u> Shelborne v.Ruynon, 1997 WL 527352 at ** 3 (emphasis added), <u>citing</u> <u>Celotex</u> 477 U.S. at 325.  However, evidence offered by the Plaintiff in this opposition may in itself, support a finding of discrimination.  Moreover, there are inconsistencies and contradictions are on the part of the statements of the Plaintiff's employer, and the Agency has not provided sufficient evidence to warrant summary judgment.  <u>See</u> Shelborne v. Runyon, 1997 WL 527352, at *8 (D.D.C. Aug. 21, 1997).

For the Agency to meet its "lack of evidence" standard, not only must the Agency meet its own evidentiary burden, but also, the Agency must shown that the evidence proffered by the non-moving party does not prove the existence of a genuine issue of material fact. <u>See</u> <u>Catrett v. Johns-Manville Corp.</u>, 756 F.2d 181, 184 (D.C.Cir.1985).[4]

---

[4] This is a procedural impossibility since the Plaintiff's allegations are considered true unless denied.  <u>See</u> Fed. Rule Civ. Pro., Rule 8(d)

The Defendant's Motion relies exclusively upon its own conclusory hearsay statements, to discredit the plan language of documentary evidence.  When read together, the evidence provided thus far raises more issues of disputed facts than it resolves.  The Agency must demonstrate the *absence* of evidence of a genuine factual dispute to prevail on its  motion and it cannot do that by merely supplying the baseless and frankly suspicious opinions of the discriminatory actors.  See Celotex Corp., 477 U.S. at 327, 106 S.Ct. at 2555.

D.      There is No Sufficient Record in Support of Summary Judgment

The local rules of this Court require the Plaintiff to present evidence which he has not had the opportunity to obtain in discovery.  In particular, LCvR (7)(h)  requires

> "each motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of *the record* relied on to support the statement."

The "undisputed facts" identified in the Defendant's Motion are excepts of documents created by the Agency during the "investigation" by the Agency of the Agency; a process in which neither Plaintiff or his counsel were allowed to participate, to present evidence, to cross examine witnesses, or, to offer alternative evidence.  The Agency's "record" then consists of purported statements taken from the discriminatory actors by the Agency itself, as such they are unreliable, untested and incomplete and they should be afforded no weight.  The Plaintiff has had no opportunity to test or disprove the statements proffered by the Agency, the very task envisioned for the Plaintiff in responding to a summary judgment motion.  See LCvR7(h).

E.      No Evidentiary Foundation for Evidence Proffered by Defendant

The excerpts of untested "evidence" submitted in support of the Defendant's

Motion should not be considered because it is neither properly authenticated, nor admissible, nor complete. Fed. Rule Evid, Rules 401, 802. In support of its motion, the Agency relies upon the Plaintiff's own *attorney-drafted* affidavits of interested persons. See Def. Ex. 3, 4, 5. Such statements are inherently unreliable. Fed. Rule Evid., Rule 802.

What the Agency ignores is that even though they have selected the "evidence" to date, their statements establish that the Agency selected seven, less-qualified, younger, non-disabled persons over Mr. Spelke, despite Mr. Spelke's superior qualifications and experience with the type of work. The Agency's submissions also show that at no time whatsoever, did the Agency undertake to deny Mr. Spelke's application until twenty four hours after realizing he had initiated the formal EEO complaint process. Thus even assuming that the affidavits *are* admissible for purposes of the Defendant's Motion, they still fail to prove a "total absence of genuine fact." Because the Agency's evidence is insufficient, as a matter of procedure, the Plaintiff, the non-moving party, is entitled to a denial of the motion as a matter of law.[5] More compelling, all of the "non-discriminatory reasons" offered by the Agency are in conflict with the documents and circumstantial evidence surrounding Mr. Spelke's non-selection, which the Agency, itself created *after* Mr. Spelke had invoked the EEO process. See Def. Undisputed Fact ¶ 5. In sum, the Agency's evidence is insufficient, unreliable, self-contradictory, and clearly fails to support a basis for this motion.

---

[5] McKinney at 1135 citing Adickes v. S.H. Kress & Co., 398 U.S. 114, 160, 90 S.Ct. 1598 (1970)(where a party fails to met its burden, the non moving party is entitled to a denial of a summary judgment, "*without making any showing.*") (emphasis added).

## **ARGUMENT**

Plaintiff's Summary Judgment is based on little more than on untested, jaundiced "Proof" which ignores the medical evidence and facts currently known and plead and relies on Plaintiff's Counsel's self serving view.

Under the now familiar three-part protocol established in McDonnell Douglas Corp. v. Green, and further elaborated upon in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) the Plaintiff bears the initial burden to establish by a preponderance of the evidence a *prima facie* case of discrimination for age, disability and retaliation. The employer then bears the burden to produce evidence of a legitimate nondiscriminatory reason for its action. See Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C.Cir.1998) (en banc).  If the employer can meet this burden of production,

> the focus … will be on whether the [fact-finder] could infer discrimination from the combination of the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff or any contrary evidence that may be available to the employer. Swanks v. Washington Metropolitan Area Transit, 179 F.3d 929, 933 (D.C. Cir. 1999).

Under the burden-shifting concept of evidence outlined in McDonnell Douglas, the Agency is unable to produce sufficient evidence to warrant consideration of as motion for summary judgment for any of the three reasons it offers in its motion.

First, the Agency contends that the Plaintiff failed to timely invoke the federal sector process and all of his claims are barred.  This is based upon the Agency's unsubstantiated claim that the non-selection of Mr. Spelke took place before the Agency's letter to Mr. Spelke on December 7, 2005.  The December 7, 2005 letter's plain

language, and the fact the Agency cites no other proof, establishes that the decision to not

select Mr. Spelke was made and communicated on December 7, 2005.  Def. Ex. 13.

Second, the Agency contends that Mr. Spelke, as a victim of cancer in remission,

is not entitled to protection under the Rehabilitation Act because his cancer is not a

disability that affects a major life activity.  The Agency has offered *no evidence* to show

whether Mr. Spelke ongoing battle with cancer has not affected any of his major life

activities and determining an effect on a major life activity fact-intensive.  Thus, there is

no evidentiary basis for entering summary judgment on this issue at this time, because the

burden is affirmatively upon the Defendant to show that Mr. Spelke's cancer has *not*

substantially interfered with a major life activity. See Fed. R. Civ. P. Rule 56; McKinney

at 1135.  Mr. Spelke's disability is frankly, not ripe for adjudication at this time because

there is no evidence offered by the Agency which disputes the extent of his illness.

Third, the Agency argues it has set forth its legitimate nondiscriminatory reason

for not hiring Mr. Spelke and that this reason, entitles it to a judgment.  The undisputed

fact is that seven other, less qualified, younger, non-disabled attorneys were selected over

the Plaintiff.  This circumstantial evidence alone refutes the Agency's proffered reason,

(see Defendant Undisputed Fact at ¶ 7), and moreover, the "proof" identified in support

of its reason consists solely of its lopsided statements from witnesses yet to undergo the

scrutiny of examination by deposition or interrogatory.  Def. Ex. 3, 4, 5, 6.  Additionally,

there is not a *particle* of documentary or contemporaneous evidence to establish that

these persons did not use discriminatory criteria in evaluating Mr. Spelke.  Instead the

"evidence" establishes that the non-selection of Mr. Spelke clearly took place only after

the Agency discriminators learned that Mr. Spelke invoked the EEO process.

## I. **PLAINTIFF TIMELY INVOKED THE FEDERAL SECTOR PROCESS**

The Agency non-selected the Plaintiff on December 7, 2005, one day after it learned he had invoked the EEO process, and eighteen months after he submitted his application. Def. Ex. 13. In its Motion, the Agency tries to re-write the December 7, 2005 letter of non-selection to cause the Plaintiff to fall through a procedural loop-hole.

Under 29 C.F.R. § 1614.105, a federal employee must seek EEO counseling within forty-five days of a discriminatory act. Generally, speaking, a discriminatory act "occurs" for purposes of charge filing requirement upon date it happens. See National R.R. Passenger Corp. v. Morgan 536 U.S. 101, 122 S.Ct. 2061 (2002). In Section B., the Agency argues that that December 7, 2005 letter to Mr. Spelke about his non-selection for the position – the *only* communication authored by the Agency about his non-selection – was not the triggering event that gives rise to this complaint for "failure to hire." Instead, the Agency argues that Mr. Spelke was not chosen for the position, at another unidentified and unexplained time. Such a claim is contrary to the express, unequivocal language of the *only communication* authored by the Agency itself about this non-selection on December 7, 2005. Def. Ex. 13; Pl. Ex. A. The December 7, 2005 letter clearly states:

> I am writing in response to your October 6, 2005, letter to United States Attorney Kenneth L. Wainstein concerning Robert A. Spelke's application to rejoin our Office as an Assistant United States Attorney in the Civil Division…. We appreciate Mr. Spelke's interest in returning to our Office, and regret we are unable to offer him a position *at this time* [December 7, 2005].*" (emphasis added). Def. Ex. 13.:

A.    Agency Affidavits Contradict Agency Statement that Spelke was non-selected on December 7, 2005 Def. Ex. 13

The Agency's motion is based upon a contention that the plain meaning of its own

communication to the Plaintiff, on the date and status of his application, is false. Def. Ex. 3, 4, 5, 6. Faced with an unequivocal expression on the non-selection, the Agency would now have the Court ignore the December 7, 2005 correspondence by insinuating that what was said was not really meant, or was wrong. Relying on statements from the discriminatory actors themselves (Defendant Undisputed Fact ¶ 5, 6) the USAO now claims that it really non-selected Mr. Spelke before AUSA Channing Phillips says it did. We are asked to dismiss Mr. Phillips' explanation, and accept those of attorneys in the Civil Division. The USAO thus argues an error as proof and impeaches itself prior to trial, discovery, or an answer to establish non-evidence from evidence.

We assume letters mean what they say, particularly when they are from lawyers and from Assistant U.S. Attorneys, thus when AUSA Phillips stated:

> "*We appreciate Mr. Spelke's interest in returning to our Office, and regret we are unable to offer him a position at this time* [December 7, 2005]." (emphasis added). Def. Ex. 13.

We presume, "at this time," means "at this time," as in the present, and not some *other* time in the future, or in the past.

B.    Plain Reading of December 7, 2005 Channing Phillips Letter Reveals Actual Date of Non-Selection was December 7, 2005 Def. Ex. 13

The Plaintiff alleged the notice of his non-selection occurred on December 7 2005. Complaint at ¶14; Def. Ex. 13. The evidence of the timing of this non-selection is unequivocal. See Def. Ex. 13. Nevertheless, the Agency argues that Mr. Spelke was non-selected on (1) July 24, 2004; *or* (2) September 7, 2004, *or* (3) March 20, 2005, *or* (4) April 17, 2005, *or* (5) May 1, 2005, *or* (6) July 10, 2005, *or* (7) August 21, 2005. That the USAO disputes its own facts is both cause for denial of the Plaintiff's case for

consideration at the sheer malleability of the purportedly "undisputed facts" the Agency

relies on.

    C.    <u>December 7, 2005 Letter was the Agency's Final Decision; Def. Ex. 13</u>

       The Agency argues that when an individual alleges that a non-selection was

discriminatory, it is not the date on which they learned of the non selection that triggers

the 45-day time period, but rather the date on which the decision became effective.  <u>See</u>

Motion at p. 8.[6]  But the previous "decisions" identified in Section B., were not firmly

made on effectively communicated in any way that can establish their solidity.  Openings

at the Civil Division are not infrequent.  Pl. Undisputed Fact at ¶ 11, 20.  Indeed on

December 2, 2005, Mr. Lawrence stated there were "still positions available at the Civil

Division and that Mr. Spelke was being considered for these positions." Pl. Undisputed

Fact at ¶ 20 yet the motion ignores this fact and fails to even state "when (if ever) [did the

Plaintiff] ha[ve] notice that the … decision was final so as to start the clock on the EEOC

filing deadline."[7] Thus, the matter of when the Agency decided not to select Mr. Spelke,

---

[6] The EEOC regulations state that the relevant date is the date on which the decision not
to hire plaintiff became effective, not the date on which plaintiff *learned* of the personnel
action. <u>See</u> 29 CFR § 1614.105(a)(1). The foot note from an unreported decision relied
upon by the Defendant explains, "[r]arely [is] the case that the effective date of a
personnel action corresponds with the date on which a vacancy announcement closes.
The date on which the vacancy announcement closes merely identifies the deadline for
applications to be submitted-it does not, as defendant suggests, identify the date on which
the position has been *filled."*  <u>Silver v. Leavitt,</u> 2006 WL 626928 * 7, n. 2(D.D.C. 2006)
This rule is in conflict with the established precedent outside which more reasonably
holds that "the timeliness and cognizability of the administrative complaint are measured
by the date the employee learned of the promotion decision."  <u>Stoller v. Marsh</u>, 682 F.2d
971, 978 (D.C. Cir. 1982).
[7] <u>Currier v. Radio Free Europe/Radio Liberty Inc.</u>, 159 F.3d 1363, 1367(D.C. Cir. 1998)
<u>citing</u> <u>Delaware State College v. Ricks</u>, 449 U.S. 250, 261, 101 S.Ct. 498, (1980)
(holding that the starting point for the deadline occurs when plaintiff has notice of an
official, i.e., not "tentative," decision)."

and when his duty to notify the EEO office of his non-selection, remains disputed and requires a test of the disputed evidence. A test of this evidence will undoubtedly be resolved in favor of the Plaintiff, because the factual basis raised by the Agency is self-contradicting, and frankly unbelievable.

The Plaintiff argues, based upon objective documentary evidence and personal knowledge,

(1) Mr. Spelke's submitted his application on July 16, 2004.  See Def. Undisputed Fact ¶ 5.

(2) Mr. Spelke was non selected on December 7, 2005. Def. Ex. 13.

(3) Mr. Spelke filed his complaint of discrimination on December 21, 2005.  Def. Ex. 14.

The Agency contradicts this version with a variety of alternative circumstances where the duty to notify the EEO office was not met.[8]  First, the Agency claims that the day Mr. Spelke was non-selected was on July 24, 2004, when he was not offered a position immediately after his first interview.[9]  Such a premise assumes that at the end of

---

[7] Instead the evidence before the Court about Mr. Spelke's disability, Mr. Spelke and his physicians suggests, based on medical evidence and Mr. Spelke's own awareness quite the contrary. Pl. Ex. A, M, O.

[8] Since the Agency has engaged in speculative statements about what Mr. Spelke should have known, we can respond in kind that as a former Assistant U.S. Attorney Mr. Spelke was aware that the openings in the USAO were filled periodically and that so long as his application remained pending he was in the running.  Also, as DOJ employee Mr. Spelke would have expected the courtesy of notice on his application from former colleagues and fellow DOJ employees.  Despite the Agency's protocol the USAO took no such steps and ignored Mr. Spelkes status inquiries until the day after they were aware he had filed an EEO Complaint.  To now argue that Mr. Spelke should have known he would not be hired from the delay is ridiculous and ignores Agency practice.  Pl. Ex. O.

[9] "The decision not to refer the Plaintiff to the Unites States Attorney for further consideration was made almost immediately following his interview in July 2004. See p. 17 of Defendant's motion, citing Def. Undisputed Fact ¶ 6, Def. Ex. 3 at ¶ 8.

Mr. Spelke's interview, Mr. Phillips, an Agency manager who refers applicants to the U.S. Attorney, entered into the room where he all the persons who conducted the interview agreed on behalf of the entire Agency, that Mr. Spelke would not be selected at that time.

The process used by the Agency however, as is evident in their own records, is a deliberative process, where applications are made, interviews are conducted, opinions are circulated and the merits of the applicants are discussed up through the chain of command. Pl. Ex. A. F, G, H, I, J, O. In each case applicants met with interviewers, these interviewers took notes, and made observations. <u>Id</u>. Then, discussions of applicant's qualifications occurred among the interviewers, and then relayed those higher in management. <u>Id</u>. The Agency claims it decided to not hire Mr. Spelke "immediately" after his interview, in a decision where the Agency also decided to abandon all protocol regarding the interview process, which was in effect for the other, younger, less qualified persons who received offers. This only begs the question: why are younger persons entitled to a deliberative process guided by MSPB and Agency protocol while the Plaintiff is rejected immediately after his interview, where the interviewers rated him as superiorly qualified?

The second version of the facts posited by the Agency is that the Plaintiff should have had the wherewithal to realize he was not going to get the position when others, who were hired on a rotating basis, began entering the Civil Division. <u>See</u> p. 17 of

---

8  The Agency submission contains no expert medical opinion or other evidence other than counsel's "gut" surmise that cancer "in remission" no longer impacts Mr. Spelkes substantial life activities. Millions of cancer sufferers might be heartened by the defendants position that cancer once in remission no longer impacts the endurance of those afflicted with it.

Motion referencing Def. Undisputed Facts ¶ 6; Def. Ex. 3.  Under this rationale, EEO claimants are presumed to have clairvoyance as to Agency protocol in failure to hire and promote cases.  They are also supposed to be able to detect the inner-workings of the confidential application process.  They are charged to have the knowledge of the identities of all persons who interviewed for position which is filled on a continuing basis and which remained open until at least December 2, 2005. Pl. Undisputed Facts ¶ 9, 20. Under the Agency's argument, each time someone else was *placed* into a position at the Civil Division, on a rolling basis, while Mr. Spelke's application was pending and his queries about his position went unanswered, Mr. Spelke's duty to file a complaint of discrimination was triggered.  Under this reading, Mr. Spelke, as an alleged victim of discrimination is required to investigate when new hires occurred at the Agency, and each time he uncovered the identity of a person who was hired, Mr. Spelke would have to amend his complaint, in this case, seven times. See Romero-Ostolaza v. Ridge, 370 F.Supp.2d 139, 148-49 (D.D.C. 2005).  In any case, the Agency's claim is lunacy, especially since its own letter to the Plaintiff indicated he was non-selected on December 7, 2005, and especially since the non-selection was phrased in the *present-tense*.  Def. Ex. 13.

D.     Agency's is Equitable Estopped from Raising an Affirmative Defense of Administrative Exhaustion

The Agency's refusal to disclose to the Plaintiff that he was non-selected until December 7, 2005 bars the Agency from relying upon a claim of administrative exhaustion, or at minimum, requires evidence why it would be fair for the Agency to be rewarded for its non-disclosure.  Def. Ex. 13.  Given the alternative "facts" presented by the Agency, it appears that even if one of the alternative dates of non-selection were in

fact the date on which the duty to notify the EEO office occurred, the time period should otherwise be tolled as a result of the Agency's failure to notify the Plaintiff of his non-selection, despite his reasonable and seasonable inquires about the status of his application.

The 45-day filing period for federal employees claiming discrimination to contact Equal Employment Opportunity (EEO) counselor is not jurisdictional prerequisite, and can be tolled where principles of equity demand it.[10]  The motion itself alleges that the Agency failed to notify the Plaintiff about his non-selection, until after the time period for raising a complaint had passed.  Thus, this requires the Agency to show why the period should not be tolled, because it is an affirmative defense based upon disputed facts.[11] Fed. Rule Civ. Pro, Rule 56.

A determination of whether to toll a limitations period, in an action brought by a federal employee, must be made on a case-by-case basis and the Agency's own motion raises sufficient fact which would warrant a case for equitable tolling of the filing date *in favor of the Plaintiff*.  Steiner v. Henderson, 194 F.Supp.2d 688, 690 (N.D.Ohio 2002) affd 354 F.3d 432 (2003), cert. denied 541 U.S. 990, 124 S.Ct. 2049 (2004). For the

---

[10] Civil Rights Act of 1964, § 717, as amended, 42 U.S.C § 2000e-16; 29 C.F.R. § 1614.105(a)(1). Steiner v. Henderson 354 F.3d 432, 435 (6th Cir. 2003) cert. denied 541 U.S. 990, 124 S.Ct. 2049 (2004).

[11] When an employer prevents an employee from filing a timely charge by actively concealing information which would enable the employee to assert his or her rights or if the employer affirmatively misleads the employee into believing that a timely charge is unnecessary, the employer will later be estopped from asserting a defense based on the employee's failure to adhere to the time limitation periods.  Currier v. Radio Free Europe/Radio Liberty Inc., 159 F.3d 1363 (D.C. Cir. 1998); see also Katz, Leo, *Equitable Modification of Time Limitations Under Title VII,* 48 U. CHI. L. REV. 1016 (1981).  It is in instances such as this one, where the Plaintiff is at no time notified that he has been non-selected, and where other applicants are being selected on a continuing basis, that the principles of equitable tolling should apply.

Agency to prevail in its affirmative defense that the Plaintiff failed to timely administratively exhaust his claims, the Agency will need to show evidence of how Mr. Spelke slept on his rights, and that the delay in filing the complaint caused prejudice to the Agency.  Ironically, the only discernable "delay" in this case is that the Agency, despite repeated request, failed to respond in any manner to the Plaintiff about his application for *eighteen months.*

The Agency is also estopped by its own misconduct from relying upon the delay it created.  Under 42 U.S.C. §1614.102 (a)(4)

> each agency shall "[c]ommunicate the agency's equal employment opportunity policy and program *and its employment needs to all sources of job candidates ….* and *solicit their recruitment assistance on a continuing basis*."

In this case, the facts show that the Agency deliberately sought to conceal the status of his application to "run-out the clock" to defeat the likely (first raised in October 2005) claim of discrimination which was to come to bear.  Def. Ex. 12, 13.

The circumstances and baseless alternative explanations of disputed facts only point to facts which would *bar* the Agency from relying upon an affirmative defense of administrative exhaustion.   The doctrine of equitable tolling or estoppel, is properly invoked in this situation because the federal agency misrepresented length of limitations period and lulled the Plaintiff into thinking that it was unnecessary to commence litigation. See e.g. German v. Pena, 88 F.Supp.2d 216 (S.D.N.Y. 2000).  Furthermore, the Agency cannot rely upon the "affirmative defense" of exhaustion by presenting alternative theories about when the Agency non-selected the Plaintiff.  The Agency in its motion was incapable or unwilling, in its own version of contested facts, to make a decision or disclose the decision about the Plaintiff's non-selection.  Accordingly,

summary judgment cannot be granted on this self-serving account of the "evidence,"

because the issue of *"[w]hen"* the Plaintiff was non-selected in favor of seven other

persons is an issue of fact that "is clearly contested [and] [a]t this juncture." Koch v.

Donaldson, 260 F.Supp.2d 86 (D.D.C. 2003) citing Fed. R. Civ. P. 56(c); Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, (1986).

**III.   PLAINTIFF'S CLAIMS FOR RETALIATION ARE NOT TIME-
        BARRED AND THERE IS SUFFICIENT EVIDENCE OF A CAUSAL
        NEXUS BETWEEN THE RETALIATION AND THE PROTECTED
        ACTIVITY (LESS THAN 24 HOURS, IN FACT).**

A.   Elements of Retaliation

The elements of a *prima facie* case for retaliation require that a plaintiff establish:

(1)    that he engaged in statutorily protected activity;

(2)    that the employer took an adverse personnel action; and

(3)    that a causal connection existed between the two." Mitchell v. Baldrige,

759 F.2d 80, 86 (D.C.Cir.1985).

The Agency disputes the first and third prong.

B.   December 7, 2005 Letter it the Date of Non-Selection

The Agency contends "the Plaintiff fails to make a *prima facie* case for retaliation

because he failed to demonstrate that he engaged in protected activity *prior* to the adverse

employment action."  The Agency bases this conclusion on the same claim that the

Plaintiff was non-selected on a date prior to December 7, 2005, when the Agency claims

that the Plaintiff was non-selected "at this time."  Def. Ex. 13.  In the process, the Agency

attempts to contradict the objective fact with its own obfuscation.  Plaintiff stands firm on

his conviction that the evidence shows he was that he was non-selected on December 7,

2005, and reincorporates the previous sections A through D of the previous section to address this allegation.

    C.    <u>No Failure to Exhaust Administrative Process: Retaliation Occurred <i>During</i> the "Impartial" Complaint Process</u>

       The Agency argues that the Plaintiff is estopped from bringing his claim for retaliation because he did not invoke anti-discrimination laws within his initial complaint although at that very moment, the Agency was processing his Complaint the Agency retaliated against the Plaintiff. The Agency contends that the Plaintiff did not check the box for retaliation when he filed his EEO complaint form of December 21, 2005. Def. undisputed Fact ¶ 10; <u>See</u> p. 9 of Motion. <u>Prince v. Rice,</u> is the authority relief upon by the Agency, <u>Price v. Rice,</u> 453 F.Supp.2d 14, 24 (D.D.C. 2006). This logic requires that the law assume that the Plaintiff knew or should have known that others at the Agency would decide to non-select him on the day they received communications from the EEO office that he had filed a Complaint.

       The peculiarities of the federal sector process require a more nuanced reading of the administrative exhaustion discussed in <u>Price</u>. <u>Price</u> is one in of a series of recent cases which seeks to apply the precedent set forth in <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 122 S.Ct. 2061 (2002). <u>Morgan</u> ruled that "a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period." This Circuit has followed this ruling. <u>Bowie v. Ashcroft</u>, 83 F.Supp.2d 25, 34 (D.D.C. 2003) <u>citing</u> <u>Morgan</u> at 122; <u>see also</u> <u>Adams v. Mineta</u>, 2006 WL 367895 at *3 (D.D.C. 2006).[12] <u>Morgan</u> however was designed to stop the endless

---

[12] In <u>Morgan</u>, the Supreme Court held that discrete act of retaliation must be documented within 300 days of the event, and then suit may be filed by simply requesting a right to

related claims which in effect rendered timeliness requirements a nullity. <u>Morgan</u> was not intended to preclude a Plaintiff from raising in federal court, a claim of retaliation, which only became known when the Agency/employee produced its investigatory file in response to the Complaint itself, and then provides evidence for the first time that establishes that non-selection occurred twenty four hours after the Complaint involved EEO protection. <u>See</u> Pl. Ex. K.

Neither Mr. Spelke nor his counsel were made aware that his non-selection occurred within twenty four hours of his submission of a formal EEO Complaint until the Agency belatedly disclosed the fact in its report of investigation which was finally submitted on December 20, 2006. Pl. Ex. K. The Agency seeks to profit from its own failure to disclose this fact during its investigative process would require a second investigative process and then would require the Plaintiff file a claim of retaliation before Plaintiff was made aware of the nexus between his protected activity and the adverse action. This flips <u>Morgan</u> onto its head, and encourages employers to hide damaging evidence in order to defeat the opportunity of the Plaintiff to file a claim.

This Circuit has determined that federal sector claimants are bound by <u>Morgan</u>'s pronouncement that discrete acts of discrimination require separate filings <u>Romero-Ostdaza v. Ridge</u>, 370 F.Supp.2d (D.D.C. 2005). In addressing, the issue of exhaustion,

---

sue letter, the federal sector discrimination process is more complicated. <u>Morgan</u> sought to limit the retroactive bootstrapping whereby Plaintiff's attorneys use the device of the continuing violation rule to bring past discrete acts into ripeness after the time-bar has already passed. But this is not a case of "bootstrapping" as Justice O'Connor observed. In this case, the retaliation took place simultaneous to the invocation of the federal sector process. It is the notice received by Mr. Wainstein, (Pl. Ex N), which was received *through* the federal sector complaint process. In fact, the problem here is that the federal sector complaint process *caused* the retaliation.

the Court's ability to do justice and the remedial purposes of anti-discrimination laws should be taken into account.[13]  In Romero-Ostolaza, the Court was attempting to decide whether the Complainant was simply trying to piggyback his stale claims onto acts which occurred within the 45 day window.  This was the tactic prohibited by Morgan and makes eminent sense from both legal and equitable perspectives: since the relation-back doctrine was in effect swallowing up the rule of the necessity of timely filings, a process described in Morgan as "bootstrapping."  See Opinion of O'Connor, J.

In this case, the Agency retaliated against Plaintiff and hid that fact.  Further it did so under a federal sector process whose regulations specifically prohibit such retaliation. Title 29 C.F.R. § 1614.101(b) commands,

> "[n]o person shall be subject to retaliation for opposing any practice made unlawful … for participating in *any stage of administrative or* judicial proceedings under [anti-discrimination] statutes;"

Furthermore, 29 C.F.R. § 1614.102(a)(2) requires,

> "[e]ach agency shall "[p]rovide for the *prompt*, fair and impartial processing of complaints;"

Under federal sector proceedings the EEO office of an Agency is expressly tasked to ensure "that individual complaints are fairly and thoroughly investigated."  29 C.F.R. § 1614.102 (c)(5).  Additionally, under 29 § 1614.105(g) the Counselor shall not "reveal the identity of an aggrieved person who consulted the Counselor, … until the Agency has received a discrimination complaint under this part from that person involving that same

---

[13] Invoking "informal counseling" does not envision a strict requirement that would normally apply to other statute of limitations and "'[t]he [45] day statute of limitations is not reasonable if agencies and courts do not liberally construe [ ] exceptions.'"  Johnson v. Runyon, 47 F.3d 911, 917 (7th Cir. 1995) citing Myles v. Schlesinger, 436 F.Supp. 8, 18 (E.D.Pa.1976).  Informal counseling serves a remedial purpose, to allow Agencies to evaluate potential claims before they are formalized.  See generally EEOC Management Directive 110.

matter."  In the instant case it was the Complainant invocation of a right to sue that served as the green-light for the Agency's adverse action.

Upon revealing the Mr. Spelke's identity to the discriminatory actors as an EEO claimant, the Agency non-selected him the very next day.  Def. Ex. 13; Pl. Ex. N.  The evidence is also that the Agency knew, through Mr. Spelke's attorney's letter that Mr. Spelke indented to invoke EEO protections as early as October 2005 but did nothing until they realized Mr. Spelke intended to pursue his federal claims – which forced the Agency's hand into an actual decision about his application.  Def. Ex. 12, 13.

The decision to not select the Plaintiff on December 7, 2005, occurred *during, and as a result of* the federal sector complaint process.  The day after the Agency received notice of his complaint, the Agency non-selected the Plaintiff.  For the prior eighteen months, the Plaintiff's queries and his counsel letters went unanswered and no explanation was ever given about the status of this pending application.    Indeed the December 7, 2005 letter <u>assures the Plaintiff that no discriminatory criteria were employed</u>.  Def. Ex. 13.  Curiously, the letter does not acknowledge the more likely catalyst for its dispatch: that the authors of the letter received notice that the Plaintiff had filed his formal EEO complaint the day before. The fact Mr. Wainstain became aware of the Plaintiff's protected status and the next day, non-selected him, was a fact not revealed until discovery of the email during the administrative processing phase of the federal sector complain process.  It was in fact revealed *well after the forty-five day period had expired.*  29 C.F.R. § 1614.105.  How the Plaintiff would have learned that the EEO office contacted Mr. Wainstain about his formal complaint is not answered nor is the fact that his non-selection occurred the next day.

It has been a "generally accepted principle that the scope of a Title VII lawsuit may extend to 'any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission.'" Nealon v. Stone 958 F.2d 584, 590 (4th Cir. 1992) citing Hill v. Western Electric Co., 672 F.2d 381, 390 n. 6 (4th Cir.) (quoting Sanchez v. Standard Brands, Inc., 431 F.2d 455, 466 (5th Cir.1970)), cert. denied, 459 U.S. 981, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982); see also EEOC v. General Electric Co., 532 F.2d 359, 373 (4th Cir.1976). Retaliation for the filing of an EEOC charge as discrimination may be adjudicated without prior exhaustion if the matter is "like or reasonably related to … and growing out of such allegations." Malhotra v. Cotter & Co., 885 F.2d 1305, 1312 (7th Cir.1989) (quotations omitted).  Though Morgan and Price may have narrowed the application of the "scope of complaint" as to *subsequent* acts, courts have not wholly abandoned the theory that reasonably related acts may be considered exhausted.[14]

Specifically this context allows Mr. Spelke to include retaliation that is not only reasonably related to the claim but a direct byproduct yet makes sense.  Morgan promotes timely filing, notice and judicial economy.  To require Mr. Spelke to file a new complaint of retaliation where he is informed of it through the Agency's investigation and to seek to preclude Mr. Spelke from being able to bring some claim on the basis that he should have raised a claim, he was unaware of, defies logic and prohibits the Court and the litigants from resolving discrimination as one discrete whole.  What was not a separate and

---

[14] Parisi v. Boeing Co., 400 F.3d 583, 586 (8th Cir.2005); see also Shelton v. Boeing Co., 399 F.3d 909, 912-13 (8th Cir.2005)("[t]he proper exhaustion of administrative remedies gives the plaintiff a green light to bring [his or] her employment-discrimination claim, along with allegations that are 'like or reasonably related' to that claim, in federal court.")

discrete act by the employer, but merely belatedly disclosed proof of impropriety, does not make a the claim of retaliation separate from the adverse action itself.

Romero-Ostolaza did not examine the impact of when the EEO office's federal sector complaint process was the cause-in-fact for the retaliation, and when the evidence or knowledge this cause in fact, came to light only after the time period had expired as a result of the Agency's own investigation. Morgan's principle seeks to limit the application of the continuing violation theory in the context of discrete acts certainly may have valid application in the federal sector. Plaintiff's counsel does not dispute this. However, in this case, the retaliatory acts arise from the federal sector process itself, and the communications which in fact *caused* the retaliation were not revealed until *after* the time period expired, thus, could not be known to the Plaintiff.

The Court has refused to read EEO regulators to promote absurdity:

> "[T]o require the employee to exhaust administrative remedies as to each weekly denial of time off would seem to put an excessive burden on plaintiffs. Instead, the employee can file a charge when the initial, *final decision is made*, or after the other, later acts, so long as those acts are independently discriminatory." Coleman-Adebayo v. Leavitt, 326 F.Supp.2d 132, 138 n. 3 (D.D.C. 2004).

In this case, the retaliation was part and parcel with the EEO allegations – it was not a subsequent act and it was not "independently discriminatory."

The non-selection of Mr. Spelke on December 7, 2005 for the position constitutes an adverse employment action under the anti-retaliation provisions of the Rehabilitation act of 1973, the ADA and the ADEA. The unequivocal evidence, now known, is that the Plaintiff's EEO claim was the chief catalyst for his non-selection, and thus the Agency, by its own admission, had notice of the potential claim of retaliation, which it identifies as "inappropriate criteria":

Indeed the Agency stated:

"Please be assured that the hiring decisions in our Office are made for legitimate non-discriminatory reasons based on the needs of the Office and the individual merits of the candidates.  We have review the circumstances [Spelke's counsel's letter invoking EEO protection of October 6, 2007] of Mr. Spelke's application and determined that neither his age, his physical condition as referenced in his letter, nor any other "inappropriate criteria" were factors in his non-selection." See Def. Ex. 13.

The Agency, however cannot deny that during the Plaintiff's federal sector EEO process, that it was unaware of the Plaintiff's protected activity.  The EEO Complaint process revealed that the Plaintiff filed a formal complaint, which triggered the non-selection the very next day.  Pl. Ex. N.  Accordingly justice and fairness require that the Plaintiff be permitted to pursue a claim his claim for retaliation, where the retaliation occurred during, as a result of the formal complaint process itself, and where the discovery of this fact was not revealed to the Plaintiff until *after* the time to amend the complaint had passed.

D.    Evidence Supports a Finding of Causal Connection between the Plaintiff's Protected Activity and His Non-Selection.

The Agency disputes that there is a causal nexus between the Plaintiff's protected activity and his non-selection.  The documents speak otherwise:

Plaintiff sought EEO Counseling because the Agency would not process his application on October 28, 2005. Def. Ex. 9, Def. Undisputed Fact ¶ 8. On December 6, 2005, Kenneth Wainstain received notice Mr. Spelke filed a complaint.  Pl. Ex. N. Mr. Wainstain directed that Mr. Spelke be denied the position the very next day.  Pl. Undisputed facts 18, 19; Def. Ex. 12, 13.  That letter addressed, specifically, the claims of retaliation though the reference to the "improper criteria."  This circumstantial evidence, *standing alone*, is sufficient to sustain a violation of federal discrimination law anti-

retaliation provisions.  Indeed, it can be argued that the Plaintiff has fulfilled his *entire*

burden with this circumstantial evidence and temporal proximity between the adverse

action and protected activity.[15]

### IV.  CANCER AFFECTS A MAJOR LIFE ACTIVITY.  BEING REGARDED AS HAVING CANCER IS SUFFICIENT TO HAVE STANDING UNDER THE REHABILITATION ACT.

The Agency next contends that Mr. Spelke, as a victim of cancer in remission, is

not entitled to protection under the Rehabilitation Act because his cancer is not a

disability that affects a major life activity.  Under the ADA, the determination of whether

---

[15] The "causal nexus" of the Plaintiff's claim of discrimination is satisfied or is at minimum, a matter of disputed fact.  Temporal proximity is *often* found sufficient to establish the requisite causal connection for anti-retaliation provisions contained in federal employment laws.  Gleklen v. Democratic Congressional Campaign Committee, 199 F.3d 1365, 1367-1368 (D.C. Cir. 2000) citing King v. Preferred Technical Group, 166 F.3d 887, 893 (7th Cir. 1999); Kachmar v. Sungard Data Sys., Inc., 109 F.3d 173, 177-78 (3d Cir. 1997);  Shirley v. Chrysler First, Inc., 970 F.2d 39, 42-43 (5th Cir. 1992) Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999) (observing that one and one-half months between the protected activity and dismissal "may, by itself, establish causation").  Moreover, "[i]n the failure-to-hire context, the employer's knowledge coupled with an adverse action taken at the first opportunity satisfies the causal connection element of the prima facie case."  Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004) citing Williams v. The Nashville Network, 132 F.3d 1123, 1132 (6th Cir.1997) (finding causal connection where secretary forwarded plaintiff's applications for further consideration prior to EEOC complaint, but did not forward subsequent applications).  The causal connection component of the prima facie case may in fact be shown simply by establishing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity.  See McKenna v. Weinberger, 729 F.2d 783, 791 (D.C. Cir. 1984) (causal connection established by knowledge of employee's protected activity closely followed by adverse personnel action); Grant v. Bethlehem Steel Corp., 622 F.2d 43, 46 (2d Cir.1980)("[C]ourts have recognized that proof of causal connection can be established indirectly by showing that protected activity is followed by discriminatory treatment."); Rutherford v. American Bank of Commerce, 565 F.2d 1162, 1164 (10th Cir.1977); Mosley v. General Motors Corp., 497 F.Supp. 583, 589 (E.D.Mo.1980); Minor v. Califano, 452 F.Supp. 36, 42 (D.D.C.1978).  See e.g. Mark S. Brodin, THE DEMISE OF CIRCUMSTANTIAL PROOF IN EMPLOYMENT DISCRIMINATION LITIGATION: ST. MARY'S HONOR CENTER V. HICKS, PRETEXT, AND THE "PERSONALITY" EXCUSE, 18 Berkeley J. Emp. & Lab. L. 183, 187 (1997).

an individual currently has, has a record of, or is regarded as having a disability is made on a case-by-case basis.[16] The Agency offers no proof about Mr. Spelke's disability, and only self-serving statements by the alleged discriminatory actors that they did not regard Mr. Spelke as disabled. These statements are contradicted by the two persons who have personal knowledge of Mr. Spelke's condition, Mr. Spelke and his treating physicians. Pl. Ex. A, M, O.

A.    The Two-Steps of Proving "Disability"

Whether one suffers from a disability, and whether that disability is covered by the Rehabilitation Act of 1973, is an issue of fact which requires proof. Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 194, 122 S.Ct. 681, 690 (2002). To qualify as disabled under the ADA's definition of disability, a claimant must initially prove that he or she has a physical or mental impairment. See 42 U.S.C. § 12102(2)(A)

The test is two-fold, merely having impairment does not make one disabled for purposes of the ADA. Claimants must show that the impairment limits a major life activity.[17] The Plaintiff's cancer sufficiently impacted a variety of major life activities

---

[16] See Questions and Answers about Cancer in the Workplace and the Americans with Disabilities Act (ADA) available at http://www.eeoc.gov/facts/cancer. html#_ftnref4 (last viewed on January 16, 2007).

[17] See e.g. 42 U.S.C. § 12102(2)(A) (2006). Examples of "major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." EEOC Regulation 29 C.F.R. § 1630.2(i) (2006). The Interpretive Guidance to the regulations further notes that "other major life activities include, but are not limited to, sitting, standing, lifting, [and] reaching." 29 C.F.R. Part 1630 Appendix § 1630.2(i). The Commission has also identified "[m]ental and emotional processes such as thinking, concentrating, and interacting with others" as examples of major life activities. EEOC Compliance Manual, Vol. 2, Section 902, Definition of the Term "Disability" (March 14, 1995) ("Compliance Manual") at 902-15. Sleeping has also been recognized by the Commission and numerous courts as a major life activity. Such proof would require expert medical evidence rather than the conjecture of Agency attorneys.

and thus is a "disability" under the Rehabilitation Act.  This is apparent from his own affidavit about his condition, and from his medical records.  Pl. Ex. A, M, O.  More significantly, the Defendant has *not* proven that Mr. Spelke's cancer has *not* impacted a major life activity, which is a burden it must show since because it is not contested that Mr. Spelke has cancer. Fed. Rule Civ. Pro., Rule 56.  Thus, at this juncture, the Defendant's argument rests solely on the baseless accusation that the Plaintiff's disability of cancer does not affect any recognized major life activity.  See Motion at p. 5 citing Shelborne v.Ruynon, 1997 WL 527352 at ** 3, citing Celotex 477 U.S. at 325.

B.      Agency's Flawed Analysis of "Disability" under ADA

The Agency's "analysis" of Mr. Spelke's disability misses the mark.  In the motion, the Defendant claims "Plaintiff cannot establish that he has a physical or mental impairment which substantially limits any major life activities."  The Defendant then cites Mr. Spelke's affidavit, which claims he undergoes regular treatment including chemotherapy for his disability.  See Def. Ex. 1 at ¶ 14.  The proof simply does not match the claim.

With treatment, Plaintiff has demonstrated that he can perform the job, despite his cancer.  The Agency does not contest that the Plaintiff was unable to perform the essential functions of the job but argues instead that the Plaintiff's cancer, which was subject to repeated chemotherapy and other treatment, is not an "impairment that actually limits a major life activity" because it is being treated (successfully).  See p. 14 of Motion *compare* Pl. Ex. O.  In essence, the Defendant callously alleges that the Plaintiff's cancer

is not a disability under the ADA because Mr. Spelke has not ultimately succumbed to the terminal illness, or because he has not suffered a marked deterioration.[18]

The Defendant's position assumes, incorrectly, that a debilitating, life-threatening disease, such as cancer, does not qualify as disabled if that person is in remission due to a medical regimen.  In making this claim, the Agency's "reasons are flawed; it confuses the disease with its treatment.," Matczak v. Frankford Candy & Chocolate Co., 136 F.3d 933, 937 (3d Cir.1997).

The Agency also conflates two separate tests of qualification under the ADA into self-fulfilling conclusion.  First, the determination as to whether an individual is "disabled" is a threshold issue; if one is not disabled, then one is not protected by the ADA against discrimination. Id.  Here, the Mr. Spleke has shown he suffers from a disability, cancer.  Pl. Ex. A, M.  The second issue, which is more fact-sensitive, is whether the disability affects a major life activity.  Id.  The Agency contends that Mr. Spelke's cancer does not affect a major life activity because he is able to perform his job as an attorney.

Thus, the Agency promotes a Catch-22 analysis which would render the Rehabilitation Act a nullity.  Since Mr. Spelke is a qualified individual performing his job well, he is not substantially impaired by his cancer.  If Mr. Spelke was a poor performer due to his cancer, he would be disabled but not qualified.  As explained by the First Circuit,

---

[18] Millions of cancer victims may disagree with the concept that remission equals cure, particularly when millions die from second or third bouts of cancer years after the disease first exhibits itself.

"Were we to adopt [the Agency's] position in this case, a plaintiff would have to prove that []he is 'substantially limited' even with ameliorative medication-- and therefore possibly unable to perform some of the essential elements of the job--in order just to be covered by the ADA's protective umbrella.  The employer could avoid liability for discrimination by excluding the plaintiff from the ADA's coverage, without giving the applicant an opportunity to show that she is qualified for the job (with or without a reasonable accommodation), with ameliorative medication." Arnold v. United Parcel Service, Inc. 136 F.3d 854, 863 (1st Cir. 1998) citing Robert L. Burgdorf, Jr., *The Americans With Disabilities Act: Analysis and Implications of a Second-Generation Civil Rights Statute,* 26 Harv. C.R.-C.L. L.Rev. 413, 448 (1991) (describing this as a "Catch-22 situation").

Such a cynical reading of a proactive civil rights statute should not be coutenanced particularly when it is proffered by the Department of Justice, which seems to have abdicated its responsibility to promote and enforce the Rehabilitation Act when it comes to one of its own employees.

C.    Whether Plaintiff Was "Regarded As" Disabled is a Contested Issue of Fact

Lastly, the Plaintiff has presented sufficient information that he was "regarded as" disabled.  Pl. Ex. A, L, O.  The Defendant simply argues that the Plaintiff was not regarded as being disabled by those who participated in the interview process.  See Def. Ex. 3, 4, 5 and 6.  This is a matter that requires discovery and the crucible examination under oath by  adversarial counsel. Thus, the matter is one of contested fact – not summary judgment.

V.    **DEFENDANT FAILED TO *PROVE* WITH EVIDENCE THAT THE NON-SELECTION WAS FOR A LEGITIMATE NON-DISCRIMINATORY REASONS' FOR NON-SELECTION PLAINTIFF**

The Agency argues it has set forth its legitimate nondiscriminatory reason for not hiring Mr. Spelke, in favor of seven other, less qualified, younger, non-disabled attorneys who did not invoke the EEO process.  The argument is misses the evidentiary burden of a legitimate non discriminatory reason and is based upon incomplete and contested facts.

First, the Agency has failed to *prove* the existence of a legitimate non-discriminatory reason and a finding of a legitimate non-discriminatory reason requires the presentation of admissible proof, and the opportunity to test that proof on cross-examination. Second, the reasons proffered by the *attorney-drafted*, after-the-fact affidavits of the alleged discriminatory actors ring hollow, and only prove the pretext of the Agency's reasons for the Plaintiff's non-selection. In fact, the pretext of this decision is apparent from the circumstances of the decision, and the Agency's anemic explanation for the non-selection on December 7, 2005, which was based on no identifiable reason, except for the self-serving declaration that the reason was not unlawful. Def. Ex. 13.

A.   Agency's Fails to Meet its Evidentiary Burden

To set forth a legitimate non-discriminatory reason, the Defendant must meet his evidentiary burden: "the defendant must clearly set forth, *through the introduction of admissible evidence*, the reasons for the plaintiff's rejection." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255-6, 101 S.Ct. 1089, 1094-95 (1981) (emphasis added). "An articulation not admitted into evidence will not suffice. Thus, the defendant cannot meet its burden merely through an answer to the complaint or by argument of counsel." Id. at n. 9. The employer is "compelled" to 'produce evidence' that the adverse employment actions were taken for a nondiscriminatory reason." Aka v. Washington Hosp. Center 156 F.3d 1284, 1289 (D.C. Cir. 1998) citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507, 113 S. Ct. 2742 (1993).The evidence referenced for the Defendant's position is exclusively hearsay statements of the alleged discriminatory actors. Fed. Rule Evid, Rules 401, 802; Def. Ex. 3, 4, 5, 6.

"[T]here may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation" Burdine. 450 at 256, 101 S.Ct. 1089, 1095 at n. 10.  The standard of proof under Rule 56 motion is heightened, not lessened.  The Defendant clearly has failed to make out his case that the legitimate non-discriminatory reason is an uncontested fact by substituting its own hearsay statements in place of admissible proof.  Fed. R.Civ Pro., Rule 56.  The lack of proof is compounded by the fact that the filing of this motion has deprived the Plaintiff from conducting *any* discovery in this case.[19]  The statements of the discriminatory actors are contested, on the basis of bias and veracity, and thus insufficient as a matter of law.  Fed. Rule Civ. Pro., Rule 56.  Because the "evidence" provided by the Defendant fails to meet its burden of persuasion under the law, the Defendant's Motion necessarily fails to meet the Agency's heightened burden under a dispositive Rule 56 motion.  McKinney at 1135.

   B.  Agency's Notice of Non-Selection is Pretext

       To date, the Agency has not proffered a consistent reason for its non-selection of Mr. Spelke and, of course, the issue has not been put to proof.  The Agency filing its motion, with untested affidavits of persons accused of discrimination is designed to derail the fact finding process and have the Court engage in a mini-trial, on inadmissible evidence, on the issue of pretext.  Again this procedural gambit is improper and offensive to the procedural and substantive processes of the Court and to the rights of Mr. Spelke as litigant.  Though Plaintiff should not have to engage in a pre-discovery showing of its

---

[19] See Standard of Review and Unfair Prejudice to Plaintiff at p. 3.

proof, nevertheless, the Defendant explanation of its legitimate non-discriminatory reason for non-selection is full of holes even at this stage.

A Plaintiff may establish pre-text in one of two ways: "either directly by persuading the court that a discriminatory purpose more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence."  See Texas Department of Community Affairs v.Burdine 450 U.S. 248, 256, 101 S.Ct. 10891095 (1981).

Mr. Van Horn's explanation for the non-selection was that budgetary constraints made it impossible for them to hire Mr. Spelke during the period of Mr. Spelke's application from July 1, 2004 to December 7, 2005. Def. Ex. 4 at ¶ 8.  Linda Goldfluss, who also participated in the interview, had no idea why Mr. Spelke was non-selected and even though she claimed she did not know about his allegations, she still "doubted strongly that such discrimination occurred."  Def. Ex. 6.  Mr. Lawrence's decision regarding Mr. Spelke appears to have been based on the "equivocal" opinions of Mr. John Fischer and Ms. Mary Lou Leary, two persons who were *never* in a supervisory role over the Plaintiff.  Def. Ex. G; Pl. Ex. A.

Moreover, seven other non-disabled, under forty-year olds were hired during the time the "budgetary constraints were purportedly in place."  See Def. Undisputed Fact No. 7.  None of these persons had invoked EEO protections.  In addition, when these applicants inquired about the status of their pending application, a flurry of email correspondence was exchanged to make certain that the application "would not languish." Pl. Ex. C.

We should not lose sight that the Agency's articulated reason for the non-selection was that there were no positions available "at this time." Def. Ex. 13. Ironically a review five days earlier, on December 2, 2005, Mr. Lawrence stated that there were "still positions available at the Civil Division and that Mr. Spelke was being considered for these positions."  Pl Ex. A; Pl. Undisputed Fact ¶ 20.  Mr. Lawrence then, back-pedaling, claims the Agency did not hire Mr. Spelke because Mr. Spelke indicated to Mr. Lawrence that he wanted to travel less.  Def. Undisputed Facts ¶6.  His story changed after the complaint was filed.  But Michael J. Ryan noted during the interview of Andrea W. McBarnette, that the applicant complained about having to travel. Pl. Ex. G. McBarnette was hired within five months of her interview.  Def. Undisputed Fact ¶ 7. Mr. Lawrence then claimed his regards of Mr. Spelke were based on the "equivocal" opinions of Mr. John Fischer and Ms. Mary Lou Leary. Def. Ex. 3. Pl. Undisputed Fact, ¶ 30.  Neither Mr. John Fischer nor Ms. Mary Lou Leary were ever in a supervisory role over the Plaintiff.  Def. Ex. L.

The Agency contends that Mr. Spelke was and is qualified for the position. See Def. Ex. 4 at ¶ 25.  The Agency interviewers stated that John F. Henault, 35 years old; and Andrea W. McBarnette, 37 years; and John C. Troung, 34 years old, were not qualified for the position at the time they applied for the position.  See Def. Ex. 2; Pl. Ex. A. F, G, H, I, J.  All the Agency interviewers stated that the Plaintiff was qualified for the position at the time he applied for the position. Pl. Undisputed Fact ¶ 25.  in fact, Plaintiff was superiorly qualified. Pl. Ex. O.

C.  Improper Criteria of Age Trumps all other Criteria in Decisions to Hire

The Agency declares there is no unlawful disparity of consideration between the

seven persons hired over the Plaintiff, and that the interviewers acted blindly with respect to the Plaintiff's age.  Each applicant, however, was required to fill out a "use of controlled substance" questionnaire which identified their age and the date that they graduated from high school.  Pl Ex. H.  Further, contrary to the Agency's claims, the documentary evidence reveals that undue special emphasis was been placed on the ages of those persons who were hired.

The first line of *each and every* memoranda recommending hires for each applicant given a position enthusiastically trumpets the age of the respective applicant.  Pl. Ex. F, G, H, I, J.  For each of the successful applicants, the interviewers noted that they were under-qualified and inexperienced in areas that Mr. Spelke was not.  The determinative factor seems to therefore be the youth and vigor of the applicant not then actual experience.

For example, on March 31, 2004 the Agency interviewed John  F. Henault.  Interviewer Deputy Chief Dan Van Horn commented that Mr. Henault "applicant has little relevant substantive experience."  Interviewer Michael J. Ryan explained "I believe with time, training and experience, [Henlaut] could become an effective AUSA" and interviewer Keith V. Morgan explained "I believe he has potential." Following this interview, Chief of Staff Channing Phillips, in an April 21, 2004 memorandum, described the applicant, in the very first words, of the first line as a "**33 year old** 1995 graduate of St. Louis University" and recommended a hire to Roscoe C. Howard, United States Attorney. Pl. Ex. F (emphasis added).

On April 2, 2004, the Agency interviewed Andrea McBarnett.  Interviewer Mark Nagle explained, "[l]ike most large-firm associates, she has very little in-court experience

or other first-chair experience." Interviewer Deputy Chief Dan Van Horn explained, "[a]lthough she has very good experience with the process of litigation, she has little if any substantive knowledge of the areas in which the Civil Division most commonly practice. Thus, if hired, she would face a steep learning curve at first." Interviewer Michael J. Ryan explained, "[h]er hands-on litigation experienced is limited and she seek an AUSA position to change that deficit." She also complained about having to travel at her current job. Following this interview, Chief of Staff Channing Phillips, in an April 16, 2004 memorandum described the applicant in the very first words, of the first line as a "**35-year-old** 1992 graduate of Stanford University" and recommended a hire to Roscoe C. Howard, United States Attorney. Pl. Ex. G (emphasis added).

On July 13, 2004 the Agency interviewed applicant Mercedeh Momeni. She was interviewed over the course of multiple days by multiple interviewers. On July 13, 2004 she was interviewed by Deputy Chief Dan Van Horn. On July 14, 2004, she was interviewed by Brian Sonfield and Peter Uhmberg. Applicant Momeni interviewed with Keith V. Morgan on July 16, 2004. There was no memorandum on file to the United States Attorney recommending Ms. Momeni for hire. See Pl. Ex. H. Mercedeh Momeni (37 years old) Def. Undisputed Facts ¶ 7; Pl. Ex. A.

On September 21, 2004, the Agency interviewed with Benton G. Peterson. The one interviewer, who was anonymous, attempted to rate Mr. Peterson on a scale *above* the scale provided on the AUSA Application Form (10/01). The other two interviewers, Michael J. Ryan and Deputy Chief Daniel Van Horn, made strong recommendation for hire. Key to all interviewers was Mr. Peterson's prior experience in the Civil Division. Chief of Staff Channing Phillips, in a November 30, 2004 memorandum described the

applicant in the very first words, of the first line as a "**33-year-old** 1992 graduate of
Marquette University" and recommended a hire to Roscoe C. Howard, United States
Attorney.  Pl. Ex. I (emphasis added).

On September 17, 2004, the Agency interviewed with John C. Troung.
Interviewer Lawrence explained, "[a]lthough his pertinent practice experience is not
generally in our area (antitrust for example), his intelligence and enthusiasm for our
office would enable him to be effective very quickly."  Pl. Ex. J.  Interviewer Brian
Sonfield explained, "I do not believe he is as strong a candidate as some of the other
applicants who have interviewed this week.  He does not have any trial experience, and
his civil litigation experience – focused on antitrust and corporate litigation – is not
directly applicable to our practice."  Id. An anonymous interviewer wrote, "he has no
handled matters independently as would be expected of him in the Civil Division.  Peter
Blumber reported, that Mr. Troung "matched others interviewed."  Id.  Following this
interview, Chief of Staff Channing Phillips, in a December 4, 2004 memorandum
described the applicant in the very first line as a "**34-year-old** 1993 graduate of the
University of Southern California." and recommended a hire to Roscoe C. Howard,
United States Attorney. See Pl. Ex. J (emphasis added).

It is clear from the Agency's own internal records that inexperience of the
applicants rates secondary as to the qualification of youth.  This is because, as Mr.
Lawrence stated to EEO Investigator Olga McLean, the Division wants young lawyers,
so Mr. Lawrence could "bring on board someone he could teach." Pl. Ex. A at p. 5; Pl.
Undisputed Fact ¶ 24.  This is quintessentially an example where the Agency sought less
experienced candidates, and championed their youth as a super-superior, non-quantifiable

qualification that trumps direct and relevant experience.  This conduct violates the law, and goes against the very *thrust* of the ADEA.[20]

The purpose of the ADEA is predicated upon the congressional finding that it is in the nation's interest "to promote employment of older persons based on their ability rather than age."  ADEA at § 621(d).  This purpose, was recklessly abandoned when the Agency decided to overlook the qualified inherent with an experienced attorney, such as Mr. Spelke, in favor of the quality of "youthfulness" the Agency presumes is paramount for advocating the government's positions in court.

## CONCLUSION

Granting summary judgment at this time is improper because 1) the Motion for Summary Judgment is procedurally improper 2) there are genuine issues of fact on each of the Plaintiff's causes of action; 3) the Agency has not shown that there is *no* evidence which would be contrary to the Plaintiff's Complaint which for purpose of this motion is considered true; and 4) the evidence cited by the Agency lacks evidentiary foundation, is hearsay and is inherently unreliable because it has not been tested by discovery and/or cross examination as required for an employer to prevail on a legitimate non-discriminatory reason.  For any of these reasons, the Defendant's Motion fails.  More

---

[20] The ADEA, in its very first section declares, "(1) in the face of rising productivity and affluence, older workers find themselves disadvantaged in their efforts to retain employment, and especially to regain employment when displaced from jobs; [and] (2) the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons."  The irony here again is that the Civil Division of the USAO-DC is the government entity specifically tasked with the protection enforcement and extension of the nations Civil Rights Laws.  Depositions of the Civil Division's attorneys should prove truly revealing.

particularly, for the obvious bias and discrimination employed by the Agency against Mr.

Spelke, Mr. Spelke should be entitled to his day in court.

        Pursuant to LCvR 7(f), Plaintiff requests an Oral Hearing on this matter.

<div align="right">
Respectfully Submitted,<br>
ROBERT A. SPELKE<br>
By Counsel
</div>

WADE & BYRNES, P.C.

/s/ Kevin Byrnes_____

Kevin Byrnes, Esq.
616 North Washington Street
Alexandria, Virginia 22314
Phone: 703/836-9030
Fax: 703/683-1543
Counsel for Plaintiff

<div align="center">

**CERTIFICATE OF SERVICE**

</div>

        I hereby certify that a copy of the foregoing was hand-delivered, faxed, emailed and/or mailed postage prepaid, this 9th day of February 2007 to:

    Allen F. Loucks
    Assistant United States Attorney
    36 South Charles Street, Fourth Floor
    Baltimore, Maryland 2101

    Jill Weisssman
    Assistant General Counsel
    General Counsel's Offi9ce
    Executive Office of United States Attorneys
    501 3rd Street, N.W.
    Washington DC  20503

<div align="right">
/s/ Kevin Byrnes_____ ____<br>
Counsel
</div>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ROBERT A SPELKE,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 06-1887 (RJL)** |
| | ) |
| **ALBERTO R. GONZALES,** | ) |
| **Defendant.** | ) |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

      Pursuant to LCvR 7, Plaintiff Robert Andrew Spelke hereby files his Statement of

Material Facts Not in Dispute in support of his Opposition to the Defendant's Motion to

Dismiss, or in the Alternative, for Summary Judgment.

      1.     Robert Andrew Spelke (hereinafter "Plaintiff" or "Mr. Spelke") has over

twenty one years experience as an attorney.  <u>See</u> Def. Ex. 2; Pl. Ex. A. at p. 2, O.

      2.     Plaintiff's performance ratings have been uniformly outstanding.  Pl. Ex.

A. at p. 2, B,  O.

      3.     Mr. Spelke has suffered from multiple pheochromocytomas, a very rare

form of cancer, since he was eighteen years old.  This requires constant treatment.

Tumors appear and have been excised from his body. These tumors affect Plaintiff's

ability to hear in his left ear by 80%.  It affects the Plaintiff's speech because it causes his

voice to "rasp."  Plaintiff continues to take medication because the illness causes

dizziness and light-headedness. Pl. Ex. A, M, O. There is no cure for this cancer. <u>Id.</u>  The

following persons who were involved with the hiring process for the position during the

knew Mr. Spelke as had cancer and knew that this cancer limited Mr. Spelke's abilities:

Craig Lawrence, John Fisher, Mary Lou Leary, Channing Phillips,  Mark Nagle, Kenneth

Wainstain and Monty Wilkinson. At all times while employed as an Assistant United

States Attorney Mr. Spelke suffered from a hearing loss.  Part of that time Mr. Speke wore a visible hearing aide.  The loss of hearing and a heavy rasp in his voice are both resultant from cancerous tumors.  During Mr. Sopelke's interviews at the USAO-DC, Civil Division, he wore a "medical alert" bracelet on his right wrist.  The bracelet states on its clearly visible face that it is a "medical alert" and carried a highly visible universal symbol for the existence of medical conditions. The bracelet is specifically designed to catch the attention of the casual observer so as to alert such an observer of my medical condition in case Plaintiff should need medical treatment. Pl Ex. O.

4.      Mr. Spelke is over forty years old and was born on July 11, 1957. Pl Ex. A. at p. 1, O.

5.      The Agency deemed Mr. Spelke qualified for the position.  Acting Chief Craig Lawrence (hereinafter "Mr. Lawrence") believed that Mr. Spelke "was qualified based on his background, especially as a former AUSA here [in the Civil Division] and his education and experience after he left the office."  <u>See</u> Def. Ex. 3 at ¶ 9.

6.      Deputy Chief Dan Van Horn (hereinafter "Mr. Van Horn") believed Mr. Spelke "was and is qualified for the position."  <u>See</u> Def. Ex. 4 at ¶ 8

7.      AUSA Doris D. Coles-Huff (hereinafter "Ms. Coles Huff") believed Mr. Spelke was qualified for the position.  Def. Ex. 5

8.      AUSA Linda Goldfluss (hereinafter "Ms. Goldfluss") participated in the interview, had no idea why Mr. Spelke was not selected for the position.  Ms. Goldfluss claimed she did not know about Mr. Spelke's EEO allegations.  Def. Ex. 6

9.      The Civil Division hires attorneys on a "rolling" basis.  <u>See</u> Pl. Ex. A at ¶6; C at p. 4 (Questionnaire of Robert Montague Wilkinson, March 8, 2006); O.

10.    Mr. Spelke submitted an application in July 16, 2004. Def. Ex. 4 at ¶ 4; Pl. Ex. O.

11.    Openings at the Civil Division are not infrequent.  Pl. Ex. A; O; Def . Ex. 3. at p. 2.

12.    During the time when Mr. Spelke's application was pending, seven other persons were accepted for the position.  See Def. Undisputed Fact No. 7.

13.    The process of Mr. Spelke's application started on July 16, 2004 and ended on December 7, 2005, the date he was non-selected.  Pl. Ex. A, O; Def. Ex. 4 at ¶ 4.

14.    On August 1, 2005, Mr. Spelke wrote United States Attorney Kenneth L. Wainstein (hereinafter "Mr. Wainstain") asking about the status of his application. Pl. Ex. A.

15.    On October 6, 2005, Mr. Spleke attorney wrote another letter to Mr. Wainstein which too went unanswered for months. Def. Ex. 12.

16.    The only time the Mr. Spelke ever heard any response about his application filed was on December 7, 2005, where the Agency stated that it had denied Mr. Spelke's application because there were no openings "at this time."  Def. Ex. 12, 13; Pl. Ex. A.

17.    Other applicants for the position received feed-back when asked about the status of their application. Pl. Ex. C.

18.    On December 6, 2005, less than twenty four hours before issuing the non-selection letter to the Plaintiff, Mr. Wainstain received notice of Mr. Spelke's EEO

complaint from Agency's EEO Office. Pl Ex. N. Mr. Wainstain directed the response and the contents of the response of December 7, 2005. Def. Ex. 12, 13.

19.    The Agency on December 7, 2005, disputed Mr. Spelke's claim of October 6, 2005 that his application was not being processed on the basis of his Spelke's age (7/11/1957), his physical disability (cancer) and/or perceived disability (cancer). See Def. Ex. 1, 12, 13. The Agency did not offer any reason for the denial of Mr. Spelke's application other than there were no openings "at this time." Id.

20.    On December 2, 2005, Mr. Lawrence was interviewed over the telephone by Olga MacLean wherein he stated that there were "still positions available at the Civil Division and that Mr. Spelke was being considered for these positions." Pl. Ex. A.

21.    Mr. Spelke filed his complaint of discrimination on December 21, 2005. Def. Ex. 15. Mr. Spelke initiated the EEO process in October 2005. Mr. Spelke's Complaint was accepted on December 6, 2006. Pl. Ex. A, N. The final decision on Mr. Spelke's application occurred over eighteen months after he submitted his application for the position on December 7, 2005. See Def. Undisputed Fact ¶ 5 and Def. Ex. 13; Pl. Ex. A, O.

22.    During this time, there were seven Assistant United States attorneys hired into the Civil Division:

(a) John F. Henault, 35 years old;

(b) Andrea W. McBarnette, 37 years old;

(c) Mercedeh Momeni, 37 years old;

(d) John C. Truong, 35 years old;

(e) Benton Peterson, 36 years old;

(f) Megan Rose, 28 years old; and

(g) Kathleen Konopka, 35 years old.

Without exception, each of these hires was 1) under forty years old; and 2) not disabled or regarded as disabled, and 2) had never engaged in protected EEO activity.  Pl. Ex. A at p. 3., . D at Section 3; Def. Ex. 3 at ¶ 13.

23.     The following persons were hired at the following times during the time Mr. Spelkes application was pending, and his questions regarding his application went unanswered

(a) John F. Henault, 35 years old, entered on September 7, 2004;

(b) Andrea W. McBarnette, 37 years old, entered on September 7, 2004;

(c) Mercedeh Momeni, 37 years old entered on March 20, 2005;

(d) John C. Truong, 35 years old, entered on April 17, 2005;

(e) Benton Peterson, 36 years old, entered on May 1, 2005;

(f) Megan Rose, 28 years old, entered on July 10, 2005; and

(f) Kathleen Konopka, 35 years old; entered on August 21, 2005.  Id. see also Def. Undisputed Facts ¶ 7.

24.     Mr. Lawrence indicated to EEO Investigator Olga McLean that he wanted "to bring on board someone he could teach." Pl. Ex. A at p. 5.

25.     Mr. Spelke was and is qualified for the position. Pl. Ex. A, O. All the Agency interviewers stated that the Plaintiff was qualified for the position at the time he applied for the position.  Def. Ex. 3, 4, 5, 6.

26.     The Agency interviewers stated that John F. Henault, 35 years old; and Andrea W. McBarnette, 37 years; and John C. Troung, 34 years old, were not qualified for the position at the time they applied for the position.  Pl. Ex. F, G, J.

27.     During the interview process the Agency required, received and reviewed information about each applicant and when they graduated from high school. Pl. Ex. E.

28.     For each of the successful applicants, the interviewers noted that they were under-qualified and inexperienced in areas of litigation and trial experience, areas in which Mr. Spelke have over twenty years of relevant experience, and ten years of direct experience.  Def. Undisputed Facts ¶ 7; Def. Ex. 2; Pl. Ex. A. F, G, H, I, J,O.

29.     The Agency refused to provide a copy of the application and interview materials for Megan Rose, 28 years old, and Kathleen Konopka, 35 years old when it produced other applications to Plaintiff's counsel on December 20, 2006.  Pl. Ex. K.

30.     Michael J. Ryan (hereinafter "Mr. Ryan") noted during the interview of Andrea W. McBarnette, that the applicant complained about having to travel. Pl. Ex. G. McBarnette was hired within five months of her interview.  Def. Undisputed Fact ¶ 7. Agency contends Mr. Spelke was not hired because he did not like to travel.

31.     Mr. Lawrence's claims regarding Mr. Spelke were based on the "equivocal" opinions of John Fischer and Mary Lou Leary. Def. Ex. 3.

32.     Neither Mr. Fischer Ms. Leary supervised Mr. Spelke.  Neither ever had a supervisory role over the Plaintiff.  Def. Ex. L.

Respectfully Submitted,
ROBERT A. SPELKE
By Counsel

WADE & BYRNES, P.C.

/s/ Kevin Byrnes
Kevin Byrnes, Esq.
616 North Washington Street
Alexandria, Virginia 22314
Phone: 703/836-9030
Fax: 703/683-1543
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was hand-delivered, faxed, emailed and/or mailed postage prepaid, this 9th day of February 2007 to:

Allen F. Loucks
Assistant United States Attorney
36 South Charles Street, Fourth Floor
Baltimore, Maryland 2101

Jill Weisssman
Assistant General Counsel
General Counsel's Offi9ce
Executive Office of United States Attorneys
501 3rd Street, N.W.
Washington DC 20503

/s/ Kevin Byrnes
Counsel

Plaintiff's Exhibit A

# DECLARATION OF ROBERT ANDREW SPELKE
## COMPLAINT OF DISCRIMINATION
### AGENCY NO. USA-2006-00075 (EH)

As a preliminary matter, I preserve all rights accorded to me under 29 CFR 1614, et. seq. (Governing investigations into allegations of discrimination in the federal workplace). And I submit the following responses to the investigator assigned by the Agency. These answers are based on information known to me at the present time. I reserve the right to amend such answers and supplement them as additional facts become known.

Preliminary Questions:

1.  What is your full name?

    Robert Andrew Spelke

2.  What is your age and date of birth?

    Age 48   Date of Birth: July 15, 1957

3.  What is your position title and grade?

    Position and title: Trial Attorney, Narcotics and Dangerous Drugs Section (NDDS), Criminal Division, U.S. Department of Justice.
    Grade: GS 15-Step 8

4.  What are your job duties?
    Investigate and prosecute international narcotics traffickers in the U.S. District Courts either in conjunction with or independent of the various U.S. Attorney's Offices (e.g., where the local U.S. Attorney's Office must recuse itself). Thus I perform the similar essential functions to those required by Assistant U.S. Attorney's.

5.  Who is your supervisor?
    Presently my supervisors are Glenn Alexander and Thomas Padden.

Accepted Issue:

6.  Do you contend that the United States Attorney's Office for the District of Columbia (USAO-DC) had one or more Assistant United States Attorney (USAO) positions in its Civil Division which were vacant and available to be filled at any time during the period July 1, 2004 thru December 7, 2005? If so, please identify all such vacancies, when they became available, and all facts which support your contention.



Initial                              Page 1 of 6

Declaration of Robert Andrew Speike
Agency No. USA-2006-00075 (HH)

Based on my information and belief, the USAO had at least four positions open during the time in question. The USAO hires AUSAs on a "rolling" basis, that is as the need arises. Given the sheer size of the USAO in the District of Columbia openings are not infrequent. During this time period, the USAO hired at least four individuals as AUSAs in the Civil Division. On December 3, 2005, Acting Chief Craig Lawrence was interviewed over the telephone by Investigator Olga MacLean and stated that there were still positions available at the USAO-DC Civil Division and I was still being considered for an AUSA position with the Civil Division.

7.  How did you become aware of each position identified in your response to Question 6 above?

From individuals in the U.S. Attorney's Office.

8.  Did you submit any application(s) during the period July 1, 2004, thru December 7, 2005, for any position(s) identified in your response to Question 6, above? If so, please identify the number in which you applied, the date(s) of your application(s), and all other facts which support your contention.

On July 2, 2004, I submitted a formal application by mail for a position with the USAO-DC with a copy of my resume. I was interviewed for the position on July 15, 2004. On at least one occasion, date unknown, I personally visited Acting Chief Craig Lawrence to confirm my interest in returning to the USAO-DC. After no response, on August 1, 2005, I wrote a letter to United States Attorney Ken Weinstein asking for the status of my application. After receiving no response, on October 4, 2005, my attorney, Kevin Byrnes, wrote another letter to United States Attorney Weinstein again asking for the status of my application. On December 7, 2005, a letter was received by my attorney denying my application for an AUSA position with the Civil Division, without explanation as to a reason or justification. The denial appeared to be prospective as well.

9.  Please state all facts which support your contention that you were qualified for any Civil Division AUSA position identified in your response to Question 8 above.

I have twenty-one years experience with the Department of Justice, including ten years with the USAO-DC. My performance ratings have been uniformly outstanding. I have litigated hundreds of matters in federal court and have ample experience in the analysis of federal cases and in their presentation to courts and juries. I am familiar with both DC Superior Court and federal judges in the District of Columbia. A resume and my last performance appraisal are attached.



Initials _____                                    Page 2 of 6

Declaration of Robert Andrew Spelke
Agency No. USA-2006-00075 (HH)

10. Describe the selection process you were required to undergo, including any interviews, dates of interviews and any comments made by management related to your qualifications, age, and/or any physical or mental impairments. Please identify all interviewers and who, if anyone, you observed making notes.

As noted above, I was interviewed on July 16, 2004. The interviewers were Acting Chief Craig Lawrence, Deputy Chief Dan Van Horn, Deputy Chief Dana Coles-Huff and AUSA Lisa Goldfuss. I believe that Ms. Coles-Huff and Ms. Goldfuss took notes. I have not seen those notes.

On information and belief, the interviewers asked questions of my former supervisors. I am uncertain of the information they obtained but it was widely known in the USAO-DC office that I had had cancer while an Assistant U.S. Attorney.

11. In response to any application identified in your response to Question 8, above, did the USAO-DC specifically decline to offer you a position or otherwise reject your application? If so, please state all facts which support that contention.

As noted above, the USAO-DC wrote a letter to my attorney, Kevin Byrnes, dated December 7, 2005, declining my application. This was the only correspondence received from the USAO-DC in the year and a half my application was pending. The December 7, 2005, letter is attached to this declaration.

12. Please identify any person(s) who were selected for any position(s) identified in your response to Question 6 above? For each such person, please state, to the best of your knowledge, that person's age, whether the person has any physical or mental impairment, and all other facts which support your contention.

According to Mr. Monty Wilkinson, Executive Assistant United States Attorney for Management, USAO-DC, the following individuals were hired between July 2004 and December 2, 2005 for the position of AUSA in the Civil Division:

John F. Henault - 35 years old
Andrea W. McBarnette - 37 years old
Meredeth Momeni - 37 years old
John C. Truong - 35 years old
Benton Peterson - 36 years old
Megan Rose - 28 years old
Kathleen Konopka - 35 years old

I do not know of any actual or perceived physical or mental disabilities for any of these



initial                                           Page 3 of 6

individuals.

13. Please state all facts upon which you rely in contending that you have an actual or perceived physical or mental impairment?

At the age of eighteen continuing until the present I have battled multiple pheochromocytomas. This is a very rare form of cancer. Specifically, tumors have been located in my stomach, neck, skull, liver, just outside the liver, chest and abdomen. Treatment for these various tumors included various surgeries, chemotherapy and radiation. Diagnosis entails repeated nuclear scans, X-rays and fluid examination.

14. For any impairment identified in your response to number 13 above, state whether such impairment substantially limits one or more of your major life activities, such as seeing, hearing, breathing, speaking, walking, caring for yourself, eating, thinking, learning, sleeping, reproducing, or working, please identify any such affected activities, the manner in which those activities are affected, and any other facts supporting your contention.

Hearing - a tumor and radiation in the left side of my skull has limited hearing in my left ear by approximately 80%.

Speech - a tumor in my chest as caused paralysis of one vocal cord causing a "rasp" in my voice.

Reproducing - Chemotherapy resulted in temporary sterilization.

The tumors secret epinephrine, a hormone that raises the blood pressure. I have been on medication to suppress the high blood pressure which sometimes causes light-headiness and dizzy spells.

15. Please state all facts upon which you rely in contending that the USAO-DC was aware of any impairment identified in your response to Question 13 above.

During my ten year tenure as an AUSA at the USAO-DC, I underwent numerous medical testing and ten months of chemotherapy for my cancer. Accordingly, the USAO-DC was well aware of my cancer, treatment and the need for continued maintenance and diagnostic care.

16. Please state the <u>complete</u> factual basis for your claim that the USAO-DC discriminated against you on the basis of an actual or perceived disability.

The factual basis currently known to me, although I, of course, have not had the opportunity to conduct discovery or cross-examine witnesses is as follows; the USAO-DC either perceives my continuing battle with cancer as a disability, or is using this disability either

Initial RAS

Declaration of Robert Andrew Spehe
Agency No. USA-2006-00675 (HHS)

separately or in combination with my age to refuse to hire me despite the fact that I have more experience than the other candidate who they have hired during this period. It appears the USAO-DC Civil Division feels it cannot or does not want to provide the limited accommodations necessary for my treatment and testing. When I was previously employed with the USAO-DC, I underwent chemotherapy. Because of this, I needed to be taken from a trial position. My belief is that the USAO fears my physical impairment will prohibit me from holding a position. Given my ability to complete my current position, which involves equal or greater responsibilities and travel, this fear is unrealistic and not based on my current medical or physical condition.

17.  Please state the complete factual basis for your claim that the USAO-DC discriminated against you on the basis of your age.

The individuals hired instead of me are all under 40 years of age and each have less government and litigation experience than I. In addition, Acting Chief Craig Lawrence indicated to Investigator Olga McLean, that he wanted "to bring on board someone he could teach". The only explanation for this statement is that older, more experienced individuals can not be taught.

18.  Please identify all neutral, non-management, or other witnesses who might have relevant information regarding the allegations raised in your complaint.

I am unaware of such persons at this time, save for those individuals who informed me regarding openings and the selection of AUSA's at the USAO-DC.

19.  Please state any other information you believe is relevant to or otherwise supports any of your contentions.

Without the benefit of discovery I have none at this time.

20.  Please state with specificity, the remedy you are requesting to resolve your complaint.

A position with the USAO-DC, Civil Division subject to an agreement not to further discriminate and reasonable attorney fees.



Initial ____     Page 5 of 6

Declaration of Robert Andrew Spelke
Agency No. USA-2006-00975 (HII)

PURSUANT TO 28 U.S.C. SECTION 1746:

I, Robert Andrew Spelke, declare under penalty of perjury that the foregoing responses, including those contained in any attached or corresponding Continuation Sheet(s), are true and correct and I give this statement under the presumption that all other persons who are knowledgeable in this case will also provide their statements under oath.

MAR - 3 2006
_____
DATE

_____
ROBERT ANDREW SPELKE

Initial [signature]                    Page 6 of 6

Plaintiff's Exhibit B

U.S. DEPARTMENT OF JUSTICE

Criminal Division

**Performance Appraisal Record**

Form 421 (2004)

DISCLOSURE STATEMENT: This information is personal. It must be appropriately safeguarded from improper disclosure.

## PART A. EMPLOYEE DATA

| Name of Employee: Robert Spelke | SSN: |
| Position Title: | Pay Plan/Series/Grade |
| Trial Attorney | GS - 905 - 15 |
| Section/Office: NDDS | |
| Rating Period (from/to): December 1, 2004 through March 31, 2005 | |

## PART B. PERFORMANCE WORK PLAN (Rating and reviewing official signatures document review and approval of the work. The employee signature documents that he/she has received a copy of the work plan.)

| Employee's Signature | Rating Official's Signature | Reviewing Official's Signature |
|---|---|---|
| *[signature]* | *[signature]* | *[signature]* |
| Date: 11-30-04 | Date: 11-30-04 | Date: 11-30-04 |

This work plan describes performance expectations for Criminal Division Non-SES employees. Please refer to the Criminal Division Performance Appraisal Program for US Employees dated October 1, 2004 for a complete description of the Division's program.

An employee's signature on this work plan cover sheet acknowledges receipt. Any concerns, questions, or suggestions about the work plan should be discussed with the supervisor.

The performance standards in this work plan describe performance at the "Successful" level. Failure to meet the standard in any bulleted item may be the basis for failure of the entire element. The employee is expected to perform as described on a consistent, routine or usual basis. Perfection is not expected and circumstances will be taken into account in assessing performance.

Rating Levels

OUTSTANDING: The employee's work significantly exceeds on a regular basis the performance standards of this work plan (appropriate for the employee's grade level).

SUCCESSFUL: The employee's work consistently meets and/or certain/on exceeds the performance standards of this work plan (appropriate for the employee's grade level).

UNSUCCESSFUL: The quantity, quality, and/or timeliness of the employee's work and/or manner in which the employee performs that work fails to meet the standards.

NOTE: If the employee's performance is "Unacceptable" in one or more elements at any time during the appraisal cycle, the supervisor should contact the Human Resources Management Unit.

## PART C. PROGRESS REVIEW (Signatures document a discussion of employee's performance.)

| Employee's Signature | Rating Official's Signature | Date |
|---|---|---|
| | | |

NOTE: For rated elements, place an "X" in the appropriate column. If there is insufficient data to rate an employee for an element, mark "N/A" in the "Successful" column.

PART B. INDIVIDUAL RATING ELEMENTS

Performance Element 1: Accountability for Organizational Results

Performance Standards: Successful Level

- Written and oral presentations are timely, concise, clearly communicate the intended message, and are factually/legally accurate, logically ordered, and substantially free of grammar and syntax errors
- The extent and depth of treatment and style and tone are appropriate to the scope of the assignment and to the intended audience
- Arguments/conclusions are fully supported and all significant issues (e.g. policy, constitutional, statutory, regulatory, treaty, procedural and case law), are analyzed and effectively addressed
- Written products are in compliance with Court, Department, Division and office policy/procedures. Substantive revisions needed are equally minor and result primarily from policy issues not communicated to the writer
- Anticipates likely questions and maintains composure, and demonstrates responsiveness when faced with unexpected and difficult situations
- Independently handles the volume and complexity of assignments consistent with the employee's grade level
- Uses sound judgment in determining which issues should be brought to the supervisor's attention and when.
- Participates in discussions, hearings and other proceedings as necessary.
- Manages Litigation/Investigations/Programs efficiently and effectively (e.g., witness use and preparation; rules of procedure and evidence; and court deadlines)

Links:

1. Department of Justice Strategic Plan (FY 2003 - FY 2008):

   DOJ Strategic Goal 1: Prevent Terrorism and Promote the Nation's Security
   Objectives:   1.1   Prevent, disrupt, and defeat terrorist operations before they occur
                 1.2   Investigate and prosecute those who have committed, or intend to commit
                       terrorist acts in the United States

   DOJ Strategic Goal 2: Enforce Federal Laws and Represent the Rights and Interests of the American people
   Objectives    2.1   Reduce the threat, incidence, and prevalence of violent crime
                 2.2   Reduce the threat, trafficking, use, and related violence of illegal drugs.
                 2.3   Combat white collar crime, economic crime, and cybercrime
                 2.5   Enforce federal statutes, uphold the rule of law, and vigorously represent the interests of the United
                       States in all matters for which the Department has jurisdiction

   DOJ Strategic Goal 3: Assist State, Local, and Tribal [and Foreign] Efforts to Prevent or Reduce Crime and Violence
   Objective:    3.1   Improve the crime fighting and criminal justice system capabilities of state, tribal, and local [and
                       foreign] governments.

   DOJ Strategic Goal 4: Ensure the Fair and Efficient Operation of the Federal Justice System
   Objective:    4.2   Ensure the apprehension of fugitives from justice

2. Attorney General's Management Goals:
   Coordinate Internal and External Communications and Outreach
   Improve Communications with Foreign Governments

| No. | Goals |
|-----|-------|
| 1 | Supports the Narcotic and Dangerous Drug Section's efforts to facilitate and conduct investigations and prosecutions of international terrorist and narcotics trafficking groups, to include reducing money laundering.  Support the Section's efforts [to ensure that] the international narcotics trafficking cases are conducted against those organizations having the greatest negative impact in the U.S. and that these matters, when appropriate, are coordinated with State Department, National Security Council, U.S. Attorney's Offices and state and local governments. 1.1, 2.2, 2.3, 4.2 |
| 2 | Supports the Narcotic and Dangerous Drug Section's efforts to ensure the smooth and effective coordination of major, multi-jurisdictional investigations against narcotics trafficking and money laundering organizations through attorney participation at the Special Operations Division (including special project areas) and the work of the NDDS attorney team. Works to resolve inter-office and agency disputes, with respect to ongoing cases. 2.1, 2.2, 2.3, 3.1 |
| | Supports the Narcotic and Dangerous Drug Section's efforts to provide advice to DEA on criminal prosecution issues |
| | Supports the Narcotic and Dangerous Drug Section's efforts to provide advice to the OCDETF Program |

Employee's Accomplishments:

Rating:

☒ Outstanding          ☐ Successful          ☐ Unacceptable

Rating Official's Comments:



**Performance Element 2: Accountability for People/Workforce**

**Performance Standards: Successful Level**

- Interacts with superiors, co-workers, and support staff in a courteous and constructive manner. Extends the same positive attitude to other Department and Government employees.
- Demonstrates commitment to the collaborative process and assesses, plans, and completes work dependably and effectively.
- Maintains professional ability by keeping current with pertinent legal and professional developments and participating in appropriate continuing legal education.
- Demonstrates knowledge of the professional rules of conduct requirements in the employee's State of licensing and any other professional rules of conduct that the employee may be subject to.
- Is familiar with and activities are handled in compliance with applicable professional standards, Section, Division and Department policies and procedures, including Standards of Conduct, ethics requirements, and Merit System Principles.
- Interactions foster a work environment free from unlawful discrimination and harassment.

I. Department of Justice Strategic Plan (FY 2003 - FY 2008):
    DOJ Strategic Goal 2:  Enforce Federal Laws and Represent the Rights and Interests of the American people
        Objective:    2.1    Reduce the threat, incidence, and prevalence of violent crime
                    2.2    Reduce the threat, trafficking, use, and related violence of illegal drugs
                    2.3    Combat white collar crime, economic crime, and cybercrime
    DOJ Strategic Goal 3: Assist State, Local, and Tribal [and Foreign] Efforts to Prevent or Reduce Crime and Violence
        Objective:    3.1    Improve the crime fighting and criminal justice system capabilities of state, tribal, and local [and foreign] governments
    DOJ Strategic Goal  4:    Ensure the Fair and Efficient Operation of the Federal Justice System
        Objective:    4.2    Ensure the apprehension of fugitives from justice

II. The Attorney General's Management Goals:
    Streamline, Eliminate or Consolidate Duplicative Functions
    Strengthen Hiring, Training and Diversity Policies

III. DOJ Human Capital Strategic Plan (September 2002):
    Goal 1:  Design an effective organization and workforce that aligns with the overall DOJ mission
    Goal 3:  Reduce skill gaps through recruitment, training, and succession planning
    Goal 5:  Develop an organization culture that clearly identifies and communicates performance expectations to employees, reports and measures results, and provides incentives and developmental training.

| No. | Goals |
|---|---|
| 1. | Supports the Narcotic and Dangerous Drug Section's efforts to improve workforce competencies by<br>- identifying operational and procedural issues that impede performance and implementing changes within own sphere and making suggestions to supervisor for improvements with wider application<br>- being available for consultation at all reasonable times;<br>- striving to improve skills; volunteering to learn new office functions/equipment;<br>- participating in training recommended by supervisor;<br>- participating in cross-training to enhance staff capability when employees with primary responsibilities are away from the office; and<br>- considering Division priorities and workload in planning and scheduling |
| 2. | Supports the Narcotic and Dangerous Drug Section's EEO principles of fairness and equity and promotes diversity by<br>- fostering a collegial work environment, and<br>- participating in mentoring new employees |
| 3. | Supports the Narcotic and Dangerous Drug Section's efforts to improve communication, teamwork and partnerships between employees and collaborating organizations by<br>- consulting with supervisor on major problems and issues, and keeping supervisor informed on work status, advising supervisor when available for new assignments;<br>- demonstrating an ability to effectively communicate, team and partner with fellow employees and collaborating organizations (USAOs, DOJ components, and other Federal agencies, etc.) |

4.  Supports the Narcotic and Dangerous Drug Section's efforts to implement effective conflict resolution mechanisms to resolve personnel and organizational issues by
    * responding positively to constructive criticism.

Supports the Narcotic and Dangerous Drug Section's requirement of personal and professional integrity by
    * complying with Standards of Conduct, ethics requirements and Merit System Principles.

**Employee's Accomplishments:**

**Rating:**

☒ Outstanding          ☐ Successful          ☐ Unacceptable

**Rating Official's Comments:**

Performance Element 5:  Accountability for Taxpayer Value.

Performance Standards:  Successful Level

Safeguards government material, financial and personnel resources from unauthorized use of disposition.
* Adheres to laws, regulations, and Department security requirements and policies regarding the use, handling, and protection of sensitive and classified information.
* Ensures the proper and appropriate use of telecommunications and other government-issued equipment.
* Ensures that procurement and contracting actions are best-value and meet requirements.
* Timely and correctly prepares appropriate travel, leave requests, time sheets, and other administrative reports and tasks

Links:

I.   Department of Justice Strategic Plan (FYs 2003-2008).
     DOJ Strategic Goal   2:  Enforce Federal Laws and Represent the Rights and Interests of the American People.
         Objectives:    2.5  Enforce federal statutes, uphold the rule of law, and vigorously represent the
                             interests of the United States in all matters for which the Department has jurisdiction

II.  President's Management Agenda:
     Expanded Electronic Management
     Budget and Performance Integration

III. AG Goals and Management Initiatives to meet Organization's Mission (11-8-01 AG Memorandum)
     Goal 8.   Improve Department-wide financial performance;
     Goal 10.  Utilize technology to improve government.

| No. | Goals |
|-----|-------|
| 1. | Complies with safeguards to ensure that resources are used effectively and appropriately in support of official business by adhering to all financial, budget, procurement, facilities, and real property policies and procedures. |
| 2. | Complies with laws, regulations and policies on the use of telecommunications and other government issued equipment, including PCs, laptops, blackberrys and cell phones. |
| 3. | Complies with all security policies and procedures. |
| 4. | Complies with all policies and procedures relating to the proper use of organizational credit cards, authorizations, and government travel and training.   Requests for funds are made before expenditure, and are properly justified.  Maintains complete and accurate records of expenses and expenditures. |

Employee's Accomplishments:

Rating:

    ☒ Outstanding        ☐ Successful        ☐ Unacceptable

Rating Official's Comments:



PART G. APPRAISAL TYPE AND RATING

| | ☒ Annual | ☐ Interim |

NOTE: For rated elements, place an "X" in the appropriate column. If there is insufficient data to rate an employee for an element, mark "N/A" in the "Successful" column.

| | Performance Elements | Outstanding | Successful | Unacceptable |
|---|---|---|---|---|
| 1 | Accountability for Organizational Results | X | | |
| 2 | Accountability for People/Workforce | X | | |
| 3 | Accountability for Taxpayer Value | | X | |

| OVERALL RATING: | ☒ Outstanding | ☐ Successful | ☐ Unacceptable |

Overall Rating Official's Comments:  SEE ATTACHED

Overall Reviewing Official's Comments:

PART H. SIGNATURES DOCUMENTING OFFICIAL RATING

| Rating Official's Signature | Reviewing Official's Signature | Employee's Signature |
|---|---|---|
| | Thomas W. Rubion | Robert A. Steele |
| Date: 9/29/03 | Date: 9/29/03 | Date: 10/5/03 |

NOTE: The employee signature on this form is simply an acknowledgment of receipt, and does not affect the right to file a grievance. Employees are responsible for contacting the Human Resource Management Unit for specific procedures for filing a grievance. Any grievance must be filed in writing within 15 days of receipt of the rating.



**Robert A. Speike - PE1/O, PE2/O, PE3/E, Overall/O**

During this rating period Mr. Speike performed in an outstanding manner, successfully prosecuting a complex, international MDMA conspiracy trial in the Southern District of Texas, while handling a variety of complex international investigations and prosecutions. Moreover, Mr. Speike emerged as a leader among the NDDS trial attorneys, offering the benefit of his experience in the District of Columbia, along with sound tactical advice, and hands-on assistance where needed. In the *Kafferberg* case, Mr. Speike "rescued" the government's case after two prior prosecutors had proven themselves incapable of organizing and incorporating the hundreds of items of evidence into a cohesive trial strategy. After nearly two years of concentrated efforts, and after obtaining responses to foreign requests for legal assistance, Mr. Speike presented a case that resulted in guilty pleas from all but one defendant -- and a verdict of guilty against the lone hold out who demanded trial. The U.S. Attorney's Office for the Southern District of Texas offered high praise of Mr. Speike's organizational and advocacy skills. The case also demonstrated Mr. Speike's ability to work well with others in extremely stressful situations. Immediately following the successful conclusion of the *Kafferberg* case, Mr. Speike agreed to take on the investigation and prosecution of a violent New Orleans drug trafficking organization after the U.S. Attorney's Office for the Eastern District of Louisiana had recused itself from the case. Working closely with a skilled team of DEA investigators, Mr. Speike obtained authorization to conduct electronic surveillance of one trafficker's cellular telephone. Intercepted phone conversations revealed the existence of a murder for hire plot and Mr. Speike and the investigators quickly moved to disrupt the plot and arrest the conspirators. Subsequently, Mr. Speike obtained an indictment against a total of 14 defendants in the case on a variety of drug-related charges, including one count of attempted murder. Mr. Speike is a prosecutor's prosecutor. He is aggressive, but fair, and generous with his assistance to more senior attorneys. He is also an accomplished teacher in more formal settings, having taught witness preparation as part of the Basic Narcotics Seminar at the National Advocacy Center and assisted in the training of chemists at DEA's Quantico Training Academy.





Plaintiff's Exhibit C

Pickett, Jeannette

**From:** Taylor, Thomas (EOUSA)
**Sent:** Friday, November 21, 2003 8:45 AM
**To:** Pickett, Jeannette; Markey, Debbie
**Subject:** RE: an applicant's question



Taylor, Thomas
(EOUSA).vcf

Thank you both!

Office of the Director
Executive Office for United States Attorneys

-----Original Message-----
From: Pickett, Jeannette
Sent: Friday, November 21, 2003 8:39 AM
To: Taylor, Thomas (EOUSA)
Subject: RE: an applicant's question

By the way, I just spoke to ▓▓▓▓ and requested additional documents. She indicated she was out of the country most of September and the mail piled up, although she has no recollection of receiving our letter. She will be completing her file early next week.

-----Original Message-----
From: Pickett, Jeannette
Sent: Friday, November 21, 2003 8:27 AM
To: Taylor, Thomas (EOUSA)
Cc: Markey, Debbie
Subject: RE: an applicant's question

Tom,

▓▓▓▓▓▓▓ application was received on September 4, 2003. We opened a file and mailed an acknowledgment letter to him on September 9, 2003, requesting that he complete his application by submitting a writing sample and official transcript. As of yesterday, we have not received the requested documents. Until he sends in those items, his file languishes. If he's inquiring through you, you might want to advise him that I'll be taking a look at those files soon and closing out those who haven't responded.

Jeannette

-----Original Message-----
From: Markey, Debbie
Sent: Friday, November 21, 2003 7:15 AM
To: Pickett, Jeannette
Cc: Taylor, Thomas (EOUSA)
Subject: RE: an applicant's question

Jeannette:

Can you respond to the attached email? Thanks!

-----Original Message-----
From: Taylor, Thomas (EOUSA)
Sent: Thursday, November 20, 2003 10:28 AM
To: Markey, Debbie

1

Subject: an applicant's question

Debbie,

How are things back at the office? I miss the folks at USAO-DC!

Is there anyone I can check with at the office to see if we received this gentleman's resume? Earlier I suggested he send his resume to Channing. His name is ████████████████ and his emails are attached below. He is a "friend of a friend" and I do not know him.

Have a good Thanksgiving!

Thanks
Tom Taylor

Office of the Director
Executive Office for United States Attorneys

-----Original Message-----
From: ████████████@hotmail.com [mailto:████████████@hotmail.com]
Sent: Wednesday, November 19, 2003 5:54 PM
To: Taylor, Thomas [EOUSA]
Subject: RE: Per Parisa's suggestion

Hi. I sent my resume to Mr. Phillips in August and have not heard anything. Would you suggest that I contact them to see if they received my resume? If so, shall I call him directly or does he have a secretary who might be the gate keeper? Thank you for your thoughts.

-----Original Message Follows-----
From: "Thomas.Taylor@usdoj.gov" <Thomas.Taylor@usdoj.gov>
To: ████████████@hotmail.com>
Subject: RE: Per Parisa's suggestion
Date: Thu, 24 Jul 2003 11:01:34 -0400 (EDT)

Hello Mr. ████████,

I apologize for the delay in responding. If you are still interested, I think you have a very good resume for our office. Unfortunately, I am not on the hiring committee. However, I forwarded your resume to someone who is on the committee. He has suggested that you send your resume and cover letter to Mr. Channing Phillips. His title is Chief of Staff, United States Attorney's Office for the District of Columbia. His address is The Judiciary Center Building, 555 Fourth Street, NW, Room 5124, Washington D.C. 20530.

Again, I apologize for the slow response.

Thomas Taylor

-----Original Message-----
From: ████████████████████@hotmail.com]
Sent: Monday, March 24, 2003 10:52 PM
To: Taylor, Thomas
Subject: Per Parisa's suggestion

Dear Mr. Taylor:

I write to you at the suggestion of Parisa Salehi. I understand that you work with the DOJ and that there may be some positions available in your office. As I plan to relocate to DC in the near future, I would be grateful if you would kindly peruse the attached resume and advise whether my

2

experience in appropriate for said positions.

Sincerely,



_____, Jr.

Add photos to your e-mail. With MSN 8. Get 2 months FREE*.
http://join.msn.com/?page=features/featuredemail

Set yourself up for fun at home! Get tips on home entertainment equipment,
video game reviews, and more here.
http://special.msn.com/home/homeent.armx

Plaintiff's Exhibit D

EEO COUNSELOR'S REPORT

A.    AGGRIEVED PERSON:

Name:  Robert A. Spelbs

Job /Series/Title/Grade:  Applicant

Place of Employment: U. S. Department of Justice, Drug Enforcement Agency (DEA),
Narcotic and Dangerous Drug Section, Bond Building, 1400 New York Avenue, NW 8th
Floor, Washington, DC 20530

Work Phone Number: (202) 353-3807

Home Phone Number: (301) 493-4491

Home Address: 9721 Whitley Park Plaza, Bethesda, MD 20914

B.    CHRONOLOGY OF EEO COUNSELING:

Date of Alleged Discriminatory Event: October 14, 2005

NOTE:  Mr. Robert A. Spelke, Aggrieved Person (AP) does not know exactly
when the discriminatory action took place since it was a hiring action, however, AP became
aware of the most recent hiring of another individual on October 14, 2005.

Date of Initial Contact with EEO Staff: October 28, 2005

Date of Initial Counseling Interview with Counselor: November 22, 2005

Calculate 45th Day After the Alleged Discriminatory Event: November 28, 2005

Date of Final Interview: December 6, 2005

Date Notice of Final Interview received by AP: December 7, 2005 (Fedex delivery)

Date EEO Counselor's Report Requested: December 9, 2005

Date EEO Counselor's Report Submitted: December 7, 2005

-2-

C.    BASIS/BASES FOR ALLEGED DISCRIMINATION:

    (X)    Age, 48 (July 11, 1957)
    (X)    Disability (Physical- Cancer-Perceived and Actual Impairment)

D.    CLAIM (ALLEGATION OF DISCRIMINATION):

    AP claims he was discriminated against based on age (over 40) and disability (physical-Cancer) when he was not selected for an Assistant United States Attorney position in the Civil Division of the United States Attorney's Office, District of Columbia.

E.    REMEDY REQUESTED:

    The AP seeks to be hired as Assistant United States Attorney in the Civil Division with USAO-DC and attorney's fees.

F.    EEO COUNSELOR'S CHECKLIST:

    The Final EEO Counseling Interview was conducted by the EEO Counselor on December 6, 2005. The EEO Counselor advised AP of his Rights and Responsibilities. The EEO Staff on December 6, 2005, issued the Notice of Final Interview and Rights and Responsibilities via FedEx to AP.

    On December 6, 2005, the EEO Counselor also advised the AP that he has 15 days calendar days within to file a formal complaint after he received the Notice of Rights to File.

G.    SUMMARY OF COUNSELOR'S INQUIRY:

    1.    Telephonic Interview with the Aggrieved Person (AP):

    On November 9, 2005 the EEO Counselor contacted AP and an initial interview was scheduled for November 22, 2005. The EEO Counselor explained to AP his right to remain anonymous and his right to representation during the counseling process. The AP's rights and responsibilities, the EEO Process, Informal Resolution and the ADR process were also explained.

    On November 22, 2005, AP stated that in July 2004, he applied (by submitting a resume and cover letter) for an Assistant United States Attorney (AUSA) position with the Civil Division in the United States Attorney's Office, District of Columbia (USAO-DC). There were interviews with Deputy Chief, Daniel Van Horn, Deputy Chief, Doris Coles-Huff and AUSA, Alan Goldfuss (each interview was held separately on July 16, 2004). Also, on July 16, 2004, AP was interviewed by Craig Lawrence, Acting Civil Chief and since that time hasn't received any

-3-

replies to his letters sent via his attorney, to United States Attorney, Kenneth Weinstein requesting the status of his application. The most recent letter was dated August 2, 2005.

Note: AP indicated that for the purpose of this pre-complaint he wanted to talk directly to the Counselor and not involve his attorney at this stage of the EEO Process.

AP stated that he worked 10 years as a line AUSA in the Criminal Division, USAO-DC and that his medical condition was known to management since he was undergoing cancer treatment while he worked there. He believes that because of his medical condition and his age he was not selected as an AUSA in Civil Division and since his letters have not being answered it adds to this perception. AP stated that there have been various AUSA positions filled in the Civil since his interview. He mentioned that they hired Ms. Kathleen Konopka, a 1997 law school graduate, Megan Linholm-Ross, a 2003 law school graduate; Mercedeh Momeni and Benton Peterson (unknown graduation dates). He considers all these individuals are younger than AP and none are disabled to his knowledge.

2.    Telephonic Interview with Channing Phillips, First Assistant United States
        Attorney (FAUSA), USAO-DC, Telephone # 202-514-6953:

On November 23, 2005, the EEO Counselor contacted the office of United States Attorney, The Honorable Kenneth L. Wainstein. Mr. Channing Phillips, FAUSA, answered the call and upon informing him of the reason for the call, he explained that he can discuss this case with the counselor and inform the U.S. Attorney who was not available at the time.

Mr. Phillips stated that the AP and he worked together at the USAO-DC for a number of years and that he is aware of AP's interest in employment with the Civil Division, USAO-DC. In fact, the U.S. Attorney is sending a letter to AP's attorney explaining that the AP has not been rejected for a position and is still being considered. Mr. Phillips added that due to the nature of how attorneys are hired the USAO-DC is not required to send rejection letters to applicants as long as these are still vacancies to be filled. He further explained that he is aware of APs medical condition since AP was undergoing treatment while assigned to the Criminal Division at the USAO-DC. However, the fact that AP has a disability nor his age (over 40) have any impact in management hiring decision.

Mr. Phillips stated that there are rules they follow in the hiring process and that he gets directly involved in the hiring of attorneys in the Criminal Division which is under his supervision, however, in the Civil Division, Mr. Craig Lawrence, Acting Civil Chief is the management official who conducts the interview and submits his decision to the United States Attorney and him as FAUSA. According to Mr. Phillips, AP did not measure up to the other individuals hired. FAUSA Phillips added that the Counselor should speak directly to Mr. Craig Lawrence, Acting Chief, Civil Division, who personally interviewed AP. Mr. Phillips is 42 years old (DOB: ███████ 1963).

-5-

3.  Telephonic Interview with Mr. Monty Wilkinson, Executive Assistant United States
    Attorney for Management, USAO-DC, December 2, 2005, Telephone# 202-307-6045:

Mr. Monty Wilkinson explained that he gets involved in interviewing attorneys for the
Criminal Division, in at the USAO-DC, however, last week (November 14-18, 2005) he gave
guidance to USA Weinstein and FAUSA Phillips reference a letter that was to be sent to AP's
attorney regarding his application to a position in the Civil Division. Mr. Wilkinson
recommended that it be reviewed by the Executive Office for United States Attorneys (EOUSA-
EO) prior to sending it. He went on to inform the Counselor that as long as their vacancies a
rejection letter is not sent to applicants. These applicants including AP, continue under
consideration as long as there are vacancies which is the case in Civil Division.

Mr. Wilkinson provided the counselor information as follows: Since July 2004, the
individuals listed were hired in Civil Division:
John F. Henault (35 years old, Date of Birth (DOB): ███████ 1970), Entry on Duty (EOD)-
September 7, 2004;
Andrea W. McBarnette (37 years old, DOB: ███████ 1968), EOD- September 7, 2005;
Meredith Momeni (37 years old, DOB: ███████ 1968), EOD-March 28, 2005;
John C. Truong (35 years old, DOB: ███████ 1970), EOD: April 17, 2005;
Benton Peterson (36 years old, DOB: ███████ 1971), EOD: May 1, 2005;
Megan Rose (28 years old, DOB: ███████ 1977), EOD: July 10, 2005;
and Kathleen Konopka (35 years old, DOB: ███████ 1970), EOD: August 8, 2005.

Mr. Wilkinson went on to explain that Megan Rose was hired under the Honors Program
and Department of Justice provided funding for her salary. The main reason there are vacancies
is due to budgetary reasons. Mr. Wilkinson is 44 years old (DOB: ███████ 961).

4.  Telephonic Interview with Mr. Doug Lawrence, Acting Chief, Civil Division,
    USAO-DC, December 2, 2005, Telephone: 202-514-7151:

Mr. Lawrence stated that since June 1, 2004 he hasn't been able to fill all vacancies and
AP is still in the mix (under consideration). He stated that AP applied to Civil Division and was
interviewed on July 16, 2005. During his interview he asked AP "Why do you want to leave
DEA", were AP is employed. AP answered "I hate to travel and want to stay closer to home."
Mr. Lawrence asks this question to every applicant he interviews and APs answer concerned him,
especially, since he feels the job is very demanding, he wants someone who can appreciate the
demands of the office and is a good fit, there's too much work and not enough attorneys, he still
can use 5 additional attorney slots, however, has to meet the job demands with less attorneys.

Also, upon comparing AP to other attorneys he has hired, for example Kate Konopka. He
considered Ms. Konopka a good writer and has great analytical skills, she is also a hard worker
and gets along well with others. Meanwhile, when he checked reference Mr. Speiler he found out
that even though he is a very good writer, he does not work as well with others, a personality fit

-5-

issue. Mr. Lawrence stated that is better to bring on board someone he can teach. He is aware of AP's cancer bout since he saw him at the gym working out at the same time he did. He added that unless AP disclosed his medical condition he would pass unnoticed since it all happened while AP was assigned to USAO-DC. Mr. Lawrence stated that he is not aware of any disability in those he has hired and it is not an issue he addresses during interviews and the same goes for age. He did state that AP has not been rejected and that there are openings to be filled still. Mr. Lawrence is 60 years old (DOB: ████████ 1945).

5.    Telephonic Interview with Mr. Daniel E. Van Horn, Deputy Chief, Civil Division, USAO-DC, December 2, 2005, Telephone # 202-514-7168:

Mr. Van Horn explained that it is customary to give an automatic interview as a courtesy to attorneys who have previously worked at the USAO-DC and also to any applicant from the Justice Department and AP met the requirement. According to Mr. Van Horn the applicant to fill a civil division position is interviewed by him, then a panel composed of another Deputy Chief, and a non-supervisory line AUSA interviews the applicant (separately). Once the interviews are completed by them, the applicant meets with the Acting Civil Chief, Craig Lawrence. Once Mr. Lawrence completes the interview, a meeting is held with supervisors and they decide who to send forward to USA Wainstein and he makes the final decision on who to hire.

On July 16, 2005, AP was interviewed by Deputy Chief, Van Horn. During the interview AP expressed his desire to do something different than litigating drug cases. AP led Mr. Van Horn to believe that "he didn't want to come here (USAO-DC- Civil Division) but, just get away from a job that he was disenchanted with." Mr. Van Horn stated that his understanding was that AP had no firm desire to come to the USAO-DC, but just get away from DEA where he worked at the time of interview. Mr. Van Horn stated that age nor disability was at issue, as a matter of fact, he had no idea what was AP's age nor whether he had a disability, it never came up during the interview. Mr. Van Horn is 54 years old (DOB: ████████ 1951).

6.    Telephonic Interview with The Honorable Kenneth L. Wainstein, United States Attorney, USAO-DC, December 2, 2005, Telephone # 202-514-6600:

Mr. Wainstein stated that he approves all attorney hires and AP is still being considered for a position in the USAO-DC. Mr. Wainstein is 43 years old. (DOB: ████████ 1962).

6.    Documents Reviewed: None.

H.    ALTERNATIVE DISPUTE RESOLUTION (ADR) PROCESS: N/A

-6-

1.    SUMMARY OF INFORMAL RESOLUTION ATTEMPT:

        Resolution attempt was unsuccessful

4.    FINAL INTERVIEW BY COUNSELOR:

        1.    Date Final Interview was Conducted: December 6, 2005
        2.    The EEO Staff issued the Notice of Final Interview on: December 6, 2005
        3.    Date NFI received by AP: December 7, 2005 (FedEx delivery)


Name of EEO Counselor:        Olga M. MacLeari

Office Address:               Executive Office for U.S. Attorneys (EOUSA)
                              Equal Employment Opportunity Staff
                              1331 Pennsylvania Avenue, N.W., NAPB, Suite 534
                              Washington, DC 20530

                              Telephone:  (202) 514-4830
                              Facsimile:  (202) 305-1431


                              _Olga M. MacLeari_____
                              Signature of Counselor


                              _December 7, 2005_____
                              Date

Plaintiff's Exhibit E

QUESTIONNAIRE
USE OF A CONTROLLED SUBSTANCE

NAME _____    DATE OF BIRTH __/__/____

YEARS YOU ATTENDED HIGH SCHOOL (e.g., 1978-1981) _1884- 1885_

YEARS YOU ATTENDED COLLEGE    (e.g., 1981-1985) _1992- 1985_

YEARS YOU ATTENDED LAW SCHOOL (e.g., 1985-1988) _1992- 2000_

DATE OF LAW SCHOOL GRADUATION    _5/2000_

DATE OF ADMISSION TO THE BAR    _10/11/2000_

1.  Have you ever used any controlled substance? ___ YES _X_ NO
    (If yes, check all of the appropriate items below and provide the
    information requested.)

____ Marijuana    Date substance first used _____, Number of
                  times substance used: weekly _____, monthly _____,
                  yearly _____. Total number of times used _____. Date last
                  used _____.

____ Cocaine      Date substance first used _____. Number of
                  times substance used weekly _____, monthly _____,
                  yearly _____. Total number of times used _____. Date last
                  used _____.

____ LSD          Date substance first used _____. Number of
                  times substance used weekly _____, monthly _____,
                  yearly _____. Total number of times used _____. Date last
                  used _____.

____ Other        Date substance first used _____. Number of
                  times substance used weekly _____, monthly _____,
                  yearly _____. Total number of times used _____. Date last
                  used _____.

1.  Have you ever enrolled treatment for use of any controlled substance?
    YES ___  X NO

    If yes, provide the date(s) of treatment, treatment facility and name
    of attending clinician.

    _____

    _____

    _____

    _____

2.  Have you ever been engaged in, arrested for, charged with or
    imprisoned for the sale, manufacture, distribution or possession of
    illegal drugs or controlled substances? ___ YES  X NO

    _____

    _____

    _____

    _____

4.  Please provide a description of the circumstances at the time(s) of
    your drug use(s) (e.g., at home alone, at small private parties (3-10
    people), at large public gatherings, etc.). That description should
    also indicate the quantity of drug(s) used (e.g., one marijuana
    cigarette, one or two puffs off of someone else's marijuana
    cigarettes, etc.).

    (Please attach additional sheet(s) if necessary.)

    N/A

    _____

    _____

    _____

    _____

5. If your use varied greatly during the time period in which you used the drug(s), please indicate the various distinctions (e.g., weekly during the first year of college then only once a month, monthly for two years then only twice a year after college, etc.).

_____ n/a _____

_____

_____

_____

_____

6. Please provide any additional information/comments you may have concerning this matter.

_____

_____

_____

_____

_____

_____

_____

_____

The illegal use, possession, importation or sale of drugs by an employee of the Department of Justice will not be condoned.

CERTIFICATION: I certify that I have read and understand the above-stated Department of Justice policy regarding drug-related activity.

_____          04/01/2004
        Signature                            Date

QUESTIONNAIRE
USE OF A CONTROLLED SUBSTANCE

NAME _Andrea McBarnette_____     DATE OF BIRTH _12/6/68_

YEARS YOU ATTENDED HIGH SCHOOL (e.g., 1978-1981) _1982 - 1986_

YEARS YOU ATTENDED COLLEGE    (e.g., 1981-1985) _1986 - 1990_

YEARS YOU ATTENDED LAW SCHOOL  (e.g., 1985-1988) _1994 - 1997_

DATE OF LAW SCHOOL GRADUATION _May 1997_

DATE OF ADMISSION TO THE BAR _~~September~~ June 1998 for NY, Nov. 2003 fr DC_

1.   Have you ever used any controlled substance?  __ YES _X_ NO
     (If Yes, check all of the appropriate items below and provide the
     information requested.)

____ Marijuana   Date substance first used _____. Number of
                 times substance used: weekly _____, monthly _____,
                 yearly _____. Total number of times used _____. Date last
                 used _____.

____ Cocaine.    Date substance first used _____. Number of
                 times substance used weekly _____, monthly _____,
                 yearly _____. Total number of times used _____. Date last
                 used _____.

____ LSD         Date substance first used _____. Number of
                 times substance used weekly _____, monthly _____,
                 yearly _____. Total number of times used _____. Date last
                 used _____.

____ Other       Date substance first used _____. Number of
                 times substance used weekly _____, monthly _____,
____             yearly _____. Total number of times used _____. Date last
                 used _____.

                                                          Page 1 of 3

2.   Have you ever received treatment for use of any controlled substance?
     ___ YES    _X_ NO

     If yes, provide the date(s) of treatment, treatment facility and name
     of attending clinician.

     _____

     _____

     _____

     _____

3.   Have you ever been engaged in, arrested for, charged with or
     imprisoned for the sale, manufacture, distribution or possession of
     illegal drugs or controlled substances?    ___ YES    _X_ NO

     _____

     _____

     _____

4.   Please provide a description of the circumstances at the time(s) of
     your drug use(s) (e.g., at home alone, at small private parties (3-10
     people), at large public gatherings, etc.).  That description should
     also indicated the quantity of drug(s) used (e.g., one marijuana
     cigarette, one or two puffs off of someone else's marijuana
     cigarette, etc.).

     (Please attach additional sheet(s) if necessary.)

     _____

     _____

     _____

     _____

     _____

5.  If your use varied greatly during the time period in which you used the drug(s), please indicate the variant distinctions (e.g., weekly during the first year of college then only once a month, monthly for two years then only twice a year after college, etc.).

_____
_____
_____
_____
_____

6.  Please provide any additional information/comments you may have concerning this matter.

_____
_____
_____
_____
_____
_____
_____

The illegal use, possession, importation or sale of drugs by an employee of the Department of Justice will not be condoned.

CERTIFICATION:  I certify that I have read and understand the above-stated Department of Justice policy regarding drug-related activity.

_____          ___4/5/89___
        Signature                          /Date /

QUESTIONNAIRE
USE OF A CONTROLLED SUBSTANCE

NAME _Mercedeh Momeni_____     DATE OF BIRTH _01-05-68_

YEARS YOU ATTENDED HIGH SCHOOL (e.g., 1978-1981) _1981-1985_

YEARS YOU ATTENDED COLLEGE     (e.g., 1981-1985) _1985-1989_

YEARS YOU ATTENDED LAW SCHOOL (e.g., 1985-1988) _1984-1997_

DATE OF LAW SCHOOL GRADUATION _5/1992_

DATE OF ADMISSION TO THE BAR _2000_


1.    Have you ever used any controlled substance? ___ YES _✓_ NO
      (If yes, check all of the appropriate items below and provide the
      information requested.)

____ Marijuana    Date substance first used _____. Number of
                  times substance used: weekly _____, monthly _____,
                  yearly _____. Total number of times used _____. Date last
                  used _____.

____ Cocaine      Date substance first used _____. Number of
                  times substance used weekly _____, monthly _____,
                  yearly _____. Total number of times used _____. Date last
                  used _____.

____ LSD          Date substance first used _____. Number of
                  times substance used weekly _____, monthly _____,
                  yearly _____. Total number of times used _____. Date last
                  used _____.

____ Other        Date substance first used _____. Number of
                  times substance used weekly _____, monthly _____,
                  yearly _____. Total number of times used _____. Date last
_____            used _____.

2. Have you ever received treatment for use of any controlled substance? YES ___ ✓ NO

If yes, provide the date(s) of treatment, treatment facility and name of attending clinician.

_____

_____

_____

_____

3. Have you ever been engaged in, arrested for, charged with or imprisoned for the sale, manufacture, distribution or possession of illegal drugs or controlled substances? ___ YES ✓ NO

_____

_____

_____

_____

4. Please provide a description of the circumstances at the time(s) of your drug use(s) (e.g., at home alone, at small private parties (1-10 people), at large public gatherings, etc.). That description should also indicated the quantity of drug(s) used (e.g., one marijuana cigarette, one or two puffs off of someone else's marijuana cigarettes, etc.).

(Please attach additional sheet(s) if necessary.)

N/A

_____

_____

_____

_____

5.   If your use varied greatly during the time period in which you used the drug(s), please indicate the various distinctions (e.g., weekly during the first year of college then only once a month, monthly for two years then only twice a year after college, etc.).

_____

_____ N/A _____

_____

_____

_____

6.   Please provide any additional information/comments you may have concerning this matter.

_____ None _____

_____

_____

_____

_____

_____

_____

_____


The illegal use, possession, importation or sale of drugs by an employee of the Department of Justice will not be condoned.

CERTIFICATION:   I certify that I have read and understand the above-stated Department of Justice policy regarding drug-related activity.


_____          _7-29-04_____
            Signature                              Date

QUESTIONNAIRE
USE OF A CONTROLLED SUBSTANCE

NAME _John C. Truong_    DATE OF BIRTH _09-09-70_

YEARS YOU ATTENDED HIGH SCHOOL (e.g., 1978-1981) _1984 - 1988_

YEARS YOU ATTENDED COLLEGE    (e.g., 1982-1985) _1988 - 1993_

YEARS YOU ATTENDED LAW SCHOOL (e.g., 1985-1988) _1993 - 1997_

DATE OF LAW SCHOOL GRADUATION    _5/1997_

DATE OF ADMISSION TO THE BAR    _11/1999  CA_
_07/2000  D.C._

1.  Have you ever used any controlled substance?  ___ YES  _✓_ NO
    (If yes, check all of the appropriate items below and provide the
    information requested.)

___ Marijuana  Date substance first used _____. Number of
               times substance used: weekly _____, monthly _____
               yearly _____. Total number of times used _____. Date last
               used _____.

___ Cocaine    Date substance first used _____. Number of
               times substance used weekly _____, monthly _____
               yearly _____. Total number of times used _____. Date last
               used _____.

___ LSD        Date substance first used _____. Number of
               times substance used weekly _____, monthly _____
               yearly _____. Total number of times used _____. Date last
               used _____.

___ Other      Date substance first used _____. Number of
               times substance used weekly _____, monthly _____
               yearly _____. Total number of times used _____. Date last
               used _____.

Page 1 of 3

1.  Have you ever received treatment for use of any controlled substance?
    ___ YES    _✓_ NO

    If yes, provide the date(s) of treatment, treatment facility and name
    of attending clinician.

    _____

    _____

    _____

    _____

3.  Have you ever been engaged in, arrested for, charged with or
    imprisoned for the sale, manufacture, distribution or possession of
    illegal drugs or controlled substances?    ___ YES    _✓_ NO

    _____

    _____

    _____

    _____

4.  Please provide a description of the circumstances at the time(s) of
    your drug use(s) (e.g., at home alone, at small private parties (2-10
    people), at large public gatherings, etc.).  That description should
    also indicate the quantity of drug(s) used (e.g., one marijuana
    cigarette, one or two puffs off of someone else's marijuana
    cigarettes, etc.).

    (Please attach additional sheet(s) if necessary.)

    _____N/A_____

    _____

    _____

    _____

5. If your use varied greatly during the time period in which you used the drug(s), please indicate the various distinctions (e.g., weekly during the first year of college then only once a month, monthly for two years then only twice a year after college, etc.).

N/A

6. Please provide any additional information/comments you may have concerning this matter.

N/A

The illegal use, possession, importation or sale of drugs by an employee of the Department of Justice will not be condoned.

CERTIFICATION: I certify that I have read and understand the above-stated Department of Justice policy regarding drug-related activity.

_____        _____
Signature                         Date

2.  Have you ever received treatment for use of any controlled substance?
    ___ YES    _X_ NO

    If yes, provide the date(s) of treatment, treatment facility and name
    of attending clinician.

    _____

    _____

    _____

    _____

3.  Have you ever been engaged in, arrested for, charged with or
    imprisoned for the sale, manufacture, distribution or possession of
    illegal drugs or controlled substances?    ___ YES    _X_ NO

    _____

    _____

    _____

    _____

4.  Please provide a description of the circumstances at the time(s) of
    your drug use(s) (e.g., at home alone, at small private parties (3-10
    people), at large public gatherings, etc.).  That description should
    also indicated the quantity of drug(s) used (e.g., one marijuana
    cigarette, one or two puffs off of someone else's marijuana
    cigarettes, etc.).

    (Please attach additional sheet(s) if necessary.)

    _____

    _____

    _____

    _____

QUESTIONNAIRE
USE OF A CONTROLLED SUBSTANCE

NAME _Benton Peterson_                    DATE OF BIRTH _2-27-71_

YEARS YOU ATTENDED HIGH SCHOOL (e.g., 1978-1982) _1985-1989_

YEARS YOU ATTENDED COLLEGE     (e.g., 1981-1985) _1989-1993_

YEARS YOU ATTENDED LAW SCHOOL (e.g., 1985-1988) _1994-1997_

DATE OF LAW SCHOOL GRADUATION _6/27/97_

DATE OF ADMISSION TO THE BAR _7/31/97_

1.  Have you ever used any controlled substance? ___ YES _X_ NO
    (If yes, check all of the appropriate items below and provide the
    information requested.)

____ Marijuana  Date substance first used _____. Number of
                times substance used: weekly _____, monthly _____,
                yearly _____. Total number of times used _____. Date last
                used _____.

____ Cocaine    Date substance first used _____. Number of
                times substance used weekly _____, monthly _____,
                yearly _____. Total number of times used _____. Date last
                used _____.

____ LSD        Date substance first used _____. Number of
                times substance used weekly _____, monthly _____,
                yearly _____. Total number of times used _____. Date last
                used _____.

____ Other      Date substance first used _____. Number of
                times substance used weekly _____, monthly _____,
                yearly _____. Total number of times used _____. Date last
                used _____.

5.  If your use varied greatly during the time period in which you used the drug(s), please indicate the various distinctions (e.g., weekly during the first year of college then only once a month, monthly for two years then only twice a year after college, etc.).

_____

_____

_____

_____

_____

6.  Please provide any additional information/comments you may have concerning this matter.

_____

_____

_____

_____

_____

_____

_____

_____

_____

The illegal use, possession, importation or sale of drugs by an employee of the Department of Justice will not be condoned.

CERTIFICATION:  I certify that I have read and understand the above-stated Department of Justice policy regarding drug-related activity.

_____          _____
Signature                        Date

Plaintiff's Exhibit F

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (1999)

Name of
Applicant JOHN F. HENAULT, JR.

Date of
Interview 3/31/04

Interviewer D.F. VAN HORN

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

___S___ **LEGAL ABILITY:** How bright is this applicant? Is this applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

___Q___ **KNOWLEDGE AND EXPERIENCE:** Does the applicant have significant legal experience, particularly in criminal law or evidence or in litigation? Is the applicant so strong in a particular area that he or she might fill a particular need in the office?

___S___ **MATURITY AND JUDGMENT:** Does this applicant possess common sense? Are the applicant's responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant stable, with good ethical instincts? Is this an applicant in whom you feel confidence as a representative of this office in court?

___Q___ **INTEREST AND MOTIVATION:** Does applicant merely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in criminal law? Does the applicant know what he or she wants to do?

___S___ **ENERGY AND INITIATIVE:** Is the applicant a "self-starter" or someone who will only act in response to clear direction and supervision? Will the applicant "carry his or her own weight?" Can the applicant be counted on to work extra time when a problem or emergency requires it?

___S___ **EFFECTIVENESS WITH OTHERS:** Is applicant diplomatic? Respectful? Cooperative? Would applicant be firm without being abrasive? Hostile? Condescending? Is the applicant likeable?

3.    **ORAL EXPRESSION**: Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will the applicant be arguing motions or appeals?

4.    **TRIAL POTENTIAL**: Will the applicant perform successfully in court? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant too meek? Does the applicant project maturity and integrity? How capable will the applicant be of advocating a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

5.    **APPEARANCE**: Are grooming, dress, and demeanor appropriate?

6.   **OVERALL RATING**

    Please provide a detailed explanation of the reasons for your evaluation:

This applicant has little relevant substantive experience but appears to be well-oriented and intelligent. His legal experience is exclusively in the private sector, and his desire to become an AUSA was not well explained. I suspect that he is seeking experience here and a recent builder. He has worked for high quality law firms, and appears to have the skills and familiarity with the practical aspects of litigation to be a strong performer after mastering the substantive law applicable to our practice. Writing sample is solid.

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (1999)

Name of Applicant    John F. Henault, Jr.    Date of Interview    March 31, 2004

Interviewer    Michael J. Ryan

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

_____

_E_    LEGAL ABILITY. How bright is this applicant? Is this applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

_Q_    KNOWLEDGE AND EXPERIENCE: Does the applicant have significant legal experience particularly in criminal law or evidence or in litigation? Is the applicant so strong in a particular area that he or she might fill a particular need in the office?

_S_    MATURITY AND JUDGMENT: Does this applicant possess common sense? Are the applicant's responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant stable, with good ethical instincts? Is this an applicant in whom you feel confidence as a representative of this office in court?

_S_    INTEREST AND MOTIVATION: Does applicant merely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in criminal law? Does the applicant know what he or she wants to do?

_S_    ENERGY AND INITIATIVE: Is the applicant a "self-starter" or someone who will only act in response to close direction and supervision? Will the applicant "carry his or her own weight"? Can the applicant be counted on to work extra time when a problem or emergency requires it?

_S_    EFFECTIVENESS WITH OTHERS: Is applicant diplomatic? Respectful? Cooperative? Would applicant be firm without being abrasive? Hostile? Condescending? Is the applicant likeable?

S     ORAL EXPRESSION: Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will it is applicant be arguing motions or appeals?

S     TRIAL POTENTIAL: Will the applicant perform successfully in court? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant too meek? Does the applicant project sincerity and integrity? How capable will the applicant be advocating a position in litigation that may be at odds with his or his personal opinions? Will applicant relate well to a jury?

S     APPEARANCE: Are grooming, dress, and demeanor appropriate?

S     OVERALL RATING

Please provide a detailed explanation of the reasons for your evaluation:

John Henault, Jr. has an excellent law school record and experience with top law firms. His actual litigation experience is somewhat thin, beyond drafting pleadings for review by more senior attorneys. He makes a very good appearance and was quite poised and affable during the interview. His writing sample was good. He asked perceptive questions about Civil Division practice. I believe that with time, training and experience, he could become a very effective AUSA.

2

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (1998)

Name of
Applicant _John Hewitt_        Date of
                               Interview  _3/31/04_

Interviewer _Leib/Mizar_

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

_S-E_  **LEGAL ABILITY:** How bright is the applicant? Is this applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

_S_  **KNOWLEDGE AND EXPERIENCE:** Does the applicant have significant legal experience, particularly in criminal law or evidence or in litigation? Is the applicant so strong in a particular area that he or she might fill a particular need in the office?

_E_  **MATURITY AND JUDGMENT:** Does this applicant possess common sense? Are the applicant's responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant stable, with good ethical instincts? Is this an applicant in whom you feel confidence as a representative of this office in court?

_S-E_  **INTEREST AND MOTIVATION:** Does applicant merely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in criminal law? Does the applicant know what he or she wants to do?

_S-E_  **ENERGY AND INITIATIVE:** Is the applicant a "self-starter" or someone who will only act in response to close direction and supervision? Will the applicant "carry out his or her own weight?" Can the applicant be counted on to work extra time when a problem or emergency requires it?

_Q-S_  **EFFECTIVENESS WITH OTHERS:** Is applicant diplomatic? Respectful? Cooperative? Would applicant be firm without being abrasive? Settled? Condescending? Is the applicant likeable?

S    ORAL EXPRESSION: Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will this applicant be arguing motions or appeals?

S    TRIAL POTENTIAL: Will this applicant perform successfully in court? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant too meek? Does the applicant project sincerity and integrity? How capable will the applicant be at advocating a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

E    APPEARANCE: Are grooming, dress, and demeanor appropriate?

S-E    OVERALL RATING

Please provide a detailed explanation of the reasons for your evaluation:

John was a very good applicant. He has had substantial experience in a big firm setting. Even though most of his work has been on large cases he has done some work on his own. The large cases tend to be staffed by several lawyers. He could do their work here, but he would have to adjust to the volume and responsibility. I think he has the potential to do it.

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (10-01)

Name of
Applicant    *John Herault*                      Date of
                                                 Interview    *3/5/04*

Interviewer    *Mark Nagle*

RANKING CATEGORIES:

W - Weak – Applicant is weak in this category compared to others interviewed

Q – Qualified - Applicant matches others interviewed

S - Strong – Applicant is strong in this category compared to others interviewed

E - Exceptional – Applicant is exceptional in this category compared to others interviewed

___

**LEGAL ABILITY**: How bright is the applicant? Is the applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

**KNOWLEDGE AND EXPERIENCE**: Does the applicant have significant legal experience particularly in criminal law or evidence or in litigation? Is the applicant so strong in a particular area that he or she might fill a particular need in the office?

**MATURITY AND JUDGMENT**: Does the applicant possess common sense? Are the applicant's responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant stable, with good ethical instincts? Is this an applicant in whom you feel confidence as a representative of this office in court?

**INTEREST AND MOTIVATION**: Does applicant merely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in criminal law? Does the applicant know what he or she wants to do?

**ENERGY AND INITIATIVE**: Is the applicant a "self-starter" or someone who will only act in response to close direction and supervision? Will the applicant "carry his or her own weight?" Can the applicant be counted up to work extra time when a problem or emergency requires it?

**EFFECTIVENESS WITH OTHERS**: Is applicant diplomatic? Respectful? Cooperative? Would applicant be firm without being abrasive? Hostile? Condescending? Is the applicant likeable?

__ ORAL EXPRESSION: Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will this applicant be arguing motions or appeals?

__ TRIAL POTENTIAL: Will this applicant perform acceptably in court? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant too meek? Does the applicant project sincerity and integrity? How capable will the applicant be at advocating a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

__ APPEARANCE: Are grooming, dress, and demeanor appropriate?

__ OVERALL RATING

Please provide a detailed explanation of the reasons for your evaluation:

Mr. Herault is a highly talented and enthusiastic candidate who, despite a very advantageous position in a firm, wants to serve the public as an AUSA. He was very well prepared for the interview, and asked informed questions about the work of the office. In his current job, he has responsibility unusual in a large firm — for a large number of cases with often conflicting deadlines. His writing sample and his answers to questions during the interview reflect strong analytical skills. Mr. Herault is a superb candidate. I recommend him for interview by U.S. Attorney.

2

# Memo

To:         Roscoe C. Howard, Jr., United States Attorney

From:       Channing Phillips, Chief of Staff

Date:       April 21, 2004

Subject:    <u>Civil AUSA Applicant Interview with John F. Henault, Jr. scheduled for
            Thursday, April 22, 2004</u>

John F. Henault, Jr. is a 33-year-old 1995 graduate of St. Louis University where he obtained his Bachelor of Arts degree. Prior to obtaining his undergraduate degree, John served in the United States Marine Corps, where he had tours of duty in both Operation Desert Shield and Operation Desert Storm. In 1997, John was awarded his Juris Doctor degree, magna cum laude, from George Mason University School of Law, where he also served as Executive Editor of the George Mason Law Review. Following law school, John joined the law firm of Venable, Baetjer, Howard & Civiletti, where he was a member of the Commercial Litigation Group for 2½ years. In 2003, John joined the law firm of Morgan, Lewis & Bockius, where he focused on Securities, Telecommunications, Banking & Contract Law. Six months later, the litigation group, of which he was a member, made a lateral transfer and joined Arnold & Porter, where he remains today.

John applied to our Civil Division earlier this year and was interviewed on March 31, 2004, by Dan **Van Horn, Keith Morgan, Michael J. Ryan, and Mark Nagle,** who unanimously recommended a final interview with the U.S. Attorney.

**Mike Ryan** noted that "*John Henault, Jr. has an excellent law school record and experience with top law firms. His actual litigation experience is somewhat thin, beyond drafting pleadings for review by more senior attorneys. He makes a very good appearance and was quite poised and affable during the interview. His writing sample was good. He asked perceptive questions about Civil Division practice [Mike] believe[s] that with time, training and experience, he could become a very effective AUSA.*"

**Keith Morgan** agreed as he thought that "*John was a very good applicant. He has had substantial experience in a big firm setting. Even though most of his work has been on large cases, he has done some work on his own. The large cases tend to be staffed by several lawyers. He could do the work here, but he would have to adjust to the volume of responsibility [Keith] think[s] he has the potential to do it.*"

**Dan Van Horn** also concurred. He felt that "*[t]his applicant has little relevant substantive experience but appears to be well-motivated and intelligent. His legal experience is exclusively in the private sector and his desire to become an AUSA was not well explained. [Dan] suspect[s] that he is seeking*

Page 2 of 2

experience here as a resume builder. He is/has worked for high quality law firms, and appears to have the skills and familiarity with the procedural aspects of litigation to be a strong performer after mastering the substantive law applicable to our practice. Writing sample is solid."

Mark Nagle made it unanimous as he believes that "Mr. Renault is a highly talented and enthusiastic candidate who, despite a very advantageous position in a firm wants to serve the public as an AUSA. He was well prepared for the interview, and asked informed questions about the work of the office. In his current job, he has responsibility – unusual in a large firm – for a large number of cases with often conflicting deadlines. His writing sample and answers to questions during the interview reflect strong analytical skills. Mr. Renault is a superb candidate."

Plaintiff's Exhibit G

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (1601)

Name of Applicant _Andrew The Ennst_    Date of Interview _4/2/04_

Interviewer _Mark Taylor_

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

___

**S.**    **LEGAL ABILITY:**  How bright is this applicant?  Is this applicant imaginative and quick to grasp new ideas?  Can the applicant accurately analyze legal problems and identify relevant issues?  Are answers to hypothetical questions logical and thoughtful?  What is the quality of applicant's law school academic record?

**S.**    **KNOWLEDGE AND EXPERIENCE:**   Does the applicant have significant legal experience preferably in criminal law or evidence or in litigation?  Is the applicant so strong in a particular area that he or she might fill a particular need in the office?

**S.**    **MATURITY AND JUDGMENT.**  Does this applicant possess common sense?  Are the applicant's responses to questions sound and realistic?  Does the applicant seem flexible or rigid?  Is the applicant stable, with good ethical instincts?  Is this an applicant in whom you feel confidence as a representative of this office in court?

**E.**    **INTEREST AND MOTIVATION:**  Does applicant merely wish to obtain trial experience, or is he or she interested in being a prosecutor and in public service?  Does the applicant have a particular interest in criminal law?  Does the applicant know what he or she wants to do?

**E.**    **ENERGY AND INITIATIVE:**  Is the applicant a "self-starter" or someone who will only act in response to close direction and supervision?  Will the applicant "carry his or her own weight"?  Can the applicant be counted on to work extra time when a problem or emergency requires it?

**E.**    **EFFECTIVENESS WITH OTHERS:**  Is applicant diplomatic?  Respectful?  Cooperative?  Would applicant be firm without being offensive?  Flexible?  Condescending?  Is the applicant likeable?

**ORAL EXPRESSION:** Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will this applicant be arguing motions or appeals?

**TRIAL POTENTIAL:** Will this applicant perform successfully in court? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant too meek? Does the applicant project sincerity and integrity? How capable will the applicant be at advocating a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

**APPEARANCE:** Are grooming, dress, and demeanor appropriate?

**OVERALL RATING**

Please provide a detailed explanation of the reasons for your evaluation:

Ms. McBurnette is an enthusiastic candidate with strong interest in the work of the office. Her work at Miller & Chevalier has included statutory/regulatory analysis common to our practice. Like most large-firm associates, she has very little in-court or other first-chair experience. She has, however, a broad and deep range of experience in discovery and motion practice. Her answers to questions during interviews were succinct, focused and informative. I would recommend interview with U.S. attorney.

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (1991)

Name of
Applicant DF Vandiver

Date of
Interview 4/6/04

Interviewer

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

_____

S    LEGAL ABILITY: How bright is this applicant? Is the applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

Q    KNOWLEDGE AND EXPERIENCE: Does the applicant have significant legal experience particularly in criminal law or evidence or in litigation? Is the applicant so strong in a particular area that he or she might fill a particular need in the office?

S    MATURITY AND JUDGMENT: Does this applicant possess common sense? Are the applicant's responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant stable, with good ethical instincts? Is this an applicant in whom you feel confidence as a representative of this office in court?

Q    INTEREST AND MOTIVATION. Does applicant merely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in criminal law? Does the applicant know what he or she wants to do?

S    ENERGY AND INITIATIVE: Is the applicant a "self-starter" or someone who will only act in response to close direction and supervision? Will the applicant 'carry his or her own weight?' Can the applicant be counted on to work extra time when a problem or emergency requires it?

S    EFFECTIVENESS WITH OTHERS: Is applicant diplomatic? Respectful? Cooperative? Would applicant be firm without being abusive? Hostile? Condescending? Is the applicant likeable?

9.    ORAL EXPRESSION:  Does applicant communicate effectively and articulately?  Are thoughts expressed clearly and concisely?  How effective will the applicant be arguing motions or appeals?

8.    TRIAL POTENTIAL:  Will this applicant perform successfully in court?  Will the applicant be a forceful and persuasive advocate for the government?  Is the applicant too meek?  Does the applicant project sincerity and integrity?  How capable will the applicant be at advocating a position in litigation that may be at odds with his or her personal opinions?  Will applicant relate well to a jury?

9.    APPEARANCE:  Are grooming, dress, and demeanor appropriate?

9.    OVERALL RATING

     Please provide a detailed explanation of the reasons for your evaluation:

This applicant has substantial experience as a litigation associate at well-regarded private law firm. Although she has very good experience with the process of litigation, she has little if any substantive knowledge of the areas in which the Civil Division most commonly practices. Thus, if hired, she would face a steep learning curve at first. Her interest and motivation in seeking employment here is to have a job with predictable hours." Although there is certainly nothing wrong with this, it does not bespeak any great commitment to public service or particular interest in areas in which we practice.

2

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (10/01)

Name of
Applicant    *Andrea McBarnette*                Date of        *4-2-04*
                                                Interview

Interviewer    *Michael J. Ryan*

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

_____    _____

*S*    LEGAL ABILITY:  How bright is this applicant? Is this applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

*Q*    KNOWLEDGE AND EXPERIENCE:  Does the applicant have significant legal experience particularly in criminal law or evidence or in litigation? Is the applicant so strong in a particular area that he or she might fill a particular need in the office?

*S*    MATURITY AND JUDGMENT:  Does this applicant possess common sense? Are the applicant's responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant stable, with good ethical instincts? Is this an applicant in whom you feel confidence as a representative of this office in court?

*E*    INTEREST AND MOTIVATION:  Does applicant merely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in criminal law? Does the applicant know what he or she wants to do?

*E*    ENERGY AND INITIATIVE:  Is the applicant a "self starter" or someone who will only act in response to close direction and supervision? Will the applicant "carry his or her own weight?" Can the applicant be counted on to work extra time when a problem or emergency requires it?

*E*    EFFECTIVENESS WITH OTHERS:  Is applicant diplomatic? Respectful? Cooperative? Would applicant be firm without being abrasive? Hostile? Condescending? Is the applicant likeable?

E.    ORAL EXPRESSION: Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will this applicant be arguing motions or appeals?

S.    TRIAL POTENTIAL: Will this applicant perform successfully in court? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant too quick? Does the applicant project sincerity and integrity? How capable will the applicant be at advocating a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

E    APPEARANCE: Are grooming, dress, and demeanor appropriate?

S - E  OVERALL RATING

Please provide a detailed explanation of the reasons for your evaluation:

Mrs. McBurnette is a very personable and enthusiastic applicant. Her hands-on litigation experience is limited, and she seeks an AUSA position to change that deficit. She has handled some pro bono cases in court. She is poised and asked perceptive questions during the interview. She was questioned regarding her ability to handle a large complex case load, and she gave assurances that she is very familiar with long hours and a demanding practice. Her writing sample shows satisfactory skills in a written work product. Her main complaint about her current job is the unpredictability of the working hours. Apparently this results from being asked to travel or accept new assignments at the last minute. She seeks the sole responsibility for her own cases that goes with an AUSA position. I believe that she would develop into an effective and productive AUSA.

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (1600)

Name of Applicant: _Andrew McBennett_     Date of Interview: _2-Apr-04_

Interviewer: _Laura_

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matched others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

_E_  **LEGAL ABILITY:** How bright is this applicant? Is this applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

_S_  **KNOWLEDGE AND EXPERIENCE:** Does the applicant have significant legal experience particularly in criminal law or evidence or in litigation? Is the applicant so strong in a particular area that he or she might fill a particular need in the office?

_E_  **MATURITY AND JUDGMENT:** Does this applicant possess common sense? Are the applicant's responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant stable, with good ethical instincts? Is this an applicant in whom you feel confidence as a representative of this office in court?

_E_  **INTEREST AND MOTIVATION:** Does applicant merely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in criminal law? Does the applicant know what he or she wants to do?

_E_  **ENERGY AND INITIATIVE.** Is the applicant a "self-starter" or someone who will only act in response to close direction and supervision? Will the applicant "carry his or her own weight?" Can the applicant be counted on to work extra time when a problem or emergency requires it?

_E_  **EFFECTIVENESS WITH OTHERS:** Is applicant diplomatic? Respectful? Cooperative? Would applicant be firm without being abrasive? Humble? Condescending? Is the applicant likeable?

_6_  **ORAL EXPRESSION:** Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will this applicant be arguing motions or appeals?

_6_  **TRIAL POTENTIAL:** Would this applicant perform capably in court? Will the arguments be a forceful and persuasive basis for the government? Is the applicant too meek? Does the applicant project sincerity and integrity? How capable will the applicant be at advocating a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

_6_  **APPEARANCE:** Are grooming, dress, and demeanor appropriate?

_6_  **OVERALL RATING**

Please provide a detailed explanation of the reasons for your evaluation:

_Andrea is an excellent candidate with strong academic credentials. She is an excellent writer and would fit in here very well. Although she has good long-term experience, she has had little in court time, and it would take a while before she would be fully up to speed._

2

# Memo

| | |
|---|---|
| To: | Roscoe C. Howard, Jr., United States Attorney |
| From: | Channing Phillips, Chief of Staff |
| Date: | April 14, 2004 |
| Subject: | **CPD AUSA Applicant Interview of Andrea McFarlane scheduled for Monday, April 19, 2004** |

Andrea W. McFarlane is a 36-year-old 1994 graduate of Stanford University where she received her Bachelor of Arts degree in Political Science. In 1997, she was awarded her Juris Doctor degree from Georgetown University Law Center. Following law school, Andrea joined the law firm of Jones, Day, Reavis & Pogue as a litigation associate. Her casework involved product liability, contract, antitrust and employment matters. In 1999, she moved over to the law offices of Milberg, Weiss, Bershad, Hynes, & Lerach, a New York law firm, where she focused on securities class actions. In 2001, she returned to Washington, D.C. and joined the law firm of Miller & Chevalier, where her casework involves fraud and white collar crime, contracts, business torts, trade secrets, intellectual property and employment matters.

Andrea first applied to our office in January 2002 and received an interview for a position on the Criminal side of the house in July. She successfully made it out of the first round, but then withdrew her application because she had recently taken a job with Miller & Chevalier and didn't think it would be appropriate to leave so soon. She had accepted that position while her application was pending with our office, but still wanted to at least start the interview process with us since she recognized how difficult it is to get an interview with our office. She requested that we reactivate her application in May 2003, and we brought her in in July for a panel interview. While finding her to be a smart, personable and talented lawyer, her panelists, **Mary Pat Brown**, **Terry Keeney**, and **Heidi Pasichow** unanimously recommended against a final interview for a criminal position because they felt, in part, we were not her first choice as she had applications with Main Justice and the EDVA. She was also not convincing in her desire to be a criminal prosecutor in our office which practices in Superior Court. Accordingly, she was not brought in for a final interview with the U.S. Attorney. Undaunted and to her credit, she applied to our Civil Division earlier this year, and interviewed with **Mark Nagle**, **Craig Lawrence**, **Dan Van Horn**, and **Michael J. Ryan**, who all recommended a final interview with the U.S. Attorney.

*Lawrence believed that "Andrea is an excellent candidate with strong academic credentials. She is an excellent writer and would fit in here very well. Although she has good big-firm experience, she has had little in court time, and it would take a while before she would be fully up to speed."*

Page 2 of 2

**Dan Van Horn** felt that *"[t]he applicant has experience as a litigation associate at well-regarded private law firms. Although she has very good experience with the process of litigation, she has little if any substantive knowledge of the areas in which the Civil Division most commonly practices. Thus, if hired, she would face a steep learning curve at first. Her interest and motivation in seeking employment here is to have a job with 'predictable hours.' Although there is certainly nothing wrong with that, it does not bespeak any great commitment to public service or particular interest in which we practice."*

**Michael Ryan** found Ms. McNamara to be *"a personable and enthusiastic applicant. Her hands-on litigation experience is limited, and she seeks an AUSA position to change that deficit. She has handled some pro bono cases in court. She is poised and asked perceptive questions during the interview. She was questioned regarding her ability to handle a large complex case load, and she gave answers that she is very familiar with long hours and a demanding practice. Her writing sample shows satisfactory skills in a written work product. Her main complaint about her current job is the unpredictability of the working hours. Apparently this results from being asked to travel or accept new assignments at the last minute. She seeks the sole responsibility for her own cases that goes with an AUSA position. [Michael] believes[] that she would develop into an effective and productive AUSA."*

**Nagle** made it unanimous as he also found her to be a strong candidate who should receive an interview with the U.S. Attorney. He described her as *"an enthusiastic candidate with strong interest in the work of the office. Her work at Miller & Chevalier has included statutory / regulatory analysis common to our practice. Like most large-firm associates, she has very little in-court or other first-chair experience. She has, however, a broad and deep range of experience in discovery and motion practice. Her answers to questions during interviews were succinct, focused and informative."*

There is little doubt that Ms. McNamara has the personality and skills to become a very competent AUSA in the Civil Division where she is probably better suited than in the Criminal Division. There is still the thought by some that she coming to the office not so much out of a desire to work on behalf of the public, but rather to she'll have more control over her work and lifestyle. I'm also not sure that she is going to find what she wants in our Office either in that regard and if she's not happy, she may continue looking for the right position.

Plaintiff's Exhibit H

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (36-93)

Name of Applicant: Mercedes Montai     Date of Interview: 7/14/04

Interviewer: Brian Sompala

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

___E___  LEGAL ABILITY: How bright is this applicant? Is this applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

___E___  KNOWLEDGE AND EXPERIENCE: Does the applicant have significant legal experience, particularly in criminal law or evidence or in litigation? Is the applicant as strong in a particular area that he or she might fill a particular need in the office?

___E___  MATURITY AND JUDGMENT: Does this applicant possess common sense? Are the applicant's responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant stable, with good ethical instincts? Is this an applicant in whom you feel confidence as a representative of this office in court?

___E___  INTEREST AND MOTIVATION: Does applicant merely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in criminal law? Does the applicant know what he or she wants to do?

___E___  ENERGY AND INITIATIVE: Is the applicant a "self-starter" or someone who will only act in response to close direction and supervision? Will the applicant "carry his or her own weight"? Can the applicant be counted on to work extra time when a problem or emergency requires it?

___E___  EFFECTIVENESS WITH OTHERS: Is applicant diplomatic? Respected? Cooperative? Would applicant be firm without being abrasive? Hostile? Condescending? Is the applicant likeable?

___ **ORAL EXPRESSION:** Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will the applicant be arguing orally or on appeals?

___ **TRIAL POTENTIAL:** Will the applicant perform successfully in court? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant too weak? Does the applicant project sincerity and integrity? How capable will the applicant be in advocating a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

___ **APPEARANCE:** Are grooming, dress and demeanor appropriate?

___ **OVERALL RATING**

Please provide a detailed explanation of the reasons for your evaluation:

Merceleh is an outstanding applicant whose skills and experiences seem particularly suited for an AUSA position.

2.

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (1099)

Name of
Applicant  MR ROED eH   Mom ENT

Date of
Interview  7/13/04

Interviewer  DF  VAN HORN

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed.

Q - Qualified - Applicant matches other interviewed

S - Strong - Applicant is strong in this category compared to others interviewed.

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

_____

**Q**   **LEGAL ABILITY:** How bright is this applicant? Is this applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

**S**   **KNOWLEDGE AND EXPERIENCE:** Does the applicant have significant legal experience particularly in criminal law or evidence or in litigation? Is the applicant so strong in a particular area that he or she might fill a particular need in the office?

**S**   **MATURITY AND JUDGMENT:** Does this applicant possess common sense? Are the applicant's responses to questions sound and reliable? Does the applicant seem flexible or rigid? Is the applicant stable, with good critical instinct? Is this an applicant in whom you feel confidence as a representative of this office to court?

**E**   **INTEREST AND MOTIVATION:** Does applicant merely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in criminal law? Does the applicant know what he or she wants to do?

**S**   **ENERGY AND INITIATIVE:** Is the applicant a "self-starter" or someone who will only act in response to close direction and supervision? Will the applicant "carry his or her own weight?" Can the applicant be counted on to work extra time when a problem or emergency requires it?

**S**   **EFFECTIVENESS WITH OTHERS:** Is applicant diplomatic? Respectful? Cooperative? Would applicant be firm without being abrasive? Flexible? Understanding? Is the applicant likeable?

6.   ORAL EXPRESSION: Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will the applicant be arguing motions or appeals?

8.   TRIAL POTENTIAL: Will this applicant perform successfully in court? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant too meek? Does the applicant project sincerity and integrity? How capable will the applicant be in advocating a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

9.   APPEARANCE: Are grooming, dress, and demeanor appropriate?

9.   OVERALL RATING

Please provide a detailed explanation of the reasons for your evaluation:

This applicant has substantial experience in the defense of employment discrimination cases, which comprise a major portion of our civil practice. In addition, she is accustomed to handling a high volume of cases, which is another characteristic of our practice. She demonstrated great enthusiasm about becoming an AUSA.

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (2004)

Name of     Mercedes Maumai                    Date of Interview: July 16, 2004
Applicant

Interviewer: Keith V. Morgan

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed.

___

_E___   LEGAL ABILITY: How bright is the applicant? Is this applicant imaginative and quick to grasp
new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers
to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic
record?

_S-E_   KNOWLEDGE AND EXPERIENCE: Does the applicant have significant legal experience
particularly in criminal law or evidence or in litigation? Is the applicant so strong in a particular area that
he or she might fill a particular need in the office?

_E___   MATURITY AND JUDGMENT: Does this applicant possess common sense? Are the applicant's
responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant
stable, with good ethical instincts? Is this an applicant in whom you feel confidence as a representative of
this office in court?

_E___   INTEREST AND MOTIVATION: Does applicant sincerely want to obtain trial experience, or is he
or she interested in being a prosecutor and in public service? Does the applicant have a particular interest
in criminal law? Does the applicant know what he or she wants to do?

_E___   ENERGY AND INITIATIVE: Is the applicant a "self-starter" or someone who will only act in
response to close direction and supervision? Will the applicant "carry his or her own weight"? Can the
applicant be counted on to work extra time when a problem or emergency requires it?

_E___   EFFECTIVENESS WITH OTHERS: Is applicant diplomatic? Respectful? Cooperative?
Would applicant be firm without being abusive? Fussto? Condescending? Is the applicant likeable?

<u>5.E</u>    ORAL EXPRESSION:  Does applicant communicate effectively and articulately?  Are thoughts expressed clearly and concisely?  How effective will this applicant be arguing motions or appeals?

<u>5.E</u>    TRIAL POTENTIAL:  Will the applicant perform successfully in court?  Will the applicant be a forceful and persuasive advocate for the government?  Is the applicant too meek?  Does the applicant project sincerity and integrity?  How capable will the applicant be at advocating a position in litigation that may be at odds with his or her personal opinion?  Will applicant relate well to a jury?

<u>n/a</u>    APPEARANCE:  Are grooming, dress, and demeanor appropriate?

Telephone interview at my request because I couldn't do the in person interview when she was in the office.

<u>F.</u>    OVERALL RATING

Please provide a detailed explanation of the reasons for your evaluation:

Ms. Momeni is a very strong candidate who should be considered for additional interviews.  Her experience with the New Jersey Attorney General's Office would make her an ideal fit for the Civil Division.  Her work there is almost identical to our employment law practice.  Indeed, her writing sample compared very favorably to briefs prepared in this office every day that deal with employment law issues.  She could clearly hit the ground running in the employment area and handle a regular docket of those cases.  However, she doesn't have the same level of experience in our other practice areas.  In fact, she quite readily conceded that she had not handled any Tort or FOIA matters for instance, but she seemed quite confident without being cocky that she could become proficient in handling these matters.  During the interview she supported this assertion by discussing her experience in working with experts in employment cases and stating that those skills could transfer to using experts on the standard case in medical malpractice cases.  This was a very good analogy and showed that Ms. Momeni has given a great deal of consideration to the requirements of this position and her ability to meet those requirements.  In sum, I think she has the potential to be a very skilled and productive Civil AUSA.

2

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (GOD)

Name of
Applicant     Meredith Manning          Date of
                                        Interview     7/14/04

Interviewer    Peter Blumberg

RANKING CATEGORIES:

W – Weak – Applicant is weak in this category compared to others interviewed

Q – Qualified – Applicant matches others interviewed

S – Strong – Applicant is strong in this category compared to others interviewed

E – Exceptional – Applicant is exceptional in this category compared to others interviewed

_____

**S**    **LEGAL ABILITY:** How bright is this applicant? Is the applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

**E**    **KNOWLEDGE AND EXPERIENCE:** Does the applicant have significant legal experience particularly in criminal law or evidence or in litigation? Is the applicant so strong in a particular area that he or she might fill a particular need in the office?

**S**    **MATURITY AND JUDGMENT:** Does this applicant possess common sense? Are the applicant's responses to questions candid and realistic? Does the applicant seem flexible or rigid? Is the applicant stable, with good ethical instincts? Is this an applicant in whom you feel confidence as a representative of this office in court?

**E**    **INTEREST AND MOTIVATION:** Does applicant merely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in criminal law? Does the applicant know what he or she wants to do?

**E**    **ENERGY AND INITIATIVE:** Is the applicant a "self-starter" or someone who will only act in response to close direction and supervision? Will the applicant "carry his or her own weight"? Can the applicant be depended on to work extra time when a problem or emergency requires it?

**S/E**  **EFFECTIVENESS WITH OTHERS:** Is applicant diplomatic? Respectful? Cooperative? Would applicant be firm without being abrasive? Docile? Condescending? Is the applicant likeable?

 **ORAL EXPRESSION:** Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will the applicant be in arguing motions or appeals?

 **TRIAL POTENTIAL:** Will the applicant perform successfully in court? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant too meek? Does the applicant project sincerity and integrity? How capable will the applicant be in developing a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

**APPEARANCE.** Are grooming, dress, and demeanor appropriate?

**OVERALL RATING**

Please provide a detailed explanation of the reasons for your evaluation:

Attached →

2

I think Ms. [illegible] would be an excellent addition to the office. She already brings in the whole array of the skills needed to be successful in this practice, including a strong knowledge of employment law, and the ability to juggle multiple matters and overlapping deadlines. She also has had extensive experience with depositions and discovery, as well as trial preparation (though her trial notes settled on the eve of trial).

She also came to the interview with "eyes wide open" – she understood the considerable commitment that comes with being a Civil AUSA, and appeared to have a fairly good understanding of our practice. She would also be a good fit with our office; she appeared to be both outgoing and enthusiastic, someone that everyone would enjoy working with.

Her biggest concern was that she was unfamiliar with the Department of Justice, and that our office might have a preference for persons from DOJ (perhaps due to speed of clearances). In this instance, I think someone who has the kind of experience in employment discrimination that Ms. [illegible] brings probably puts her ahead of most applicants. Also, a slightly longer wait for the clearance process is well worth it if the person is ultimately going to give us four years (or more) of service. I would welcome the chance to work with her.

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (2000)

Name of
Applicant: *Meredith Dumont*          Date of
Interview: *July 13, 2004*

Interviewer: *Eric Lawrence*

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

---

**S**     **LEGAL ABILITY:** How bright is the applicant? Is the applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

**S+**    **KNOWLEDGE AND EXPERIENCE:** Does the applicant have significant legal experience particularly in criminal law or evidence (a la litigation)? Is the applicant so strong in a particular area that he or she simply fills a particular need in the office?

**E**     **MATURITY AND JUDGMENT:** Does this applicant possess common sense? Are the applicant's responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant stable, with good ethical instincts? Is this an applicant in whom you feel confidence as a representative of the office in court?

**E**     **INTEREST AND MOTIVATION:** Does applicant sincerely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular reason to commit him/herself? Does the applicant know what he or she wants to do?

**E**     **ENERGY AND INITIATIVE:** Is the applicant a "self-starter" or someone who will only act to satisfy close direction and supervision? Will the applicant "carry his or her own weight?" Can the applicant be counted on to work even when faced with a problem or unexpected requires it?

**S+**    **EFFECTIVENESS WITH OTHERS:** Is person diplomatic? Respectful? Cooperative? Would applicant be fun without being abrasive? Tactful? Condescending? Is the applicant likeable?

5+    **ORAL EXPRESSION:** Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will the applicant be arguing matters of appeals?

5+    **TRIAL POTENTIAL.** Will this applicant perform successfully in court? Will the applicant be a creative and persuasive advocate for the government in the applicant's work? Does the applicant project sincerity and integrity? How capable will the applicant be at arguing a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

5+    **APPEARANCE:** Are grooming, dress, and demeanor appropriate?

5+    **OVERALL RATING**

    Please provide a detailed explanation of the reasons for your evaluation.

_[handwritten evaluation, largely illegible]_

Plaintiff's Exhibit I

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (1991)

Name of Applicant _Denton Peterson_    Date of Interview _9/21/04_

Interviewer

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S – Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

 E*  _Star quality_ - Applicant is the best among all I have interviewed

___ **LEGAL ABILITY:** How bright is this applicant? Is this applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

___ **KNOWLEDGE AND EXPERIENCE:** Does the applicant have significant legal experience particularly in criminal law or evidence or in litigation? Is the applicant so strong in a particular area that he or she might fill a particular need in the office?

___ **MATURITY AND JUDGMENT:** Does this applicant possess common sense? Are the applicant's responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant stable, with good ethical instincts? Is this an applicant in whom you feel confidence as a representative of this office in court?

___ **INTEREST AND MOTIVATION:** Does applicant merely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in criminal law? Does the applicant know what he or she wants to do?

___ **ENERGY AND INITIATIVE:** Is the applicant a "self-starter" or someone who will only act in response to close direction and supervision? Will the applicant "carry his or her own weight?" Can the applicant be counted on to work extra time when a problem or emergency requires it?

___ **EFFECTIVENESS WITH OTHERS:** Is applicant diplomatic? Respectful? Cooperative? Would applicant be firm without being abrasive? Hostile? Condescending? Is the applicant likeable?



ORAL EXPRESSION:  Does applicant communicate effectively and articulately?  Are thoughts expressed clearly and concisely?  How effective will this applicant be arguing motions or appeals?

TRIAL POTENTIAL:  Will this applicant perform successfully in court?  Will the applicant be a forceful and persuasive advocate for the government?  Is the applicant too meek?  Does the applicant project sincerity and integrity?  How capable will the applicant be at advocating a position in litigation that may be or exist with his or her personal opinion?  Will applicant relate well to a jury?

APPEARANCE:  Are grooming, dress and demeanor appropriate?

C⁺    OVERALL RATING

Please provide a detailed explanation of the reasons for your evaluation:

Attached

2

I cannot imagine the reason that we would not make every effort to give Benton an offer. Further, I think he should be moved to the head of the line (i.e., he should be the next one to get an offer. Benton actually asked the Department of Labor to put him on trial level litigation matters in order to get more experience to better position himself for a job here. There's nothing I can say in this write up that speaks louder than that.

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (10/01)

Name of Applicant    Benton G. Peterson    Date of Interview    9-31-04

Interviewer    Michael J Ryan

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

_E_    **LEGAL ABILITY:** How bright is this applicant? Is this applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

_E_    **KNOWLEDGE AND EXPERIENCE:** Does the applicant have significant legal experience particularly in criminal law or evidence or in litigation? Is the applicant so strong in a particular area that he or she might fill a particular need in the office?

_E_    **MATURITY AND JUDGMENT:** Does this applicant possess common sense? Are the applicant's responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant stable, with good ethical instincts? Is this an applicant in whom you feel confidence as a representative of the office in court?

_E_    **INTEREST AND MOTIVATION:** Does applicant merely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in criminal law? Does the applicant know what his or her wants to do?

_E_    **ENERGY AND INITIATIVE:** Is the applicant a "self-starter" or someone who will only act in response to close direction and supervision? Will the applicant "carry his or her own weight?" Can the applicant be counted on to work extra time when a problem or emergency requires it?

_E_    **EFFECTIVENESS WITH OTHERS:** Is applicant diplomatic? Respectful? Cooperative? Would applicant be firm without being abrasive? Hostile? Condescending? Is the applicant likeable?

E     ORAL EXPRESSION: Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will this applicant be arguing motions or appeals?

E     TRIAL POTENTIAL: Will this applicant perform successfully in court? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant too meek? Does the applicant project sincerity and integrity? How capable will the applicant be at advocating a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

E     APPEARANCE: Are grooming, dress, and demeanor appropriate?

E     OVERALL RATING

Please provide a detailed explanation of the reasons for your evaluation:

Benton Peterson has already served successfully as a SAUSA in our Civil Division. He is extremely enthusiastic about the possibility of working full-time for us. He has the "right stuff" and would make an excellent addition to our Civil staff.

2

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (2004)

Name of
Applicant: Barron G. Peterson                    Date of
Interview: 9/21/04

Interviewer: Daniel E. Van Horn

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

S    LEGAL ABILITY: How bright is this applicant? Is this applicant imaginative and quick to grasp new
     ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to
     hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

S    KNOWLEDGE AND EXPERIENCE: Does the applicant have significant legal experience
     particularly in criminal law or evidence or in litigation? Is the applicant so strong in a particular area that he
     or she might fill a particular need in the office?

S    MATURITY AND JUDGMENT: Does this applicant possess common sense? Are the applicant's
     responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant stable,
     with good ethical instincts? Is this an applicant in whom you feel confidence as a representative of this office
     in court?

E    INTEREST AND MOTIVATION: Does applicant merely want to obtain trial experience, or is he
     or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in
     criminal law? Does the applicant know what he or she wants to do?

E    ENERGY AND INITIATIVE: Is the applicant a "self-starter" or someone who will only act in
     response to clear direction and supervision? Will the applicant "carry his or her own weight?" Can the
     applicant be counted on to work extra time when a problem or emergency requires it?

E    EFFECTIVENESS WITH OTHERS: Is applicant diplomatic? Respectful? Cooperative? Would
     applicant be firm without being abrasive? Hostile? Condescending? Is the applicant likeable?

_6._  **ORAL EXPRESSION:** Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will this applicant be arguing motions or appeals?

_E._  **TRIAL POTENTIAL:** Will this applicant perform successfully in court? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant too timid? Does the applicant project sincerity and integrity? How capable will the applicant be at advocating a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

_F._  **APPEARANCE:** Are grooming, dress, and demeanor appropriate?

**5.  OVERALL RATING**

   Please provide a detailed explanation of the reasons for your evaluation.

This applicant worked in the Civil Division as a SAUSA and was an effective litigator who was well-liked by everyone in the Division. His writing and analysis were average to good, but his interest and enthusiasm are second to none. Since the end of his SAUSA detail, he has acquired additional experience that enhances his qualifications. His trial and courtroom presence combined with an excellent demeanor that give him unlimited potential as an incisive advocate. He is a very strong candidate.

2

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (1999)

Name of _Brenda Williams_                                   Date of _28 Sept 99_
Applicant                                                                  Interview

Interviewer _Swanhart_

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed



_Q/S_    **LEGAL ABILITY:** How bright is the applicant? Is the applicant imaginative and quick to grasp problems? Can the applicant adequately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

_S_    **KNOWLEDGE AND EXPERIENCE:** Does the applicant have significant legal experience particularly in criminal law or evidence or in litigation? Is there apparent to be strong in a particular area that he or she might fill a particular need in the office?

_S_    **MATURITY AND JUDGMENT:** Does this applicant possess common sense? Are the applicant's responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant stable, with good ethical instincts? Is this an applicant in whom you feel confidence as a representative of this office in court?

_S-_    **INTEREST AND MOTIVATION:** Does applicant merely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in criminal law? Does the applicant know what he or she wants to do?

_S-_    **ENERGY AND INITIATIVE:** Is the applicant a "self-starter" or someone who will only act in response to clear direction and supervision? Will the applicant "carry his or her own weight?" Can the applicant be counted on to work extra hours when a problem or emergency requires it?

_S_    **EFFECTIVENESS WITH OTHERS:** Is applicant diplomatic? Respectful? Cooperative? Would applicant be firm without being abrasive? Humble? Understanding? Is the applicant likeable?

4/5 **ORAL EXPRESSION:** Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will the applicant be in arguing motions or appeals?

5 **TRIAL POTENTIAL:** Will the applicant perform successfully in court? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant too rash? Does the applicant project sincerity and integrity? How comfortable will the applicant be at advocating a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

5 **APPEARANCE:** Are grooming, dress and demeanor appropriate?

5 **OVERALL RATING**

**Please provide a detailed explanation of the reasons for your evaluation:**

Benton, who worked for us as a Special Asst [illegible] demonstrated strong writing and oral skills while he was here. His prior work as a [illegible] in the [illegible] and his intellectual skills make him a formidable advocate in a trial setting. Benton has a great attitude and got along well with the staff while he was here. I believe he would make an exceptional AUSA.

[signature]

# Memo

To:        Kenneth L. Weinstein

From:      Channing Phillips, Principal AUSA

Date:      November 30, 2004

Subject:   Civil AUSA Applicant interview with Benton Peterson scheduled for
           Tuesday, November 30, 2004

Benton Peterson is a 33-year-old 1995 graduate of Marquette University, where he received his Bachelor of Arts degree, with distinction, double majoring in history and political science with a minor in economics. In 1998, he received his Juris Doctor Degree, from the University of Wisconsin Law School, where he was Managing Editor of the Law Review. In January 2000, Benton joined the Office of the Solicitor of Labor where he has served as litigation and appellate counsel. One of his cases has included serving as co-counsel for the largest dollar volume case prosecuted by the Secretary of Labor in federal court. Between December 2001 and September 2002, he served as a Special Assistant United States Attorney with our Office, assigned to our Civil Division.

Benton applied to our office in September 2004 and breezed through the interviews, in part, because he is a known commodity, that is, the Civil Division is very familiar and impressed with his work. All of his interviewers gave him high marks. Mike Ryan ranked him as "exceptional" and noted that *"Benton Peterson has already served successfully as a SAUSA in our Civil Division. He is extremely enthusiastic about the possibility of working full-time for us. He has the "right stuff" and would make an excellent addition to our Civil staff."*

Dan Van Horn ranked him as "strong plus." He noted that *"[t]his applicant worked in the Civil Division as a SAUSA and was an effective litigator who was well-liked by everyone in the Division. His writing and analysis were average to good, but his interest and motivation are second to none. Since the end of his SAUSA detail, he has acquired additional experience that enhances his qualifications. He has an imposing presence combined with an excellent demeanor that give him unlimited potential as an in-court advocate. He is a very strong candidate."*

Another interviewer (either Madelyn Johnson or Doris Coles Huff - I'm not certain who at this writing since this evaluation sheet is unsigned but I'll confirm later) ranked him as above exceptional and stated, *"[she] cannot imagine the reason that we would not make every effort to give Benton an offer. Further, [she] think[s] he should be moved to the head of the line; i.e., he should be the next one to get an offer. Benton actually asked the Department of Labor to put him on trial-level litigation matters in order to get more experience to better position himself for a job here. There's nothing [she] [could] say in this write up that speaks louder than that. "*

Page 7 of 2.

Craig Lawrence made it unanimous. He also described Benton as "exceptional." He noted that "*Benton was with us as a Special and demonstrated strong writing and oral skills while he was here. His size makes him a presence in the courtroom and his intellectual skills make him a formidable advocate in a trial setting. Benton has a great attitude and fit in very well with the staff while he was here. [Craig] believe[d] he would be an exceptional AUSA.*"

By all appearances, Benton looks like a no-brainer as a civil AUSA hire.

Plaintiff's Exhibit J

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (1993)

Name of Applicant: _John Tracy_          Date of Interview: _17 Sept 99_

Interviewer: _Lawrence_

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

 **LEGAL ABILITY:** How bright is this applicant? Is this applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

 **KNOWLEDGE AND EXPERIENCE:** Does the applicant have significant legal experience, particularly in criminal law or evidence or in litigation? Is the applicant as strong in a particular area that he or she might fill a particular need in the office?

 **MATURITY AND JUDGMENT:** Does the applicant possess common sense? Are the applicant's responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant stable, with good ethical instincts? Is this an applicant whom you feel confidence as a representative of this office in court?

 **INTEREST AND MOTIVATION:** Does applicant merely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in criminal law? Does the applicant know what he or she wants to do?

 **ENERGY AND INITIATIVE:** Is the applicant a "self-starter" or someone who will only act in response to close direction and supervision? Will the applicant "carry his or her own weight?" Can the applicant be counted on to work even time when a problem or emergency requires it?

 **EFFECTIVENESS WITH OTHERS:** Is applicant diplomatic? Respectful? Cooperative? Would applicant be firm without being abrasive? Flexible? Understanding? Is the applicant likeable?

[illegible] **ORAL EXPRESSION:** Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will this applicant be arguing motions or appeals?

[illegible] **TRIAL POTENTIAL:** Will the applicant's performance [illegible] fully be used? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant too meek? Does the applicant project sincerity and integrity? How capable will the applicant be at advocating a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

[illegible] **APPEARANCE:** (Are grooming, dress, and demeanor appropriate?)

[illegible] **OVERALL RATING**

**Please provide a detailed explanation of the reasons for your evaluation:**

[illegible] is a very strong candidate. He is bright, articulate and engaging. His clerkship will stand him in good stead and he has a broad range of private practice in his background that makes him suited to our litigation practice. Although his private practice experience is not generally in our area ([illegible] for example), his intelligence and enthusiasm for our office would enable him to be effective very quickly.

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (1999)

Name of  John Truong                Date of   9/19/08
Applicant                           Interview

Interviewer  Brian Sanders

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

S    LEGAL ABILITY:  How bright is this applicant?  Is this applicant imaginative and quick to grasp new ideas?  Can the applicant adequately analyze legal problems and identify relevant issues?  Are answers to hypothetical questions logical and reasoned?  What is the quality of applicant's law school academic record?

S    KNOWLEDGE AND EXPERIENCE:   Does the applicant have significant legal experience, particularly in criminal law or evidence or in litigation?  Is the applicant so strong in a particular area that he or she might fill a particular need in the office?

Q    MATURITY AND JUDGMENT:  Does this applicant possess common sense?  Are the applicant's responses to questions sound and realistic?  Does the applicant seem flexible or rigid?  Is the applicant stable, with good ethical instincts?  Is this an applicant in whom you feel confidence as a representative of this office to assist?

S    INTEREST AND MOTIVATION:  Does applicant merely wish to obtain trial experience, or is he or she interested in being a prosecutor and in public service?  Does the applicant have a particular interest in criminal law?  Does the applicant know what kind of work to do?

Q    ENERGY AND INITIATIVE:   Is the applicant a "self-starter" or someone who will only act in response to close direction and supervision?  Will the applicant "carry his or her own weight?"  Can the applicant be counted on to work extra time when a problem or emergency requires it?

Q    EFFECTIVENESS WITH OTHERS:  Is applicant diplomatic?  Respectful?  Cooperative?  Would applicant do this without being a "pushover"?  Hostile?  Condescending?  Is the applicant likeable?

Q   ORAL EXPRESSION.  Does applicant communicate effectively and articulately? Are thoughts expressed clearly and cogently? How adequate will the applicant be arguing motions or appeals?

Q   TRIAL POTENTIAL. Will this applicant perform competently in court? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant at ease? Does the applicant project maturity and strength? How capable will the applicant be advocating a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

Q   APPEARANCE. Are grooming, dress, and demeanor appropriate?

Q   OVERALL RATING

Please provide a detailed explanation of the reasons for your evaluation.

Based upon my interview of John, I think he would do fine as an AUSA in the civil division. But I do not believe he is as strong a candidate has some of the other applicants who have interviewed this week. He does not have any trial experience, and his civil litigation experience is focused on antitrust and corporate litigation — is not directly applicable to our practice.

2

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (10/01)

Name of            John Truong              Date of
Applicant                                   Interview    September 17, 2004

Interviewer

RANKING CATEGORIES:

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional – Applicant is exceptional in this category compared to others interviewed

--------------------------------------------------

E____    LEGAL ABILITY: How bright is the applicant? Is the applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

S-E____  KNOWLEDGE AND EXPERIENCE: Does the applicant have significant legal experience particularly in criminal law or evidence or in litigation? Is the applicant so strong in a particular area that he or she might fill a particular need in the office?

E____    MATURITY AND JUDGMENT: Does this applicant possess common sense? Are the applicant's responses to questions sound and reliable? Does the applicant seem flexible or rigid? Is the applicant stable with good critical instincts? Is this an applicant in whom you feel confidence as a representative of this office in court?

S-E____  INTEREST AND MOTIVATION: Does applicant merely want to obtain trial experience, or is he or she interested in being a prosecutor and in public service? Does the applicant have a particular interest in criminal law? Does the applicant know what he or she wants to do?

S____    ENERGY AND INITIATIVE: Is the applicant a "self-starter" or someone who will only act in response to close direction and supervision? Will the applicant "carry his or her own weight"? Can the applicant be counted on to work extra time when a problem or emergency requires it?

S-E____  EFFECTIVENESS WITH OTHERS: Is applicant diplomatic? Respectful? Cooperative? Would applicant be firm without being abrasive? Hostile? Condescending? Is the applicant likeable?

§     ORAL EXPRESSION: Does applicant communicate effectively (i.e. articulately)? Are thoughts expressed clearly and concisely? How effective will the applicant be arguing motions or appeals?

§     TRIAL POTENTIAL: Will the applicant perform successfully in court? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant too meek? Does the applicant project sincerity and integrity? How capably will the applicant keep advocating a position a holding does that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

E.___   APPEARANCE: Are grooming, dress, and demeanor appropriate?

S.K   OVERALL RATING

**Please provide a detailed explanation of the reasons for your evaluation:**

Mr. Truong was very engaging during his interview.   During his time at Morgan, Lewis it appears that he has aggressively sought out opportunities to develop his litigation skills.  From his description it appeared that the partners and senior associates have entrusted him with many significant assignments.  Although he has not handled matters independently as would be expected of him in the Civil Division, he has taken advantage of training opportunities and maximized his experience so that he could handle the responsibilities of a Civil assistant.  Moreover, he gained valuable insights into our practice as a law clerk to Judge Urbina.  His writing sample demonstrated that he could do the written work in this office.  Hence, I recommend him for additional interviews.

OFFICE OF THE UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA
AUSA APPLICANT EVALUATION FORM (1998)

Name of
Applicant          John Truong

Date of
Interview          9/14/04

Interviewer         Peter Blumberg

RANKING CATEGORIES

W - Weak - Applicant is weak in this category compared to others interviewed

Q - Qualified - Applicant matches others interviewed

S - Strong - Applicant is strong in this category compared to others interviewed

E - Exceptional - Applicant is exceptional in this category compared to others interviewed

Q    **LEGAL ABILITY.** How bright is this applicant? Is this applicant imaginative and quick to grasp new ideas? Can the applicant accurately analyze legal problems and identify relevant issues? Are answers to hypothetical questions logical and thoughtful? What is the quality of applicant's law school academic record?

Q    **KNOWLEDGE AND EXPERIENCE.** Does the applicant have significant legal experience particularly in criminal law or evidence or a litigator? Is the applicant so strong in a particular area that he or she might fill a particular need in the office?

Q    **MATURITY AND JUDGMENT.** Does this applicant possess common sense? Are the applicant's responses to questions sound and realistic? Does the applicant seem flexible or rigid? Is the applicant stable, with good ethical integrity? Is this an applicant in whom you feel confidence as a representative of this office in court?

Q    **INTEREST AND MOTIVATION.** Does applicant sincerely want to obtain trial experience, as a he or she interested in being a prosecutor and a public servant? Does the applicant have a particular interest in criminal law? Does the applicant know what he or she wants to do?

Q    **ENERGY AND INITIATIVE.** Is the applicant a "self-starter" or someone who will only act in response to close direction and supervision? Will the applicant "carry his or her own weight?" Can the applicant be counted on to work extra time when a problem or emergency requires it?

Q    **EFFECTIVENESS WITH OTHERS.** Is applicant diplomatic? Respectful? Cooperative? Would applicant be firm without being abrasive? Docile? Condescending? Is the applicant flexible?

 ORAL EXPRESSION: Does applicant communicate effectively and articulately? Are thoughts expressed clearly and concisely? How effective will the applicant be arguing motions or appeals?

 TRIAL POTENTIAL: Will the applicant perform competently in court? Will the applicant be a forceful and persuasive advocate for the government? Is the applicant too meek? Does the applicant project sincerity and integrity? How capable will the applicant be at advocating a position in litigation that may be at odds with his or her personal opinions? Will applicant relate well to a jury?

 APPEARANCE: Are grooming, dress, and demeanor appropriate?

 OVERALL RATING

Please provide a detailed explanation of the reasons for your evaluation:

I hope that my awarding mostly "C"'s is not taken as a sign that John is not a good applicant, but the rating form says to assign a "C" when the "applicant matches other interviewed" and most of the people I have interviewed have been strong candidates.

John served as a law clerk to Judge Urbina in the '97-'98 term. That experience certainly would provide good exposure to the kind of work that we do here (both type and volume), and also would give him a good understanding of the kind of work product (both written and oral) that is most persuasive with the Court. Since the end of his clerkship, John has done principally antitrust and cartel investigations, which, based on the interview, is a different type of litigation (big case, heavy document) than the kind we do here most of the time. However, in the course of his years at the firm, he has acquired substantial experience in both taking and defending depositions, working with expert witnesses, and writing and arguing motions. With six years of litigation experience, he should be able to handle much of what comes across the plate of an AUSA.

I was a little surprised that he did not have more questions during the interview. He said that Keith Morgan was able to explain the practice well, but with Brian and I on the panel I would have expected questions that seek the AUSA's perspective. (Having a few questions is always a good idea for an interviewee.) It did lead me to wonder whether John really wants to work here, or whether he just wants to leave Morgan Lewis.

I do believe that if selected, John would be a solid contributor to the office, and would be a good "fit" in terms of personality and work ethic.

# Memo

To:        Kenneth L. Wainstein

From:      Chauncey Phillips, Principal AUSA

Date:      December 4, 2004

Subject:   Civil AUSA Applicant interview with John C. Truong scheduled for
           Monday, December 6, 2004

John C. Truong is a 34-year-old 1993 graduate of the University of Southern California, where he received his Bachelor of Arts degree. In 1997, he was awarded his Juris Doctor degree from American University's Washington College of Law. In 2003, he also received his Master's Degree from the American University's School of International Service. After law school, John worked for the Honorable Ricardo M. Urbina, U.S. District Judge for the District of Columbia. He then joined the law firm of Morgan, Lewis & Bockius as an Associate where he remains today. His practice focuses on price-fixing and bid-rigging cartel investigations, antitrust counseling, and criminal and civil litigation.

John applied to our Office in August 2004, and began interviewing in September. While all of his interviewers liked him and thought he would be a solid contributor, the extent and level of support varied. For example, Peter Blumberg only ranked him as "qualified." However, he wrote that he "hope[d] that [his] awarding merely "Qs" is not taken as a sign that John is not a good applicant, but the rating goes to weight a "Q" when other "applicants matches others interviewed" and most of the people [he] [has] interviewed have been strong candidates. John served as a law clerk to Judge Urbina in the '97 - '98 term. That experience certainly would provide good exposure to the kind of work that we do here (both type and volume), and also would give him a good understanding of the kind of work product (both written and oral) that is most persuasive with the Court. Since the end of his clerkship, John has done principally antitrust and cartel investigations, which based on the interview, is a different type of litigation (big case-heavy document), than the kind of work we do here most of the time. However, in the course of his years at the firm, he has acquired substantial experience in both taking and defending depositions working with expert witnesses, and writing and arguing motions. With six years of litigation experience, he should be able to handle much of what comes across the plate of an AUSA. [He] was a little surprised that he did not have more questions during the interview. He said that Keith Morgan was able to explain the practice well, but with Helen and [Peter] on the panel [Peter] would have expected questions that seek the AUSA's perspective .... It did lead [Peter] to wonder whether John really wants to work here, or whether he just wants to leave Morgan Lewis. [He] [has] believe that if selected, John would be a solid contributor to the Office, and would be a good "fit" in terms of personality and work ethic."

Page 2 of 2

Brian Senfield also only ranked John as "Qualified." However, he noted, like Peter, that "[b]ased upon [his] interview of John, [he] think[s] he would do fine as an AUSA in the Civil Division. But [he] do[es] not believe he is as strong a candidate as some of the other applicants who have interviewed this week. He does not have any trial experience, and his civil litigation experience focused on antitrust and corporate litigation -- is not directly applicable to our practice."

Another interviewer ranked John higher. Indeed, giving him a "strong/exceptional" ranking. That interviewer wrote, "Mr. Truong was very engaging during his interview. During his time at Morgan Lewis, it appears that he has aggressively sought out opportunities to develop his litigation skills. From his description it appeared that the partners and senior associates have entrusted him with many significant assignments. Although he has not handled matters independently, as would be expected of him in the Civil Division, he has taken advantage of training opportunities and maximized his experience so that he could handle the responsibilities of a Civil assistant. Moreover, he gained valuable insights into our practice as a law clerk to Judge Urbina. His writing sample demonstrated that he could do the written work in this office. Hence, [he] recommended him for additional interviews."

Lastly, Craig Lawrence found John to be a "very strong candidate. He's bright, articulate and experienced. His clerkship will stand him in good stead, and he has a broad range of private practice in his background that make him suited to our litigation practice. Although his private practice experience is not generally in our area (antitrust for example), his intelligence and enthusiasm for our office would enable him to be effective very quickly."

John Truong appears to be a solid candidate, although from the evaluations, perhaps not as strong as past ones. I would recommend seeing how he does in the final round. If he does well and impresses you, then we can move forward with the reference checks. If not, we should inquire of Civil as to whether they have any stronger candidates in the hopper.



Plaintiff's Exhibit K

**U.S. Department of Justice**

Executive Office for United States Attorneys

USA-2006-00075 (HH)

Equal Employment Opportunity Staff

Suite 524, National Place Building
1331 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

DEC 20 2006

Ms. Jill Weissman
Assistant General Counsel
EOUSA/General Counsel's Office
601 Third Street, N.W.
Suite 5500
Washington, D.C. 20530



RE:    Complaint of Discrimination
       Robert Andrew Spelke
       U.S. Attorney's Office, District of Columbia
       Agency No. USA-2006-00075 (HH)

Dear Ms. Weissman:

As requested, please find enclosed an unredacted copy of the applications of the selectees listed in volume three of the investigative summary and file in the matter of Robert Andrew Spelke.

Should you have any additional questions, please feel free to contact EEO Specialist Hilda L. Hudson or me at (202) 514-3982.

Sincerely,

Rita M. Sampson
Assistant Director

cc: Kevin Brynes, Esquire (w/enclosures)
    Wade & Byrnes P.C.
    616 North Washington Street
    Alexandria, Virginia 22314-1991

CERTIFIED MAIL

# UN REDACTED COPIES

### Investigative File - Volume III - Additional Exhibits

Application of John F. Henault, Jr.

Application of Andrea W. McBarnette

Application of Mercedeh Momeni

Application of John C. Truong

Application of Bennon Peterson

Application of Megan Rose (not provided)

Application of Kathleen Krusioka (not provided)

Plaintiff's Exhibit L

REBUTTAL DECLARATION OF ROBERT ANDREW SPELKE
COMPLAINT OF DISCRIMINATION
AGENCY NO USA-2006-00075

In rebuttal to the affidavits and information provided by Kenneth L. Weinstein, Channing Phillips, Monty Wilkinson, Craig Lawrence, Daniel F. Van Horn, Doris Coles-Huff and Lisa Goldfluss, the managers at the United States Attorney's Office for the District of Columbia (USAO-DC) in response my complaint of discrimination for failure to hire I provide the following:

All three supervisors at the Civil Division of the USAO-DC, i.e., Mr. Lawrence, Mr. Van Horn and Ms. Coles-Huff, agree that my qualifications and experience meet the criteria for an Assistant United States Attorney position with the Civil Division. Despite this position, Mr. Lawrence indicates that he consulted with John Fisher, then Chief of the Appellate Division and Mary Lou Leary, then an Assistant United States Attorney concerning my application. Indeed, Mr. Lawrence stated that he placed emphasis on the opinion of Mr. Fisher as a supervisor in the Appellate Division. According to Mr. Lawrence, both Ms. Fisher and Ms. Leary were "equivocal" about my application. No other details were provided by Mr. Lawrence on his conversation with these two individuals.

As for Mr. Fisher, despite Mr. Lawrence's assumption, he was never my supervisor at any time during my ten years with the USAO-DC. When I served in the Appellate Division, Mr. Fisher, to the best of my recollection, was not even a member of the USAO-DC. At that time, the Chief of the Appellate Division for the USAO-DC was Michael Farrell, not Mr. Fisher. Since he never supervised my work, it would be fruitless to rely on his opinion of my abilities.

As for Ms. Leary, she, too, was never my direct-line supervisor. Ms. Leary and I did work closely, however, when we served together on a felony trial team. Ms. Leary was the senior prosecutor on the three person team before the Honorable Ricardo Urbina in the District of Columbia Superior Court. Being the most junior of the team, I was responsible for the prosecution of drug felonies. Ms. Leary and I were team members for approximately one year in 1990. My performance during this one year time period was the basis of a monetary Superior Achievement Award. At no time during this time period did Ms. Leary ever question or criticized my ability or work ethic. I have had only very limited contact with Ms. Leary since I left the USAO-DC approximately eight years ago.

It should be pointed out that both Mr. Fisher and Ms. Leary were well aware of my disabilities while I was in the office. I suggest both be asked to provide statements under oath on this issue and both be asked whether they communicated that fact to the interviewing committee.

What is most striking, however, is that no Civil Division supervisor, including Mr. Lawrence, made any attempt to contact my current supervisor. If the office was truly concerned with the quality or ability to perform my work rather than my age and perceived disability, it would seem that at least one individual would have contacted the individual(s) that *presently*

supervise my work. Clearly, my current supervisor at the Narcotics and Dangerous Drug Section would have been in a better position to comment on my writing and litigation skills than Mr. Fisher and Ms. Leary. At a minimum, Mr. Lawrence could have contact Judge Urbina, who I appeared before daily for three of my ten years at the USAO-DC, to seek his assessment of my abilities.

In addition, Ms. Cole-Huff, although admitting that I am qualified for the job, stated that other candidates had civil experience. While that may be true, she fails to recognize that other candidates that were hired also had no civil experience. The hiring history of the Civil Division includes volumes of individuals that have been hired or transferred to the Civil Division without any civil litigation experience. Nonetheless, Ms. Cole-Huff readily admits that I have the ability to learn civil litigation quickly.

According to all three supervisors at the Civil Division, the reason they did not hire me was because of my desire to travel less than my present position. Apparently, they interpreted this to mean that I was simply looking for a way out of my present employment rather than a true interest in the Civil Division. In contrast, Mr. Lawrence never questioned the motivation and ability of Ms. Konopka, an individual hired instead of me with no civil litigation experience, who was working for the Department of Justice Inspector General's Office and wanted to come "back to litigation" nor Mr. Paterson, another individual who was hired instead of me, who simply "wanted to come back to our office". *See Affidavit of Craig Lawrence*, paragraph 17.

I believe this reason is a pretext for failing to hire me because of my age and perceived disability. During my lengthy interviews, I discussed both my reasons for leaving my present position as well as my desire to work for the Civil Division. Indeed, my statement about travel was not the only reason I gave to leave my present position nor why I was interested in the Civil Division. Rather, I indicated that I was looking for a new and exciting challenge in civil litigation. During my career with the Department of Justice, I have done countless drug prosecutions, from simply possession to international drug smugglers. I was excited at the opportunity to learn civil litigation and explained how that would compliment my career as a government attorney. I specifically told Ms. Cole-Huff that I knew the Civil Division worked harder than the Criminal Division, had no illusion about the immense caseload but was looking forward to coming back to the USAO-DC as an AUSA in the Civil Division.

Pursuant to 28 U.S.C. Section 1746;

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____          4/24/06

Robert A. Spelke                          Date

Plaintiff's Exhibit M

Admitted on 10-10-89
Discharged on 10-12-89

CHIEF COMPLAINT:

    Nausea.

HISTORY OF PRESENT ILLNESS:

    The patient is a 32-year-old, white male with history of multiple
pheochromocytomas admitted now for chemotherapy.  The patient initially
presented at age-17 with an upper gastrointestinal bleed.  This required
emergency surgery and the pathologic report was unexpectedly leiomyosarcoma.
He was thus referred to Sloan Kettering where he had further gastric
resection.  At age-19 he developed a right neck mass which was found to be a
pheochromocytoma of the carotid body.  He had surgical resection of this
tumor but developed subsequent blood pressure elevations which prompted the
finding of a right adrenal field pheochromocytoma.  This was also resected but he
was subsequently found to have a mass anterior to the vertebral column in the
chest.  The decision was made at that time to defer surgery.  He then
developed left vocal cord paralysis thought secondary to recurrent laryngeal
nerve involvement.  The patient then on June 1980 developed increasing
symptoms of noise in his left ear and pulsatile tinnitis.  On physical exam
at that time, a pulsatile red mass was seen in the left ear.  Angiography at
that time revealed a large neoplastic lesion in the jugular fossa suspicious
for a glomus tumor.  He had radiation treatment to that area with resolution
of his symptoms.  Since then, he has been noted to develop a mass around the
celiac artery with involvement of the hepatic artery and a lesion near the
organ of Zuckerkandl's and an isolated liver mass in the right lobe of the
liver.  The decision was made for the patient to have chemotherapy in 21
cycles with the possible attempted surgical resection after chemotherapy.

DRUG AND THERAPEUTIC HISTORY:

    Current Medications:  Prazosin, 2 mg. P.O. b.i.d.

    Allergies:  He has no known allergies.

PAST HISTORY:

    Nothing in addition to that given in the History of Present Illness.

FAMILY HISTORY:

    Noncontributory.

Admitted on 10-10-89            DISCHARGE SUMMARY
Discharged on 10-12-89

Patient Identification

Spalka, Robert A.        22-64-56  1

The Clinical Center
National Institutes of Health
Inpatient Record
NIH-899 (Rev. 10-84)
PA 09-25-0099

- 1 -

SOCIAL HISTORY:

The patient is a lawyer and is married. He does no abuse alcohol. Does not smoke.

REVIEW OF SYSTEMS:

Negative.

PHYSICAL EXAMINATION:

Vital Signs: Blood pressure was 130/75 with a pulse of 95, respiratory rate of 15 and he was afebrile.

General Appearance: The patient was nauseated and vomiting, but alert and oriented times three.

Head, Ears, Nose and Throat: Atraumatic. Extraocular muscles intact. Pupils equal, round and reactive to light. Throat was clear.

Neck: Supple with postop changes of the right neck.

Lungs: Clear to auscultation and percussion.

Cardiac: Regular rate and rhythm without murmurs, rubs or gallops.

Abdomen: Several well healed abdominal scars. Abdomen was soft, nontender, nondistended without hepatosplenomegaly. Bowel sounds were present in all four quadrants.

Extremities: No clubbing, cyanosis or edema.

Neurologic: Alert and oriented times three. Cranial nerves II-XII intact. Five out of five strength. 2+ Reflex. Normal speech. Normal gait. and normal sensation.

SUMMARY OF SUBJECTIVE AND OBJECTIVE FINDINGS:

This is a 32-year-old, white male with history of multiple pheochromocytomas who currently appears well with the exception of nausea and vomiting.

Admitted on 10-10-89          DISCHARGE SUMMARY
Discharged on 10-12-89

Patient Identification

Spelko, Robert A.        22-44-56 1

The Clinical Center
National Institutes of Health
Inpatient Record
NIH-969 (Rev. 10-84)
PA: 09-25-0036

- 2 -

DIAGNOSTIC IMPRESSION ON ADMISSION:

PROBLEM #1 - Pheochromocytoma.

The patient is known to have multiple masses believed to be pheochromocytomas most likely this represents malignant disease given that he has a liver metastases.

PLAN:

The plan is to give him chemotherapy with CVD. Plan is for him to receive 21 cycles with possible attempt at surgical resection after the chemotherapy is completed. Plan is also to monitor his blood pressure during this period of time when he is receiving chemotherapy. If he tolerates the chemotherapy well without a hypertensive response, he can receive his further chemotherapy as an outpatient.

SIGNIFICANT FINDINGS:

Laboratory Data: White blood cell count 10.0. Hemoglobin 15.0, Hematocrit 47.9. Mean corpuscular volume 90. Platelet count 246,000. Differential revealed 84 polys, 1 band, 9 lymphocytes, 6 monocytes. The sodium was 143, potassium 4.1, chloride 108, CO-2 27, creatinine 1.1, glucose 116, BUN 11. Alkaline phosphatase 44, SGPT 12, SGOT 16, total bilirubin 0.6, albumin 4.3, calcium 9.7, magnesium 1.47, phosphorus 2.9.

X-rays: Chest x-ray revealed that the heart is within normal limits. The mediastinum is widened measuring 5.5 cm. in diameter. The consecutive films from 1986, 1987, and 1988 and 1989 show no change in the mass, the lung fields remain clear and the pleura is free of disease. Impression: Stable mediastinal mass over a five year period. An upper GI from this year revealed limited views of an upper GI are submitted. The esophageal mucosa is normal. The gastric rim is within normal limits. Two compression views show a mass effect in the lateral aspect of the stomach but this is not reproduced on overhead films. I am not certain of the significance of this since the fluoroscopic impression does not make mention of it. The patient is status-post partial gastrectomy. The anastomosis is normal without evidence of obstruction. The proximal small bowel was normal. CT scan from August 28, 1989, CT of the chest was performed with routine actual images. The patient has a mass density seen in the left paraesophageal area of the superior mediastinum on images. There is a 1 mm. nodule seen in the lateral aspect of the right lung on the image #2 which could represent a metastatic focus. There is another seen on the right middle lobe laterally on image 16. Abdominal CT scan reveals the following; the patient has multiple clips in the region of the right adrenal bed and in the right retroperitoneum. These obscure detail seriously. There is a low attenuation area on the right lobe

Admitted on 10-10-89          DISCHARGE SUMMARY
Discharged on 10-12-89

Joint Identification:

Spelke, Robert A.      22-44-56 1

-3-

The Clinical Center
National Institutes of Health
Inpatient Record
NIH-999 (Rev. 10-84)
PAs 09-25-0069

of the liver anterior to the inferior vena cava which may represent tumor. Unfortunately, I cannot see this area well. There is some patchy inhomogeneity of the liver as well. We have done an MRI on this patient and accompany report of that will be made revealing. Pancreatic head area is somewhat full. This could be due to the surgery in the retroperitoneum rather than recurrent tumor. Unfortunately, this is the first exam that I have on this patient. It would be helpful to have a postoperative exam on him with which to compare the present exam. The remainder of the abdomen appears normal. MRI of the chest with T1 and T2 weight spin echo sequences and spir sequences reveals a superior mediastinal mass described on the chest CT. They were unable to see any lung lesions as were seen on the CT scan. However, the MRI exam is a much more motion sensitive study, therefore it was felt that the CT readings were more reliable for this type of evaluation. The abdominal MRI performed with the same sequence revealed definitely an abnormality seen in the liver anterior to the inferior vena cava. The head of the pancreas area is not as prominent on the MRI as it was on the CT scan. It did not produce the prominent signal seen. There is also some prominent signal seen in the middle portion of the right lobe of the liver on image F7. All the foci of abnormality of that anterior to the inferior vena cava, that in the middle portion of the lobe of the liver and the lesion in the mediastinum have the extremely bright signal on T2 that suggests pheochromocytoma. Incidently, there are some mottle changes in the vertebral bodies which could represent some foci of metastatic disease as well.

COURSE IN HOSPITAL:

PROBLEM #1 - Pheochromocytoma.

The patient received chemotherapy on 10-10-89 with CVD. This is the first cycle of 21 cycles. The patient developed a significant amount of nausea and vomiting after his chemotherapy. However, with continued medication with antiemetics he did quite well and by the morning was feeling quite well and able to eat. He became mildly dehydrated when he was nauseated and vomiting.

OPERATIONS AND DATES PERFORMED:

None.

CLINICAL DIAGNOSIS:

Malignant pheochromocytoma.

CONDITION OF PATIENT:

Good.

Admitted on 10-10-89              DISCHARGE SUMMARY
Discharged on 10-12-89.

Patient Identification

Spzike, Robert A.      22-44-56 1

-2-

The Clinical Center
National Institutes of Health
Inpatient Record
NIH-269 (Rev. 10-84)
PA: 09-25-0099

INSTRUCTIONS TO PATIENT:

Diet: Resume regular diet.

Discharge Medications: Prazosin, 2 mg. P.O. b.i.d.

Physical Activity Limitations: No specific physical activity limitations.

DISPOSITION:

The patient is discharged to home with the plan for him to have follow up at the National Institutes of Health in three weeks for second round of chemotherapy.

Follow up Arrangements/Plans: Plan is for him to return every three weeks for the 21 cycles of chemotherapy.

Sign & Date: _____ 10/18/89
Fredrick P. Smshu, M.D.7B/10-12-89  (Dictated)
FPS:mvr:90125                10-14-89  (Transcribed)

Sign & Date: _____ 10/25/89
Senior (Attending) Physician

Admitted on 10-10-89                 DISCHARGE SUMMARY
Discharged on 10-12-89

Patient Identification

Spelke, Robert A.    23-44-56 1           -5-

The Clinical Center
National Institutes of Health
Inpatient Record
NIH-899 (Rev. 10-84)
PA: 09-25-0099

Period covered by this report:  From 10-2-89 to 1-1-90

SIGNIFICANT FINDINGS:

CT scan of the chest performed on 8-28-89 shows a mass density in the left paraesophageal area to superior mediastinum. There is also 1 mm. nodule seen in the lateral aspect of the right lung on image 12 that could represent a metastatic focus. Also a lesion seen in the right middle lobe laterally on image 15. Abdominal CT scan performed on 8-28-89 shows multiple surgical clips in the region of the right adrenal bed and in the right retroperitoneum. These obscure details seriously in this area. There is a low attenuation area in the right lobe of the liver and also a mass around the celiac access anterior the inferior vena cava.

MRI of the chest with T1 and T2 weighted sequences revealed the superior mediastinal mass described on the chest CT. They were unable to see any lung lesions that were seen on the CT scan. MRI of the abdomen showed the head of the pancreas area to be not as prominent as on the CT scan. There was some prominent signal seen in the middle portion of the right lobe of the liver corresponding to the area of well attenuation on the CT scan. All the foci of abnormality, including that anterior to the inferior vena cava, that in the middle portion of the right lobe of the liver, and the lesion in the mediastinum have the extremely bright signal on T2 weighted image that suggest pheochromocytoma. Incidentally, there are some mottle changes in the vertebral bodies which could represent some foci of metastatic disease.

Blood tests performed on 12-10-89 show a full blood picture consistent with recent chemotherapy. Urea, electrolytes, creatinine, LDH, calcium phosphate, uric acid, albumin and total protein were all within normal limits. Alkaline phosphatase was 49, bilirubin 0.7, ALT 116, and AST 42. Urinary catecholamines included norepinephrine, 418; epinephrine, less than 5; dopamine, 278; VMA, 13.6; metanephrine, 2.5. Of those results the urinary norepinephrine, VMA and metanephrine are abnormal.

An MIBG adrenal scan was performed on 8-28-89. Spot scintiphotos were obtained at 24 and 48 hours after tracer administration. There is a focal area of increased uptake in the left upper hemithorax close to the midline which corresponds with the abnormalities seen on the CT scan of the chest. There is a large focal area of increased uptake in the liver slightly to the left of the midline which appears to correspond to abnormality in the patient's liver scan. There was a third focal area of increased uptake which is very close to the midline and this corresponds to a level just inferior to the umbilicus. There is no corresponding abnormality on CT scan.

Sent Identification

Spaike, Robert A.        22-44-56 1

-1-

The Clinical Center
National Institutes of Health
Clinical Record
NIH-605 (Rev. 10-84)
PA: 09-25-0099

COURSE OF OUTPATIENT CARE/TREATMENT:

Mr. Spolke is a 52-year-old Justice Department Lawyer with probable Carney's syndrome. He originally presented in 1975 with hematemesis. He was found to have gastric leiomyosarcoma and this was removed in two operations. In 1978, he developed a right carotid body tumor which was removed and carotid graft performed. Biopsy revealed this tumor to be pheochromocytoma. Postoperatively, he remained hypertensive and was found to have increased catecholamines metabolites in both blood and urine. In 1979, a pheochromocytoma was removed from the right adrenal gland and he became normotensive. Chest x-ray at the time showed a left paratracheal mass. In 1981, he developed a left glomus jugular tumor which caused him to have a symptom of tinnitus. This was treated at Memorial Sloan Kettering with irradiation with a side effect that he has a greater than 80% hearing loss in the left ear.

In 1986, he developed hoarseness and was found to have left vocal cord paralysis. On chest x-ray, there was an increase in size of the left paratracheal mass, but catecholamines were said to have risen.

He was initially seen in the National Cancer Institute's Clinic on 10-2-89 at which time he was extremely well complaining of only very occasional episodes of palpitations and headache which were associated with rise in his blood pressure. He was seen by Dr. Antonio T. Fojo and commenced on an old protocol MR-197 for malignant pheochromocytoma. This consisted of intermittent treatment with DTIC, vincristine and cyclophosphamide. To date, he has received four courses of treatment and after the first two cycles the DTIC and cyclophosphamide doses were increased by 33%. The dose of vincristine was reduced to 2 mg. total because of symptoms of peripheral neuritis. He has tolerated the treatment extremely well, although requiring the cycle to be changed from three to four weeks with the increased doses of therapy. His urinary catecholamines have been fluctuating but if anything have gradually increased since he has commenced treatment. He is due to have a CT scan of the chest and abdomen performed on 1-2-89 and as long as there is not evidence of progressive disease will go on for a further six courses of treatment.

OPERATIONS AND DATES PERFORMED:

NIL.

CLINICAL DIAGNOSES:

1. Malignant pheochromocytoma currently receiving combination chemotherapy with DTIC, vincristine and cyclophosphamide.
2. Hypertension.

Period covered by this report:          OUTPATIENT SUMMARY
    From 10-2-89 to 1-1-90

Patient identification:

Spolke, Robert A.        22-44-56 1          — 2 —

The Clinical Center
National Institutes of Health
Outpatient Record
NIH-532 (Rev. 10-64)
PA: 09-25-0099

3.  Status-post partial gastrectomy to remove gastric gl[x]omyoshroma.
4.  Status-post right carotid Body tumor removal and carotid graft.
5.  Status-post removal of phrochromocytoma from right adrenal gland.
6.  Status-post irradiation of left glomus jugular tumor.
7.  Left vocal cord paralysis.
8.  80% Hearing loss in left ear.

INSTRUCTIONS TO PATIENT:

Continue current medications.

No limitation on diet or physical activity.

DISPOSITION:

The patient is discharged to home and will be followed in the 12th Floor Outpatient Clinic.  His next course of chemotherapy will be due on 1-15-90.

Sign & Date: _____   1/2/90

            Gary L. Richardson, M.D./C/12-18-89   (Dictated)
            GER:mrc:90123                         12-26-89   (Transcribed)

Period covered by this report:        OUTPATIENT SUMMARY
   From 10-2-89 to 1-1-90

...ent Identification

Spalke, Robert A.        22-44-56 1

                                              -3-

The Clinical Center
National Institutes of Health
Outpatient Record
NIH-232 (Rev. 10-84)
PA: 09-25-0099

INTERNAL MEDICINE CENTER P.A.
8484 WISCONSIN AVENUE • SUITE 824 • CHEVY CHASE, MARYLAND 20815
TELEPHONE: 656-9170

August 9, 1989

Allergy/General Medicine
HARRY A. HORSTMAN, JR. M.D.

Cardiology/Internal Medicine
ROBERT L. FLYNN, M.D.

Endocrinology/Internal Medicine
JOSEPH P. SWIFT, M.D.

Hematology/Internal Medicine
DANIEL J. ESPOSITO, M.D.

Internal Medicine
GEORGE I. MISHTOWT, M.D.
ROBERT H. SLEE, M.D.
WENDY J. ROBNETT, M.D.

Office Manager
JACQUELINE R. BLEVINS

Registered Dietitian
BARBARA J. HASS

Harry R. Keiser, MD
Clinical Director
National Health, Lung and Blood Institute
National Institutes of Health
Bethesda, Maryland 20814

RE:  Robert Spelke                DOB:  7/11/57

Dear Dr. Keiser,

I am writing you regarding the above-named patient,
who is now 29 years of age.  The patient has a
recurrent pheochromocytoma and I am asking you to
see him and evaluate the aspects of his unusual
problem for diagnosis and therapy.  I have enclosed
a copy of a summary written by his prior physician
which I think outlines the history in regard to his
problem.  I have been seeing him intermittently
over the past two years and in that time his blood
pressure has been controlled on Minipress, 1 mg.
two times per day.  Recently however, it has gone
up to the range of 140-150/90, where it had been
much lower than that in the past.  Also, we are
aware of an abnormality on chest x-ray which has
been presumed to be a recurrent pheo, but because
of its location, it was felt by his physicians in
Long Island, that this should not be attacked
surgically.

I have also enclosed copies of two recent 24-hour
urine for VMA and catecholamines.  These figures
represent a mild increase over the values last
year, when his VMA was 9.7 and his total
norepinephrine was 285 and his epinephrine was 4.8.

He otherwise enjoys good health and works daily as
an attorney for the Justice Department.  He does
have residuals from his prior surgery and there is
some concern about a recent increase in hoarseness
that might have to do with the increase in size of
his chest tumor.

We have chosen not do any CAT scans or further
investigation at this point, but now the patient is
interested in further examination and I indicated
to him that I thought it would be wise for it to be
done in a facility such as your own where
angiography as well as sampling of various possible
sites of recurrent pheochromocytomas would be

Harry R. Keiser, MD
RE: Robert Spelke
August 9, 1989

Page 2

available. Whether or not this sole recurrence is
in his chest is not clear and also it is not clear
whether or not this could be successfully removed.

I would appreciate it if you would consider seeing
him and examining him further. He has a lot more
information from his physicians in Long Island that
we could obtain and I would be most interested in
your opinion about his case. His address is:
10701 Mist Have Terrace, Rockville, Maryland
20852. His home phone number is: (301) 231-7141
and his office phone is: (202) 272-9781. I will
attempt to contact you personally by the time you
receive this information.

Thank you for your concern in this regard.

Sincerely,

Joseph F. Smith, MD, FACP

JFS/bg
t-8/16/89

F84 A.W.
M68 A.W.
1834 A.W.
awnter dictate

PATIENT: SPELKE,ROBERT                          HSSN: 15-16-96 AGE: 51Y
ORDER #: 47044                                  ADMIT BY: SWIFT,JOSEPH M
ADMIT DATE: 08/16/88                            LOC: DP
SERVICE: 08/16/88                               ACCOUNT #: 315961
DICTATED BY: DRUMMOND,RICHARD R
REPORT STATUS: COMPLETE


CXR PA/LAT     (CC:0817101)
PA AND LATERAL CHEST: There is a left peritracheal mass assuring
a soft density with greatest dimension. This is unchanged in size since
the study of 5/16/87. In the lateral view this is not well seen
but appears to lie anteriorly. The lung is free of active inflammatory
disease. The heart is within normal limits. There has been no
significant change since the study dated 5/16/87.

UGI/AIR CON     (CC:0817470)
SUPINE ABDOMEN:  Show several metallic clips in the right upper
quadrant. There is a transitional lumbar vertebrae.

AIR CONTRAST UGI SERIES:   The patient has had a partial gastric
resection with Billroth Type II,gastroduodenostomy. The esophagus
is normal without evidence of  obstruction or deviation. No filling
defects are identified within the esophagus. The gastric remnant is
normal. There is no evidence of obstruction,filling defect or outlet
obstruction.  The visualized proximal small bowel appears normal.


IMPRESSION:
NORMAL POST-PARTIAL GASTRECTOMY-STATUS.

RD/enb
08/16/88
2:09 PM

                                    RICHARD R DRUMMOND, MD

PATIENT: SPELRE,ROBERT
ORDER #: 92342
ADMIT DATE: 07/06/89
SERVICE: 07/06/89
DICTATED BY: PALEY,ROBERT H
REPORT STATUS: COMPLETE

MRUN: 15-18-96 AGE: 61Y
ADMIT DR: SWIPI,JOSEPH P
FROM 07/06/89 FROM DR
ACCOUNT #: 364942

CXR PA/LAT    (CC:39121017)
CHEST:  Redemphadenopacy loss that is seen along the left paratracheal
border is unchanged in comparison to previous exam from the adjacent
bronchovascular markings. Chest is otherwise normal.

IMPRESSION:
NO INTERVAL CHANGE.

RP/pas
07/07/89
11:37 AM

                              ROBERT H PALEY, MD

PRINTED: FRI JUL 7, 1989 11:32 AM

Robert Spalke
Initial Office Visit
September 25, 1984

Mr. Spalke is a 27 year old gentleman followed previously by Dr. Howard
Kolodny with a diagnosis of leiomyosarcoma, multiple pheochromocytomas,
and glomus jugular tumor. This unusual grouping of tumors has been observed
in a small number of other patients. A series of these patients is
apparently being followed by Dr. J. Carney in the Department of Surgical
Pathology at Mayo Clinic in Rochester, Minnesota (53905).

The patient was in his usual state of good health until 1976 when he
developed a severe upper GI bleed. Surgery at that time revealed a
leiomyosarcoma which was removed in 2 surgical procedures. He did well
until 1978 when he developed a right carotid body tumor which on
pathologic evaluation proved to be a pheochromocytoma. Surgery at
that time required a carotid artery graft. Following surgery, the
patient was noted to have hypertension and, on further evaluation,
was noted to have increased catecholamine metabolites and in 1979 a
pheochromocytoma was removed from the right adrenal gland. The patient
continued to have increased catecholamine metabolites and on chest
x-ray a shadow was noted in his left chest which on angiogram proved
to be a tumor in the pulmonary aortic window which, in the opinion
of vascular surgeons, was not operable. It is assumed that this tumor
is a pheochromocytoma. The patient was treated initially with
dibenzyline and propranolol but this led to failure to ejaculate. He
was therefore begun on prazosyn 1 mg. bid.

In 1981, the patient developed tinnitus in his left ear which, on
evaluation, proved to be result of a glomus jugular tumor which was
treated with radiation therapy at Memorial Sloan Kettering Cancer Center
with apparent arrest of the tumor. The patient has approximately 50%
hearing loss in the left ear as a result of this.

For the last 6-7 years there has been apparently no change in the
x-ray of the patient's intrathoracic tumor. Approximately three years
ago, however, the patient developed some vocal cord paralysis involving
his left vocal cord which has been felt secondary to the tumor. Other
medical problems include a hiatal hernia. The patient had an episode
of increased bronchial secretions which was felt possibly secondary
to acid regurgitation from his hiatal hernia and was treated successfully
with zantac, 150 mgs. po bid. The patient also instituted measures
to decrease any reflux from his hiatal hernia. He continues on Zantac
at this time.

Because of moving from New York to the Washington area, the patient
is referred by Dr. Kolodny for further follow-up.

The patient has had no problems with headaches. He does note an occasion,
particularly when he goes to higher altitudes, that he has episodes
of palpitations and may have a mild headache at that time. These symptoms
abate if the patient goes off of his prazosyn and begins taking phenoxybenzamine
and propranolol.

works as a trial attorney for the U.S. Department of Justice.
Past Medical History: Remarkable as noted in his history of present illness. There are no known allergies to any medication.
Family History: Remarkable for a family history of diabetes, cancer and hypertension.
Review of Systems: The patient wears glasses. He has had approximately 80% loss of hearing associated with his glomus tumor.
Physical Examination: Revealed a well developed, well nourished white male in no acute distress.
Height: 714 inches.
Weight: 175 pounds.
Blood pressure: 120/70 right arm sitting.
Pulse: 68 and regular.
Skin: A pigmented nevus is noted on the left ankle.
Skeletal: Grossly normal.
HEENT: PERRL. EOMs full. Fundi benign. TMs intact with normal architecture. Mouth and nose benign.
Neck: A series of right neck surgical scars are noted. Thyroid is not enlarged. No significant adenopathy.
Chest: Clear to P&A.
Cardiovascular: No murmurs or gallops.
Abdomen: A right flank and mid abdominal surgical scar are noted. Normal bowel sounds. No masses. Non-tender.
Genitalia: Normal external genitalia. No hernia.
Rectal: Non-tender. No masses. Guaiac negative.
Extremities: No clubbing, cyanosis or edema.
Neurologic: Grossly intact.
IMPRESSION: Multiple pheochromocytomas, leomyosarcoma, glomus tumor, hiatal hernia with reflux by history.
Plan: The patient is to continue on his current medical regimen. I have suggested, however, that the patient may wish to try omitting his Zantac to see if symptoms recur off Zantac with gravity measures alone. Routine urine is obtained for urinalysis at this time. Blood is obtained for CBC and SMAC-24. A 24 hr. urine will be obtained for creatinine, VMA, metanephrines, and catecholamines. A PA and lateral chest x-ray is obtained. The patient will call shortly for these results. He will be seen in follow-up in approximately 6 months time.


February 28, 1995
Office Visit
Robert Spelke


Mr. Spelke returns complaining of a several week history of mild left costovertebral angle tenderness associated with some darkening of his urine. This has improved over the ensuing two weeks since it first occurred and, at present, he has almost no discomfort whatsoever and his urine has returned to almost its normal color. He has had no dysuria. Early on he did have some urinary frequency. There has been no fever. He has felt otherwise well.
Physical Examination: Revealed a well developed, well nourished white male in no acute distress.


X? are obtained. A repeat chest x-ray is to be obtained. Routine urinalysis

INTERNAL MEDICINE CENTER

ELKE, ROBERT

INTERNAL MEDICINE CENTER, P.A.
5454 WISCONSIN AVENUE
SUITE 925
CHEVY CHASE, MD   20815

| TEST NAME | IN RANGE | OUT OF RANGE | UNITS | |
|---|---|---|---|---|
| CHEM 24 PROFILE | | | | |
| CALCIUM | 8.9 | | mg/dl | 8.9 - 10.2 |
| IONIZED CALCIUM (CALCULATION) | 4.4 | | mg/dl | 2.2 - 4.7 |
| PHOSPHORUS | 4.0 | | mg/dl | 2.2 - 4.7 |
| GLUCOSE | 84. | | mg/dl | 70 - 112 |
| URIC ACID | 6.4 | | mg/dl | 4.2 - 8.5 |
| UREA NITROGEN | 19 | | mg/dl | 7 - 23 |
| CREATININE | 1.1 | | mg/dl | 0.7 - 1.5 |
| TOTAL PROTEIN | 6.4 | | gm/dl | 6.0 - 8.1 |
| ALBUMIN | 4.3 | | gm/dl | 3.4 - 4.5 |
| GLOBULIN | 2.1 | | gm/dl | 2.0 - 3.5 |
| ALBUMIN/GLOBULIN RATIO | 2.0 | | gm/dl | 1.2 - 2.3 |
| TOTAL BILIRUBIN | | 1.9  H | mg/dl | 0.2 - 1.2 |
| ALT (SGPT) | 17 | | IU/L | 8 - 40 |
| ALKALINE PHOSPHATASE | 139 | | IU/L | 38 - 126 |
| GGT | | | IU/L | 25 - 219 |
| AST (SGOT) | 13 | | IU/L | 13 - 48 |
| | | | IU/L | 8 - 65 |
| SODIUM | 142 | | mmol/L | 138 - 151 |
| POTASSIUM | 4.3 | | mmol/L | 3.5 - 5.1 |
| CHLORIDE | 110. | | mmol/L | 100 - 114 |
| CARBON DIOXIDE | 28 | | mEq/L | 19 - 32 |
| TRIGLYCERIDES | | 402  H | mg/dl | 0 - 165 |
| CHOLESTEROL | | 234  H | mg/dl | 131 - 200 |

Lab Director: DANIEL ESPOSITO, M.D.

| | | | | | |
|---|---|---|---|---|---|
| PATIENT | | COLLECTED | RECEIVE | REPORTED | |
| SPELKE, ROBERT | | 06/22/00 | 06/26/09 | 06/30/09 | |
| SEX | AGE | | INTERNAL MEDICINE CENTER, P.A. | ACCOUNT NO. | |
| M | | 5454 WISCONSIN AVENUE | 806801 | |
| PATIENT I.D. | | SUITE 925 | | |
| | | CHEVY CHASE, MD   20815 | LAB NO. | |
| | | 800801ST | 092185849 | |

| TEST NAME | RESULTS | | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| | IN RANGE | OUT OF RANGE | | |
| CATECHOLAMINES, FRACT., URIN | | | | 15 - 100 |
| NOR-EPINEPHRINE | | | UG/24 HR | |
| EPINEPHRINE | | | UG/24 HR | |
| DOPAMINE | 344 | | UG/24 HR | |
| TOTAL CATECHOLAMINE | | DUB.4 S | UG/24 HR | 20.0 - 552.0 |
| URINE VOLUME | 1.220 | | ML/24 HR | |
| | | 1278.00 | UG/24hrs | |

Lab Director: DANIEL ESPOSITO, M.D.

SWIFT

| PATIENT | COLLECTED | RECEIVED | REPORTED |
|---|---|---|---|
| SPELKE, ROGER | 07/31/89 | 07/31/89 | 08/06/89 |

| SEX | AGE | | ACCOUNT NO. |
|---|---|---|---|
| M | | JOSEPH SWIFT, M.D. | U89001 |
| | | 5454 WISCONSIN AVE. | |
| PATIENT ID NO. | | SUITE 923 | LAB NO. |
| | | CHEVY CHASE, MD   20815 | 89D167874 |

| TEST NAME | RESULTS | | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| | IN RANGE | OUT OF RANGE | | |
| URINARY FREE CORTISOL MICROG 24 | | | ng/24hrs | 0 - 10 |
| | | | | |
| CATECHOLAMINES FRACTIONATED | | | | |
| | | | UG/24 HR | |
| RESULTS RECHECKED AND VERIFIED | | | | |
| NOREPINEPHRINE | | | UG/24 HR | |
| DOPAMINE | | | UG/24 HR | |
| TOTAL CATECHOLAMINE | | | UG/24 HR | |
| URINE VOLUME | 1800 | | ML/24 HR | 6 - 5000 |
| CATECHOLAMINES TOTAL, URINE/24 | | | UG/24 HR | 0 - 1000 |
| URINE VOLUME | | | | |

Lab Director: DANIEL ESPOSITO, M.D.
PAGE 1 OF 1                                                          Final Report



# MAGNETIC IMAGING
## —OF WASHINGTON—



Charles A. Citrin, M.D.
Bruce S. Bowen, M.D.
John L. Sherman, M.D.

5530 Friendship Boulevard
Chevy Chase, Maryland 20815
301/951-7077

PATIENT        :  SPELKE, Robert
REF. PHYSICIAN :  Norman Barr, M.D.
DATE OF BIRTH  :  07-11-57
DATE OF EXAM   :  July 15, 1986

REPORT

Magnetic imaging of the brain with special attention to the posterior fossa was performed.

Routine sections through the cerebrum reveal normal differentiation of gray and white matter. The cerebral ventricles are normal in size and shape. There is no evidence of abnormal cerebral vascularity.

Thin sections through the posterior fossa reveal the presence of a 3 cm. mass in the left cerebellopontine angle. The mass appears to extend from the porus acousticus or into the porus acousticus, but the bulk of the tumor is in the cerebellopontine angle cistern. The tumor has slightly increased signal intensity relative to the adjacent cerebellum on the most heavily T2-weighted sequence, and slightly diminished intensity on the T1-weighted sequence. The tumor extends from the level of the left internal auditory canal, caudally, down to the base of the skull. There is noted to be a disparity in the visuali-zation of the jugular veins bilaterally. On the right side, the jugular vein is clearly seen as an area of prominent decreased signal, representing flow of blood. On the left, there is abnormal tissue density occupying the site of the jugular vein. The carotid artery appears normal. In the region of the sigmoid sinus, there are tubular areas of slightly increased signal intensity on the T2-weighted sequence. These may represent areas of paradoxical enhancement of slow-flowing blood, perhaps due to compression of the sigmoid sinus or jugular vein by the tumor. Several small areas of linear or tubular decreased signal intensity are noted associated with the tumor on both T1-weighted and T2-weighted pulse sequences. These raise the question of prominent vascularity supplying the tumor.

The fourth ventricle does not appear compressed and there is no evidence of brain stem torsion. The right cerebellopontine angle appears normal. There is no evidence of edema extending into the brainstem or adjacent cerebellar hemisphere.

Incidentally noted is the presence of the 12 to 13 mm. rounded area of increased signal intensity, apparently located in the nasopharyngeal airway.

~continued to page 2~

SPELKE, Robert                                                    Page 2
Magnetic Resonance Imaging Scan
July 15, 1986


OPINION:     There is a tumor in the left cerebellopontine angle measuring
             approximately 3 cm.  While the tumor appears to involve the
auditory canal and most likely represents an acoustic neuroma, there are
several atypical features which call that diagnosis into question.  I cannot
definitely exclude possible invasion caudally into the jugular foramen.  This
raises the question of a glomus jugulare tumor.  Another explanation for the
findings seen is that the jugular vein is compressed by the tumor and that
there is very slow flow in the vessel, although signal intensity does not
actually indicate thrombosis.  Signal intensity of the tumor is compatible with
an acoustic neuroma or a meningioma.  I would expect a glomus jugulare tumor to
have increased signal intensity, although this is not exclusionary.

RECOMMENDATION:  Because of the isointensity of the tumor, CT is recommended
                 with IV contrast.  It is expected that this tumor may enhance
and its caudal extent into the skull base could be more clearly evaluated.


John C. Sherman, M.D.

JCS:gde
0719C

EAR, NOSE AND THROAT MEDICAL GROUP OF WASHINGTON, P.C.

NAME: ROBERT SPELKE   DOB: 2-11-57   DATE: 7-2-86
ADDRESS: 10701 MIST HAVEN TERR ROCKVILLE, MD 20852   HOME: H301-231-7141   W202-272-6069
SPONSOR: SELF   ADDRESS:
OCCUPATION: TRIAL ATTORNEY   REF BY: Dr. _____

COMPLAINT: _____   ALLERGIES: 0

PRESENT ILLNESS: _____

THROAT: SORE THROAT _____

NECK: _____

EAR: HEARING R: _____   FULL: _____
     OTORRHEA: _____   INFECTION: _____
     TINNITUS: _____   R/O: _____
     HEAD INJURY: _____   OTHER: _____

GENERAL HEALTH: GROSS CHANGES: _____   GAIN: _____
MEDICATION: _____   STOP: _____
FAMILY: ASTHMO _____   DEAFNESS: _____
BLEEDING: _____   OTHER: _____

PHYSICAL EXAMINATION: _____

NOSE: EXT _____   MUCOSA: _____   SEPTUM: _____
BONES: _____   POLYPS: _____   NASOPH: _____
SINUSES: TRANS: _____   ETUBES: _____

THROAT: LIPS _____   TEETH & GUM _____   TONGUE: _____
GINGIVO/ALV: _____   PALATE & UVULA: _____   TONSIL: _____
PHARYNX: _____   NPLX: _____   HYPOPH: _____
LARYNX: _____

EAR: AURICLE R _____   CANAL R: _____
     TM: _____   DRUM: _____
     HEARING: _____

NEURO: PC/P _____   PAST POINTING: _____   NYSTAGMUS AT RES: _____
       CRANIAL V: _____   ROMBERG: _____   GAIT: _____
       CORNEAL SENSITIVITY: _____   TROMBERG: _____   TURNING: _____

X-RAY: _____

IMPRESSION: _____

RECOMMENDATION: _____

NMRI   7:00 AM /5th

_____



FORM 6041

## CLINICAL DATA GENERAL

NAME _____ AGE _____ SEX _____

RE&B _____ PHONE _____ DATE _____

SPONSOR _____ ADDRESS _____

OCCUPATION _Assistant U.S. Attorney_ REF. BY _____

_U.S. Attorney's Office_

_District of Columbia_

_9-7-91_

JAMES L. McFARLAND, JR., M.D.    BLAIR W. REED, M.D.    ROBERT E. PUMPHREY, M.D.
DAVID N. C___ BBANKS, M.D.    NORMAN L. BARR, JR., M.D.
J. GORDON VAP, M.D.

McLEAN MEDICAL BLDG.    NO. THREE WASHINGTON CIRCLE
SUITE 208    SUITE 365
1515 CHAIN BRIDGE RD.    WASHINGTON, D.C. 20037
McLEAN, VIRGINIA 22101    (202) 325-5566
(703) 356-5001

## AUDIOLOGICAL RECORD

NAME _Robert Spelter_    DATE _7/3/86_

AGE _~29_    TESTER _____

DOCTOR'S
NAME _Barr_    AUDIOMETER _____

### AUDIOGRAM



KEY TO AUDIOGRAM

| TEST | RIGHT (RED) | LEFT (BLUE) |
|---|---|---|
| AIR | O - O | X - X |
| AIR MASKED | △ - △ | □ - □ |
| BONE | > | < |
| BONE MASKED | ⊐ | ⊏ |
| NO RESPONSE | ↓ | ↓ |
| SOUND FIELD | * | |
| BEST BONE | ∧ | |

SRA = Pure Tone Spread Average
SL = Sensation Level
SAT = Speech Awareness Threshold
DNT = Did Not Test
CNE = Could Not Establish
NR = No Response

TEST RELIABILITY:

EFFECTIVE MASKING
Is Non-Test
Ear.
RE CUB HL.

### SPEECH AUDIOMETRY

| Type of Masking | | RIGHT | | | | | LEFT | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AC | | PT AV | SRT | SAT | PB MAX | UCL | PT AV | SRT | SAT | PB MAX | UCL |
| BC | | 2 | 3 | | 80 | | 40/50 | | | 40/100 | |
| SPEECH | | | | | | | | 50 | | 40/90 | |
| EM LEVEL IN OPPOSITE EAR | | | | | | | | | | | |

emarks:

ecommendations:

CHAIRMAN
Axel J. Marc, M.D.
(202) 867-4091

*Sibley Memorial Hospital*

Department of Radiology
5h. Georgia, Heath and Merritt, PC
5255 Loughboro Road, NW
Washington, D.C. 20016

SPRUNG, ROBERT                                    #RM# 415-18-06
DATE OF SERVICE:  3-28-99                          DR J. QUIRT

1434 SURGERY(?)

CHEST X-RAY, 3-28-99:  There is a very densely marginated left
paratracheal area.  This was present on films dated 1987 and is
unchanged.  Heart and lungs are otherwise normal.

IMPRESSION:
Left paratracheal mass as described above.

LS/ree
06/29/99
3:26 PM

                                        LEORA S SALES, MD

IMPRESSION:   [illegible] SPECIFIC ENHANCEABLE LESION IN THE BASE OF THE SKULL
              PRIMARILY INVOLVING THE JUGULAR FOSSA AND EXTENDING INTO THE
              POSTERIOR FOSSA AS DESCRIBED ABOVE, COMPATIBLE WITH THE
              ANGIOGRAPHIC FINDINGS OF GLOMUS JUGULARE TUMOR.
DR. [illegible]

Plaintiff's Exhibit N

USAEO-EEO1

| | |
|---|---|
| From: | USAEO-EEO1 |
| Sent: | Tuesday, December 06, 2005 10:32 AM |
| To: | Weinstein, Kenneth |
| | Schools, Scott (USAEO) |
| Subject: | PRIVATE AND CONFIDENTIAL |
| | |
| Attachments: | MANAGEMENT DO. NFt.pdf; ADRbrochure3.pdf |

Dear Mr. Weinstein:

Pursuant to 28 C.F.R. §1614, the EEO Staff of EOUSA provides a Notice of Final Interview to aggrieved persons who file requests for counseling, once the counseling (informal or pre-complaint) stage of the EEO complaint processing is finished. As a courtesy to United States Attorneys, we are attaching documents related to the completion of a request for EEO counseling by an applicant for employment or employee in your office.

The aggrieved person has up to 15 days from the date he or she receives the Notice of Final Interview in which to file a formal complaint of discrimination. Should the aggrieved person file a formal complaint, this Office will again notify you that the complaint has been filed. Please read these attachments carefully and call the EEO Staff at (202) 514-3982, if you have questions.


MANAGEMENT DO. NFt.pdf (44 KB)...


ADRbrochure3.pdf (491 KB)



Tracking:

| Recipient | Delivery | Read |
|---|---|---|
| Weinstein, Kenneth | | |
| Schools, Scott (USAEO) | Delivered: 12/6/2005 10:32 AM | Read: 12/6/2005 11:12 AM |
| Milanes, Joan E. (USAEO) | Delivered: 12/6/2005 10:12 AM | Read: 12/6/2005 10:49 AM |
| Robinson, Sylvia M. (USAEO) | Delivered: 12/6/2005 10:32 AM | |
| Madsen, Olga (USAEO) | Delivered: 12/6/2005 10:32 AM | Read: 12/6/2005 10:43 AM |
| Gray-Powers, Donna (USAEO) | Delivered: 12/6/2005 10:32 AM | Read: 12/6/2005 11:24 AM |

Plaintiff's Exhibit O

AFFIDAVIT OF ROBERT A SPELKE

I, Robert Andrew Spelke, do depose and say:

That I was born on July 11, 1957.

That I am employed with the Narcotics and Dangerous Drug Section (NDDS), Criminal Division, Department of Justice, as a trial attorney and have been so employed since January 2003.

That my duties include the investigation, presentment, prosecution, post-trial motions and appeal of federal criminals involving complicated, multi-defendant narcotics traffickers.

That as a result of my duties, I present matters to various United States District Courts and am familiar with all facets of the Federal Rules of Criminal Procedure, evidence and various district's local practice.

That prior to my position with NDDS, I spent five years as an attorney with the Office of Chief Counsel, Domestic Criminal Law Section of the Drug Enforcement Administration which is part of the Department of Justice.

That, as part of my duties with the Domestic Criminal Law Section at DEA, I served as virtual in-house counsel for the domestic operations of the Drug Enforcement Agency and that for four years I held the position of Chief, Domestic Criminal Law Section during which I managed five attorneys and support staff.

That prior to my employment with the DEA, I served ten years as an Assistant United States Attorney in the District of Columbia (USAO-DC) and tried numerous cases before judges of both the District and Superior Courts of the District of Columbia.

That my performance ratings were consistently either outstanding and/or substantially exceeds expectation's depending on the categories used for that particular year.

That prior to serving as an Assistant United States Attorney I spent three years with the Department of Justice's Civil Rights Division, Special Litigation Section handling civil cases in the various U.S. District Courts throughout the United States.

That from the time I was 18 years of age I have suffered from a rare form of cancer, which is a disability that effects substantial life activities including: caring for myself, performing manual tasks, walking, sitting, standing, reaching work and sexual relations. With ameliorative medical procedures and medication I am able to perform these functions.

As a result of my cancer, I also suffer the disabling condition of hypertension. Ameliorative medications and treatment when diligently pursued have allowed me to perform the essential functions of my position with or without accommodation.

In October 1989, while employed as an Assistant United States Attorney, I was advised I had terminal cancer and would need aggressive chemotherapy.

As a result of chemotherapy and subsequent treatment the spread of my cancer is presently checked.

During the time I was at the USAO-DC I made it known to my supervisors, colleagues and friends that I had cancer and was under treatment. The existence of my medical conditions were widely known by members of the U.S. Attorney's office and several members of the local judiciary. During this time period, I believe I wore a pendant that identified my condition.

During my chemotherapy I lost sections of my hair and took sick leave for my treatment.

While employed with the USAO-DC my contact with the following individuals undoubtedly rendered them aware of my condition and treatment:

Craig Lawrence
John Fisher
Mary Lou Leary
Channing Phillips
Mark Nagle
Kenneth Wainstein
Monty Wilkinson

Indeed Mr. Wainstein was an associate of mine who I believe had personal knowledge of my medical condition.

Additionally, at all times while employed as an Assistant United States Attorney I suffered from a hearing loss. Part of that time I wore a visible hearing aide. The loss of hearing and a heavy rasp in my voice are both resultant from cancerous tumors.

During my interviews at the USAO-DC, Civil Division, I wore a "medical alert" bracelet on my right wrist. The bracelet states on its clearly visible face that it is a "medical alert" and carried a highly visible universal symbol for the existence of medical conditions. The bracelet is specifically designed to catch the attention of the casual observer so as to alert such an observer of my medical condition in case I should need medical treatment.

I believe the symbol was clearly observed by all interviewers.

I am of the belief that as a former AUSA and as a current DOJ attorney, that when a person is non-selected professional courtesy and protocol requires written or oral notice of the non-selection to the fellow DOJ employee.

IN THE CITY/COUNTY OF ~DISTRICT~ OF ~COLUMBIA~

I Robert A. Spelke, having read the above, state that the statements contained herein are true and correct to the best of my knowledge and belief.

_Robert A. Spelke_
Robert A. Spelke

SUBSCRIBED AND SWORN to before me, this 9th day of _February_, 2007.

_Pamela M. Washington_
Notary Signature

My Commission Expires:

PAMELA M. WASHINGTON
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires June 14, 2009

3