## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ROBERT ANDREW SPELKE,              :

     *Plaintiff,*                          :

     v.                              :    **Civil No. 06-1887 (RJL)**

ALBERTO R. GONZALES,               :

     *Defendant.*                         :
                                                :

...o0o...

## REPLY MEMORANDUM
## IN SUPPORT OF MOTION TO DISMISS
## <u>OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>

The defendant has moved to dismiss the complaint or, in the alternative, for summary judgment. Plaintiff has filed an opposition. For the reasons set forth herein (as well as in the opening defense memorandum), the defendant's motion should be granted.

### I. <u>Introduction</u>

Qualified candidates for any job may yet perform poorly in the interview. Interviewers make assessments about candidates. They make judgments about the candidate's interest in the position. Successful candidates generally demonstrate an overriding interest. Candidates whose interest appears weaker may experience a disappointing result.

In this case the plaintiff, a career criminal prosecutor at the Department of Justice, sought a position in the Civil Division of the United States Attorney's Office for the District of Columbia ("USAO"). Plaintiff had shown little if any prior interest in civil

work.  Granted an interview, the Civil Division litigators listened carefully to his reasons for wanting to join them.  What they heard was disquieting.

Plaintiff emphasized that he had tired of the travel associated with his criminal position.  This caused the USAO interviewers to worry about plaintiff's motives for making application to the Civil Division.  As the then Acting Civil Chief Craig Lawrence put it: "Based on our crushing workload and shortage of people I believe[d] that it [was] important to look for people [who] want to come to Civil not just leave a less agreeable position."  Def's Undisputed Facts, ¶ 6.  Other participants in the interview had similar misgivings.  Id.  The Civil Division could ill afford to hire someone who was not motivated to do the work, which was precisely the impression this plaintiff made by saying that he wanted a change to avoid travel.

In this Court, the plaintiff has candidly admitted telling the USAO Civil Division interviewers that he wanted to leave his criminal position in order to avoid traveling.  See def. ex. 15 at 2 (final full paragraph).  Thus, on this record the factual basis for the poor impression plaintiff made at the interview stands uncontradicted.  Similarly, on this record the impressions formed by USAO Civil Division interviewers are equally uncontradicted and, as might readily be imagined, justified.  In a day and age of limited resources, mistakes in hiring can work to the detriment of every Civil Division lawyer. As a matter of uncontradicted fact on this record, such explains the USAO decision not to hire this plaintiff.

2

## II. <u>Discovery</u>

The present motion has been made before the defense answered the complaint and, indeed before any discovery occurred.  This procedural posture has engendered criticism from plaintiff.  Plaintiff devotes substantial portions of the initial sections of his argument to the proposition that the defense motion has denied him "the right" to conduct discovery.  <u>See</u> plaintiff's opposition ("pl. opp.") at 3, 7-11.  Plaintiff complains about the "jaundiced" and "self serving" defense affidavits (prepared in the course of the administrative handling of the EEO complaint).  <u>Id</u>. at 7.  Plaintiff argues that he cannot adequately respond to the motion "because no discovery has commenced."  <u>Id</u>.  He also argues that the difficulty of proving discriminatory motive leads courts to treat such motions with caution.  <u>Id</u>. at 8.

The Federal Rules provide a mechanism for the non-movant who is unable to respond to a motion for summary judgment.  Rule 56(f) provides that

> Should it appear <u>from the affidavits of a party opposing the motion</u> that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. Rule Civ. Pro 56(f)(emphasis added).

As an initial matter, no affidavit from plaintiff or plaintiff's counsel states reasons why plaintiff cannot oppose the instant motion.  The Rule on its face requires an explanation by affidavit.  The only affidavit included with plaintiff's opposition papers is

that of the plaintiff, which fails to address the need for discovery.  Pl. ex. O.  (Two other

affidavits of plaintiff were included in defendant's moving papers – def. ex. 1 & 15 – but

they were prepared for the administrative EEO proceedings long before this discovery

issue arose).  Plaintiff has, accordingly, failed to comply with the terms of the Rule and

the Court need not consider whether the unverified statements about the need for

discovery made in the opposition memorandum otherwise would suffice.  E.g., Nguyen v.

CNA Corp., 44 F.3d 234, 242 (4th Cir. 1995)("'[a] party may not simply assert in its brief

that discovery was necessary and thereby overturn summary judgment when it failed to

comply with the requirement of Rule 56(f) to set out reasons for the need for discovery in

an affidavit.'"); Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994) ("[a]

reference to Rule 56(f) and to the need for additional discovery in a memorandum of law

in opposition to a motion for summary judgment is not an adequate substitute for a Rule

56(f) affidavit ... and the failure to file an affidavit under Rule 56(f) is itself sufficient

grounds to reject a claim that the opportunity for discovery was inadequate"); Hayes v.

North State Law Enforcement Officers Ass'n, 10 F.3d 207, 215 (4th Cir. 1993)(same);

Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1567 (Fed. Cir.

1987)(same).  Undersigned counsel is unaware of any reported opinion in this Circuit that

relieves a non-movant of the obligation to comply with Rule 56(f)'s affidavit

requirement.

     Assuming arguendo that one excused the affidavit requirement, plaintiff fails to

offer an adequate explanation.  Plaintiff should show what facts he intended to discover that would create a triable issue and explain why he could not produce them in opposition to the motion.  Byrd v. U.S. E.P.A., 174 F.3d 239, 248 (D.C. Cir 1999); Hotel & Restaurant Employees Union, Local 25 v. Attorney General, 804 F.2d 1256, 1259 (D.C. Cir. 1986). A party making a Rule 56(f) request must "state[ ] concretely" why discovery is needed to oppose a motion for summary judgment.  Strang v. United States Arms Control & Disarmament Agency, 864 F.2d 859, 861 (D.C. Cir. 1989).  This Circuit will not find an abuse of discretion where the requesting party has offered only a "conclusory assertion without any supporting facts" to justify the proposition that the discovery sought will produce the evidence required.  Messina v. Krakower, 439 F.3d 755, 762-763 (D.C. Cir. 2006), citing, Byrd, 174 F.3d at 248 n. 8; Carpenter v. Federal Nat. Mortgage Ass'n, 174 F.3d 231, 237 (D.C. Cir.1999).

Plaintiff's memorandum fails to meet these standards.  Plaintiff states that he has not been able to depose a single witness.  Pl. opp. at 7.  Plaintiff argues that the defense is "the custodian of records, and employer of the main witnesses," id. at 8, without however revealing what documents he may need and without pointing out that he appears to have successfully filed a host of exhibits that he claims prove his case.  Pl. ex. A-O.  Plaintiff argues that the case will turn on the probative value of "circumstantial evidence," id., without any preview of how such evidence might relate to the issues.  Plaintiff finally argues that he has not had an opportunity to use discovery to "cross examine witnesses,"

to "test" or "disprove the statements offered." Id. at 10. Yet, these are just the kinds of

conclusory assertions that this Circuit has repeatedly held fail to meet the requirements

for Rule 56(f), even were they presented by affidavit. E.g., Strang, 864 F.2d at 861.

The Court should proceed to rule on the motion.

### III. Exhaustion

#### A. The Main Claims

The defense argued that the plaintiff failed to exhaust administrative remedies

because he sought counseling more than 45 days after the personnel actions at issue. Def.

mem. at 8-9. Circuit precedent holds that the relevant date is the date of the personnel

action, not the date on which the plaintiff may happen to learn of the personnel action.

Def. mem. at 8-9; James v. England, 332 F. Supp. 239, 246 (D.D.C. 2004), citing,

Jakubiak v. Perry, 101 F.3d 23, 27 (4th Cir. 1996). The Civil Division hires were all

outside the 45 day period. Def. mem. at 9.

Plaintiff concedes these points sub silentio. Pl. opp. at 14-19. He argues instead

that the relevant date is not that of the personnel action but is instead the date of the letter

he received from Principal AUSA Channing Phillips – December 7, 2005 – in response to

his direct inquiry. Pl. opp. at 14-19. Not until December 7, plaintiff argues, did he have

reason to believe he was not selected and, therefore, his December 21 Formal

Administrative Complaint (def. ex. 14) was timely.

Several difficulties attend plaintiff's argument. First, as a matter of fact, plaintiff

6

had formed the view long before December 7 that the USAO rejected his application and had done so for unlawful reasons.  He had retained counsel as of October 6, 2005. Counsel wrote to the United States Attorney, Kenneth Wainstein, on October 6, 2005 suggesting that the non-selection was unlawful.  Def. ex. 17.  Thus, by October 6, 2005, plaintiff was well aware that he had not been selected.  Any residual doubt on this point is removed by the simple fact that on October 28, 2005 plaintiff sought EEO counseling. Def. ex. 9 ("2 weeks ago found out that a younger male was hired").  Insofar as the main discrimination claims are concerned, setting aside that is the retaliation claim, the December 7 date is a red herring.

The real question as regards the age and disability claims is whether the request for counseling on October 28, 2005 was timely.  Def. mem. at 8-9.  We submit that it was not, for two reasons.  First, by October 2005 approximately 15 months had passed since the application and the interview.  Plaintiff applied in and was interviewed in July 2004. On this record, no communication occurred between July 2004 and October 2005.  This case is not like those where an employer clearly advises that applications will be kept on file.  Smallwood v. United Air Lines, 661 F.2d 303 (4th Cir. 1981); Poindexter v. Northrop Corp., 728 F. Supp 1362 (N.D. Ill. 1990).

Second, however, the relevant date is not that when plaintiff happened to conclude that he was discriminatorily non-selected.  The relevant date is that of the personnel action.  James v. England, 332 F. Supp. 239, 246 (D.D.C. 2004), citing, Jakubiak v. Perry,

101 F.3d 23, 27 (4th Cir. 1996).  The discovery rule does not apply.  <u>J.D. Hamilton v. 1st</u>

<u>Source Bank</u>, 928 F.2d 86, 87-89 (4th Cir. 1990)(<u>en</u> <u>banc</u>)(ADEA claim).  Each personnel

action constitutes a discrete event, for which a timely administrative claim is required.

<u>National Rail Road Passenger Corp. v. Morgan</u>, 536 U.S. 101, 112 (2002).  On this

record, there is no dispute that the October 28, 2005 counseling request was over 45 days

after each personnel action.  Def. mem. at 8-9.

Perhaps recognizing the weakness of his reliance upon December 7, plaintiff

makes a fallback argument of estoppel.  Pl. opp. at 19-22.  The Court should reject this

argument.  Estoppel, or equitable tolling, applies in a narrow range of circumstances.

<u>Irwin v. Department of Veterans Affairs</u>, 498 U.S. 89, 96 (1990)("Federal courts have

typically extended equitable relief only sparingly.").  The <u>Irwin</u> Court explained that

equitable tolling would only apply when the government engaged in trickery or other

affirmative misconduct.

> <u>We have allowed equitable tolling</u> in situations where the claimant has
> actively pursued his judicial remedies by filing a defective pleading during
> the statutory period, or <u>where the complainant has been induced or tricked</u>
> <u>by his adversary's misconduct into allowing the filing deadline to pass.</u>

<u>Id</u>. at 60 (footnotes omitted)(emphasis added).  <u>Accord</u> <u>Colbert v. Potter</u>, 473 F.3d 158,

166 (D.C. Cir. 2006). The standard requires that "affirmative misconduct on the part of a

defendant lulled the plaintiff into inaction."  <u>Mondy v. Secretary of the Army</u>, 845 F.2d

1051, 1057 (D.C. Cir. 1988).  Here there is no affirmative misconduct.  Nothing that the

defense did lulled plaintiff into sleeping on his rights, as a matter of law.

B. <u>Retaliation</u>

The defense next argued that the retaliation claim should be dismissed for failure to exhaust administrative remedies because plaintiff's December 21, 2005 formal administrative Complaint of Discrimination failed to mention "retaliation." <u>Def</u>. <u>ex</u>. <u>14</u> at 1, box 5.  The form administrative complaint asked the complainant to: "Check Below Why You Believe You Were Discriminated Against?" <u>Id</u>.  Plaintiff marked the boxes next to the words "Age," "Disability," and "Physical." <u>Id</u>.  He left blank the box for "Reprisal." <u>Id</u>.  Plaintiff had all the facts he needed to go forward, having received the allegedly retaliatory December 7, 2005 letter by then, but he elected to proceed on the main claims only.

In opposition, plaintiff's argument covers many pages but makes only one essential point: that when he filed the formal administrative complaint on December 21, 2005 he did not know that the persons selected for employment in the Civil Division were in fact selected on December 20, the very day before.  Pl. opp. at 22, 24.  He writes: "Neither Mr. Spelke nor his counsel were made aware that his non-selection occurred within twenty four hours of his submission of a formal EEO Complaint until the Agency belatedly disclosed the fact in its report of investigation which was finally submitted on December 20, 2006." <u>Id</u>. at 24, <u>citing</u>, <u>pl</u>. <u>ex</u>. <u>K</u>.  Plaintiff's memorandum, for all its length, fails to elaborate on this proposed factual scenario.

The lack of elaboration is unfortunate because plaintiff's exhibit K does not

establish anything about when any selections were made.  That exhibit is a December 20, 2006 letter from Rita Sampson, Assistant Director, Executive Office United States Attorneys ("EOUSA"), to Jill Weissman, Assistant General Counsel, EOUSA, transmitting unredacted copies of the applications of the selected applicants.  By open "cc" a copy of the same material was sent to plaintiff's counsel.  Sampson transmitted this information for use in this litigation.  The unredacted applications do not indicate when the selections were made or the dates of the personnel actions.  No other document or evidentiary material supports the assertion that selections occurred within 24 hours of the filing of the formal administrative complaint.  There simply is no basis in this record for the assertion that plaintiff's non-selection occurred within 24 hours of his December 21, 2005 formal administrative Complaint.  For all that appears, plaintiff and his counsel have misinterpreted the contents of the Sampson transmittal and have transmogrified its date from December 20, 2006 to December 20, 2005, which is the only evident means on this record of achieving the 24-hour window plaintiff relies upon.  Pl. opp. at 22 (heading: "Less Than 24 Hours, In Fact").

      In short, as a matter of law, the record fails to support the argument.

IV. <u>No Prima Facie Case – Rehabilitation Act</u>

The defense argued that the plaintiff cannot, as a matter of law, establish a <u>prima</u> <u>facie</u> case under the Rehabilitation Act.  Def. mem. at 13-18.  The defense argued that plaintiff's alleged disabilities do not substantially limit him in any major life activities. <u>Id</u>. at 13-15.  The defense also established that USAO staff did not regard plaintiff as disabled or that they even were aware of the alleged disability.  <u>Id</u>. at 15.

In response, plaintiff first contends that the defense "has offered *no evidence*" to show that plaintiff's cancer has not affected any major life activity.  Pl. opp. at 13 (original emphasis); pl. opp. at 31-34.  Plaintiff argues that a two-fold test applies, first the establishment of an impairment and second that the impairment "impacted a major life activity."  <u>Id</u>. at 32.  Plaintiff argues that through his affidavit (<u>pl</u>. <u>ex</u>. <u>O</u>) and the medical records he appends to his opposition (<u>pl</u>. <u>ex</u>. <u>M</u>) he has established an impairment.  <u>Id</u>. at 32.  He argues that the defense has not carried its burden to show that the impairment substantially impacts a major life activity.  <u>Id</u>.

A. <u>Plaintiff Retains the Burden of Proof</u>

Plaintiff argues that the burden of proof rests on the defense.  <u>E.g</u>., pl. opp. at 32 ("More significantly, the Defendant has *not* proven that Mr. Spelke's cancer has *not* impacted a major life activity, which is a burden it must show since because [sic] it is not contested that Mr. Spelke has cancer.")(original emphases).  The suggestion that the defense bears a burden of proof also appears elsewhere in plaintiff's argument.  <u>Id</u>. at 13

11

("[T]he burden is affirmatively upon the Defendant to show that Mr. Spelke's cancer has not substantially interfered with a major life activity.").

Plaintiff appears to be relying on outdated law. He cites McKinney v. Dole, 765 F.2d 1129 (D.C. Cir. 1985), as well as some pre-McKinney cases. Pl. opp. at 9, 13. One year after the McKinney decision, however, a trilogy of cases dramatically rearranged the summary judgment landscape. Anderson v. Liberty Lobby, 477 U.S. 242 (1986); Celotex Corp. v Catrett, 477 U.S. 317 (1986);[1] Matsushita Electr. Indus. Corp. v. Zenith Radio Corp, 475 U.S. 574 (1986). These Anderson standards are now so well known that the government will not belabor this reply memorandum with a lecture about their import. We respectfully submit, however, that the Anderson trilogy stands for the proposition that a defendant may, on summary judgment, challenge the factual underpinnings of a plaintiff's case, arguing as a matter of law that no legally sufficient evidence exists to establish one element or more of plaintiff's case, without the defense becoming responsible for carrying any burden of proof on the point.

B. No Substantial Impact

Plaintiff argues as though the fact of having a diagnosis of cancer in and of itself constitutes an impairment that necessarily substantially impacts a major life activity. Pl.

---

[1] Regretabbly, one of the cases upon which Spelke relies – Catrett v. Johns-Manville Corp., 756 F.2d 181 (D.C. Cir. 1985)(pl. opp at 9) –  was one of the very cases that the Supreme Court reversed in its famous trilogy: Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

opp. at 32-33 ("Defendant callously alleges that the Plaintiff's cancer is not a disability under the ADA [sic] because [plaintiff] has not succumbed to terminal illness or because he has not suffered a marked deterioration."). To the extent that plaintiff suggests that his cancer ipso facto substantially impacts a major life activity, his argument should be rejected. Courts have generally required a specific showing of an effect that the cancer may have. The published cancer cases are instructive. Cancer is generally held to be an impairment. E.g., Pimental v. Dartmouth-Hitchcock Clinic, 236 F.3d 177, 182 (D.N.H. 2002). "But, although plaintiff's cancer qualifies as an impairment, it does not necessarily follow that she is also 'disabled' ... ." Id.; accord Ellison v. Software Spectrum, Inc., 85 F.3d 187, 190-191 (5th Cir. 1996)(analyzing the evidence against the C.F.R. definition of substantial impairment); Porch v. Dillard's Inc., 2004 WL 1809813 at *3-*6 (N.D. Tex.)(cancer an impairment but not one with a substantial impact under the circumstances); Treiber v. Lindbergh School District, 199 F. Supp. 2d 949, 958-961 (E.D. Mo. 2002)(same). It simply is not enough to establish that one has cancer. Plaintiff must demonstrate that it has substantially limited a major life activity.

For the purposes of this argument in this motion only, the defense assumes that plaintiff's cancer is an impairment. There is, however, no legally sufficient evidence of any substantial limitation on any major life activity, as the defense argued. Def. mem. at 14-15. For all that appeared in the record, plaintiff was able to work and live life to the fullest, albeit with occasional treatment.

Plaintiff's memorandum of law is silent about the nature of the alleged substantial limitation.  Pl. opp. at 31-32 ("The Plaintiff's cancer sufficiently impacted a variety of major life activities... .").  Plaintiff refers instead to his affidavits (pl. mem. at 32), in one of which one finds a very specific catalog of alleged substantial impacts: (1) hearing (a tumor and radiation limited hearing in the left ear by 80%); (2) speech (a chest tumor caused paralysis of a vocal cord causing a rasp); (3) reproducing (chemotherapy resulted in temporary sterilization); and (4) high blood pressure.  See pl. ex. A at 4, question 14. The second affidavit, pl. ex. O, by contrast, makes no effort to describe how cancer has affected plaintiff, limiting itself to a laundry list of Rehabilitation Act buzzwords without any other factual detail: "[F]rom the time I was 18 years of age I have suffered from a rare form of cancer which is a disability that affects substantial life activities including: caring for myself, performing manual tasks, walking, sitting, standing, reaching work and sexual relations."  Pl. ex. O. at 1.  We respectfully suggest that where the law assigns to plaintiff the burden of proof, plaintiff must, on summary judgment, do more than parrot the list found in the regulations.  Accordingly, the Court can disregard the 2007 affidavit's conclusory list (pl. ex. O) and focus on the more specific allegations in the 2006 affidavit (pl. ex. A).

Turning to the 2006 list, on the present record plaintiff fails to establish, as a matter of law, any substantial impact on a major life activity.  Nothing in the record establishes that plaintiff's speech was substantially limited.  Assuming arguendo that the

ability to speak constitutes a major life activity, the alleged "rasp" in plaintiff's voice did not impair his ability to communicate. Plaintiff's affidavits describe no impediment to communication that his raspy voice may have occasioned. Plaintiff's performance evaluation for December 2004- March 2005 (pl. ex. B) indicates outstanding performance in all areas and contains a glowing write up, with no indication of any communication issues. Cases concerning others with speech impediments have looked to the record as a whole as regards plaintiff's ability to communicate, holding that in the absence of record facts establishing an inability, the impairment is not substantial. E.g., Ross v. GTE Directories Corp., 73 F. Supp. 2d 1342, 1346-1347 (M.D. Fla. 1999)(surgical removal of vocal cord polyps produced a "persistent 'raspy' sound" but no substantial limitation); see also Dorn v. Potter, 191 F. Supp. 2d 612, 621-622 (W.D. Pa. 2002)(speech impediment not a substantial limitation where record established plaintiff able to communicate for years in various positions); accord Bell v. Gonzalez, 398 F. Supp. 2d 100, 101-102 (D.D.C. 2005)(Bates, J.)(Tourette's syndrome not a substantial limitation where record established plaintiff's ability to communicate). Nothing in this record establishes any inability of the instant plaintiff to communicate.

So, too, with plaintiff's alleged hearing loss. The record evidence of any limitation is as thin as it could possibly be. Plaintiff's 2006 affidavit asserts an 80% hearing loss in his left ear. Two of the medical records also indicate an 80% loss. Pl. ex. M; see also

<u>def</u>. <u>ex</u>. <u>16</u>.[2]  Nothing in this record, however, establishes what effect if any this

diagnosed limitation may have had on this plaintiff, especially in light of plaintiff's use of

a hearing aid (<u>pl</u>. <u>ex</u>. <u>O</u> at 2) which, in the absence of contrary evidence, presumably

worked.  "It is insufficient for individuals attempting to prove disability status ... to

merely submit evidence of a medical diagnosis of an impairment.  Instead, the ADA

requires those 'claiming the Act's protection ... to prove a disability by offering evidence

that the extent of the limitation [caused by the impairment] in terms of their own

experience ... is substantial.'" <u>Toyota Motor Manuf. v. Williams</u>, 534 U.S. 184, 198

(2002), <u>quoting</u>, <u>Albertson's, Inc. v. Kirkenburg</u>, 527 U.S. 555, 567 (1999).  More than

one court has required plaintiffs to adduce evidence on motion that establishes a

substantial limitation.  <u>E.g.</u>, <u>Brennan v. Naperville School Dist.</u>, 2005 WL 3299347, at *5

(N.D. Ill. 2005)("[plaintiff] has offered no evidence to show how that [severe] hearing

loss [in her left ear] affected her overall ability to hear in comparison to that of an average

person in the population, whether the loss was mitigated by the use of a hearing aid ... .");

<u>Miller v. Taco Bell Corp.</u>, 204 F. Supp. 2d 456, 461, 463 (E.D.N.Y. 2002)(plaintiff's 95%

hearing loss held not to constitute a substantial limitation considering her ability to

maintain employment, but finding a question of fact by the presence of a treating

physician opinion).

---

[2] Defendant's exhibit 16, merely extracts from plaintiff's exhibit M the two
medical records so that the Court may have ready access to them.

The principle that emerges from these cases is that the Court should make an individualized assessment of the alleged impairment.  The instant plaintiff, challenged on motion for summary judgment to adduce legally sufficient evidence of a substantial limitation, has merely informed the Court about the 80% diagnosis in one ear and has candidly admitted that the hearing aid renders him able to hear.  Pl. ex. O at 1 ("With ameliorative medical procedures and medication I am able to perform these functions.").  Aside from this admission, plaintiff has made no other effort to translate his 80% diagnosis into the real world of his own experience, to show how the ameliorated condition produced a limitation of any kind, let alone a substantial one.  Plaintiff will bear this burden at trial, and the office of summary judgment is to determine if plaintiff has evidence legally sufficient to go to a jury.  Plaintiff needed no discovery to explain how his alleged hearing disability substantially limited him.  The only reasonable conclusion is that it did not, as a matter of law.

All that remains from the list of alleged substantial impairments is the reference to high blood pressure and reproduction.  Pl. ex. A at 4, question 14.  The medical records provide nearly no support for the alleged high blood pressure.  Pl. ex. M.  There is one reference to hypertension and another to a seemingly elevated reading.  Id.  But there is no evidence whatsoever that would enable anyone to assess the nature of the restrictions it causes, the duration of the impairment, its permanency, or anything else about it.  Toyota Motor Manuf, 534 U.S. at 195-196.  For all that appears in this record, plaintiff was

17

diagnosed with hypertension once or twice between 1984 and 1991, the only period for which the plaintiff has included medical records in his exhibit M.  That is, these medical records relate to time periods 13 years before his July 2004 application to the USAO.  No medical record pertains to any later date, rendering it a challenge to determine how these records from decades before establish his condition in 2004.  In any event, as plaintiff concedes, "[a]meliorative medications and treatment ... have allowed me to perform the essential functions of my position."  Pl. ex. O. at 1; Sutton v. United Air Lines, 527 U.S. 471, 475 (1999)(determination of whether an individual is disabled to be made with reference to "measures that mitigate the impairment").

As for the reproductive issue, as far as undersigned counsel can determine, no medical record in plaintiff's exhibit M supports this.  Nothing, not even plaintiff's affidavits, indicates that he was undergoing chemotherapy in 2004 and suffered any reproductive issue then.  Plaintiff candidly concedes the alleged impairment was temporary and has failed to allege that the temporary impairment interfered with any family plans he may have had at whatever time it was that he underwent chemotherapy. Pimental, 236 F. Supp. 2d at 184("[P]laintiff must point to something that suggests she at least contemplated having more children."); Bragdon v. Abbott, 524 U.S. 624, 658-659 (1998)("no evidence that, absent the HIV, respondent would have had or was even considering having children.").

C. <u>Not Regarded As</u>

The defense established that no person who interviewed plaintiff was aware of any disability. Def. mem. at 15. Plaintiff responds with one four-sentence paragraph, that does nothing more than reference his three affidavits. Pl. opp. at 34. Plaintiff's affidavits, however, do not fill the bill. His first affidavit states only that during his tenure at the USAO he underwent chemotherapy and that accordingly "the USAO-DC" was well aware of his medical condition. <u>Pl</u>. <u>ex</u>. <u>A</u>. at 4, question 15. The rebuttal declaration says nothing at all about who regarded plaintiff as disabled. <u>Pl</u>. <u>ex</u>. <u>L</u>. The affidavit plaintiff prepared specifically for the instant opposition is wholly inadequate: "While employed with the USAO-DC my contact with the following individuals <u>undoubtedly</u> rendered them aware of my condition and treatment." <u>Pl</u>. <u>ex</u>. <u>O</u> at 2. The only person plaintiff then lists who participated in the interview is Craig Lawrence. <u>Id</u>.

An individual is "regarded as" disabled if her employer "mistakenly believes that [the] person has a physical impairment that substantially limits one or more major life activities" or "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." <u>Thompson v. Rice</u>, 422 F. Supp. 2d 158, 175 (D.D.C. 2006), <u>citing</u>, <u>Sutton</u>, 527 U.S. at 489. This definition of a disabled individual "is included to disabuse employers of myths about the disabled and to prohibit discrimination against those with an impairment that does not substantially limit major life activities." <u>Flasza v. TNT Holland Motor Express</u>, 159 F.R.D. 672, 678 (N.D. Ill.

19

1994).  An employer's mere knowledge or awareness of a medical condition, without more, is legally insufficient evidence that the employer "regarded" the plaintiff as disabled.  Mitchell v. National Railroad Passenger Corp., 407 F. Supp 2d. 213, 239 (D.D.C. 2005)(citing cases).

There is no evidence whatsoever that any person at the USAO, let alone the interviewers, regarded plaintiff as disabled.  There is no evidence that anyone thought he had a medical condition that limited his ability to litigate.  Only Acting Chief Lawrence is alleged to have been aware of his medical conditions, and nothing in the record suggests that he considered plaintiff limited in any way.  Indeed, the USAO interviewers considered plaintiff qualified; they simply thought him not as motivated as other candidates.

There is no legally sufficient evidence that plaintiff was regarded as disabled.

## V. The Legitimate Non-Discriminatory Reason and No Pretext

The defense articulated a legitimate, non-discriminatory reason for its selections. Def. mem. at 18-20.  In response, plaintiff renews the argument that the defense must "prove" its case (pl. opp. at 34), a position at odds with black letter law.  "The burden that shifts to the defendant ... is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons."  Texas Dept. of Community Affairs v. Burdine, 450

U.S. 248, 254 (1981).

Plaintiff then argues that the defendant's affidavits are not admissible.  Pl. opp. at 35-36.  The affidavits, however, were sworn to under penalties of perjury and are an appropriate manner of presenting evidence on motion for summary judgment.  Fed. Rule Civ. Pro. 56(c)(referencing affidavits).

The defense challenged plaintiff to establish pretext, and one finds plaintiff's effort in this regard at pages 36-42.  Tellingly, in these pages, plaintiff makes no serious response to the defendant's articulated reason: the interviewers' concern that plaintiff wanted to avoid travel more than he wanted to begin a civil practice.  Instead of meeting the defense position head on, plaintiff takes the Court in other directions, which ultimately prove no more fruitful.  Thus, plaintiff makes an initial attack on alleged "budgetary reasons" for his non-selection, noting that seven other non-disabled, under forty-year olds were hired."  Pl. opp. at 37.  Plaintiff has erected a straw man.  Nowhere did the USAO interviewers state that budget constraints prevented plaintiff's hiring.  The affidavits establish that other candidates were felt to be stronger.

Plaintiff next interprets the record to suggest that the USAO has offered contradictory reasons for its position.  Pl. opp. at 38.  Plaintiff asks the Court "not to lose sight" that the articulated reason was "that there were no positions available 'at this time.'"  Id, misquoting, def. ex. 13.  Sadly, plaintiff has mis-stated the relevant exhibit.  Principal AUSA Phillips, in his affidavit, did not say that "there were no positions

21

available." He said: "[I advised counsel] that we would by unable to offer Mr. Spelke a position at this time." Def. ex. 13, at 2 (last line of carry-over paragraph from p. 1). Principal AUSA Phillips' December 7, 2005 letter to plaintiff's counsel also makes no representation about the availability vel non of positions in the Civil Division, stating only – and consistently – that "[w]e appreciate Mr. Spelke's interest in returning to our Office, and regret that we are unable to offer him a position at this time." Def. ex. 12 (emphasis added). One reads Principal AUSA Phillips' affidavit and letter in vain for any explanation other than the one on which the USAO has repeatedly relied: the concern about plaintiff's desire to travel less as an inadequate reason for a significant career change. See def. ex. 13 at 2 (Phillips: "I was advised that [plaintiff's] interest in joining our Civil Division was based primarily upon a desire to leave his current position where he admittedly had grown weary of the travel demands. In other words, it was not so much about wanting to do the work of the Civil Division, but rather looking for a position that did not require him to travel.").

Plaintiff lastly resorts to a comparative analysis of his qualifications with those of the selectees. Pl. opp. at 38-42. Yet, a court "may not 'second-guess' an employer's personnel decision absent demonstrably discriminatory motive." Fishbach v. District of Columbia Dept. of Corrections, 86 F. 3d 1180, 1183 (D.C. Cir. 1996); Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1556 (D.C. Cir. 1997). "Short of finding that the employer's stated reason was indeed a pretext . . . the court must respect the employer's

22

unfettered discretion to choose among qualified candidates." <u>Mungin</u>, 116 F. 3d at 1556.

In a non-selection case, pretext may be demonstrated by showing that the qualifications of

a plaintiff are far superior to those of the selectee. <u>Barnette v. Chertoff</u>, 453 F.3d 513,

517 (D.C. Cir. 2006)(finding no evidence of pretext even where selectee had less

supervisory experience over all); <u>Stewart v. Gonzales</u>, 352 F.3d 422, 429-430 (D.C. Cir.

2003)(same).  Only where a reasonable employer would have found the plaintiff

"significantly better qualified" can a fact finder infer that the employer consciously

selected the less qualified applicant. <u>Carter v. George Washington Univ.</u>, 387 F.3d 872,

881 (D.C. Cir. 2004); <u>Aka v. Washington Hospital Center</u>, 156 F.3d 1284, 1294 (D.C.

Cir. 1998).

      Plaintiff's qualifications, as a matter of law, did not so far outstrip those of the

selectees as to render their selection a pretext for intentional discrimination.  Plaintiff had

no civil experience whatsoever. <u>Pl</u>. <u>ex</u> <u>O</u>. at 1 (describing career criminal positions held).

Further, his reason for wanting to make a career change – the desire to travel less – was

intensely suspect.  None of the selectees expressed a similar desire to leave their present

position on account of travel demands.  Plaintiff would have it that one of the selectees,

Andrea McBarnette, "also complained about having to travel at her current job."  Pl. opp.

at 40.  In fact, however, what McBarnette complained about, as noted by one of the

interviewers, was the unpredictability of the work hours occasioned by "being asked to

travel or accept new assignments at the last minute" and not having sole responsibility for

her own cases.  Pl. ex. G.  McBarnette wanted the kind of control over her work life that she knew she could get from not having to work cases with more senior persons, with last-minute demands on her time.  There is, in short, no comparison between McBarnette's situation and plaintiff's.

Unable to show that the USAO hired someone younger who wanted to leave a position because of travel, plaintiff is left to a straight-up comparison of qualifications in the hopes of establishing pretext.  Pl. opp. at 40-42.  Civil Division interviewers were looking first for highly motivated persons who had civil experience.

> Every selected applicant expressed a strong desire to work in the Civil Division.  Megan Rose was a selection from the pool of Honors Program Selectees who, because we needed attorneys and justified the selection, was assigned to Civil rather than the Tax Division.  Mercedeh Momeni had excellent academic credentials and excellent Title VII experience in New Jersey and she wanted to come to this office and take part in our employment practice.  Benton Peterson had served as a Special AUSA for approximately a year and had done an excellent job for us, and he wanted to come back. Katherine Konopka, a former AUSA had excellent credentials and was serving at DOG IG.  She wanted to come to Civil and return to litigation.  John Fisher, then Appellate Division Chief, spoke well of her writing and analytical skills.

Def. ex. 3 at 3 (question 17)(Lawrence decl.).  One can pick at the qualifications of each and attempt to make comparisons, as plaintiff endeavors.  At the end of the analysis, however, two facts stand out and compel the conclusion that the comparison fails to show pretext.  On the salient and important criteria – a high degree of motivation and translatable civil experience – each selectee had them and plaintiff did not.

VI. Conclusion

The motion to dismiss or, in the alternative for summary judgment, should be granted.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney


By:_____/s/_____
    Allen F. Loucks
    Assistant United States Attorney
    36 South Charles Street
    Fourth Floor
    Baltimore, Maryland 21201
    (410) 209-4800

# Exhibit 16

<u>Spelke v. Gonzales</u>, Civil No.  06-1887 (RJL)

<u>Exhibit 16</u> to Defendant's January 2007
Motion to Dismiss or, in the Alternative, for Summary Judgment

Robert Spelke
*Initial Office Visit*
*September 25, 1984*

Mr. Spelke is a 27 year old gentleman followed previously by Dr. Howard
Kolodny with a diagnosis of lyomyosarcoma, mulitple pheochromocytomas,
and glomus jugular tumor.  This unusualy grouping of tumors has been observed
in a small number of other patients.  A series of these patients is
apparently being followed by Dr. J. Carney in the Department of Surgical
Pathology at Mayo Clinic in Rochester, Minnesota (55905).

The patient was in his usual state of good health until 1976 when he
developed a severe upper GI bleed.  Surgery at that time revealed a
lyomyosarcoma which was removed in 2 surgical procedures.  He did well
until 1978 when he developed a right carotid body tumor which on
pathologic evaluation proved to be a pheochromocytoma.  Surgery at
that time required a carotid artery graft.  Following surgery, the
patient was noted to have hypertension and, on further evaluation,
was noted to have increased catecholemine metabolides and in 1979 a
pheochromocytoma was removed from the right adrenal gland.  The patient
continued to have increased catecholemines metaboloids and on chest
x-ray a shadow was noted in his left chest which on angiogram proved
to be a tumor in the pulmonary aortic window which, in the opinion
of vascualr surgeons, was not operable.  It is assumed that this tumor
is a pheochromocytoma.  The patient was treated initially with
Dibenzaline and propranolol but this led to failure to ejaculate.  He
was therefore begun on prazosyn 1 mg. bid.

In 1981, the patient developed tinnitus in his left ear which, on
evaluation, proved to be result of a glomus jugular tumor which was
treated with radiation therapy at Memorial Sloan Kettering Cancer Center
with apparent arrest of the tumor.  The patient has approximately 80%
hearing loss in the left ear as a result of this.

For the last 6-7 years there has been apparently no change in the x
x ray of the patient's intrathoracic tumor.  Approximately three years
ago, however, the patient developed some vocal cord paralysis involving
his left vocal cord which has been felt secondary to the tumor.  Other
medical problems include a hiatal hernia.  The patient had an episode
of increased bronchial secretions which was felt possibly secondary
to acid regurgitation from his hiatal hernia and was treated successfully
with Zantac, 150 mgs. po bid.  The patient also instituted measures
to decrease any reflux from his hiatal hernia.  He continues on Zantac
at this time.

Because of moving from New York to the Washington area, the patient
is referred by Dr. Kolodny for further follow-up.

The patient has had no problems with headaches.  He does note on occasion,
particularly when he goes to higher altitudes, that he has episodes
of palpitations and may have a mild headache at that time.  These symptoms
abate if the patient goes off of his prazosyn and begins taking phenoxybenzamine
and propranolol.

Personal History: The patient does not smoke. drinks rarely. He works as a cabinet maker.

Past Medical History: Remarkable as noted in his history of present illness. There are no known allergies to any medication.

Family History: Remarkable for a family history of diabetes, cancer and hypertension.

Review of Systems: The patient wears glasses. He has had approximately 80% loss of hearing associated with his glomus tumor.

Physical Examination: Revealed a well developed, well nourished white male in no acute distress.

Height: 71¼ inches.

Weight: 175 pounds.

Blood pressure: 120/70 right arm sitting.

Pulse: 68 and regular.

Skin: A pigmented nevus is noted on the left ankle.

Skeletal: Grossly normal.

HEENT: PERRL. EOMs full. Fundi benign. TMs intact with normal architecture. Mouth and nose benign.

Neck: A series of right neck surgical scars are noted. Thyroid is not enlarged. No significant adenopathy.

Chest: Clear to P&A.

Cardiovascular: No murmurs or gallops.

Abdomen: A right flank and mid abdominal surgical scar are noted. Normal bowel sounds. No masses. Non-tender.

Genitalia: Normal external genitalia. No hernia.

Rectal: Non-tender. No masses. Guaiac negative.

Extremities: No clubbing, cyanosis or edema.

Neurologic: Grossly intact.

IMPRESSION: Multiple pheochromocytomas, lyomyosarcoma, glomus tumor, hiatal hernia with reflux by history.

Plan: The patient is to continue on his current medical regimen. I have suggested, however, that the patient may wish to try omitting his Zantac to see if symptoms recur off Zantac with gravity measures alone. Routine urine is obtained for urinalysis at this time. Blood is obtained for CBC and SMAC 24. A 24 hr. urine will be obtained for creatinine, VMA, metanephrines, and catecholemines. A PA and lateral chest x-ray is obtained. The patient will call shortly for these results. He will be seen in follow-up in approximately 6 months time.


February 28, 1985
Office Visit
Robert Spelke


Mr. Spelke returns complaining of a several week history of mild left costovertebral angle tenderness associated with some darkening of his urine. This has improved over the ensuing two weeks since it first occurred and , at present, he has almost no discomfort whatsoever and his urine has returned to almost its normal color. He has had no dysuria. Early on he did have some urinary frequency. There has been no fever. He has felt otherwise well.

Physical Examination: Revealed a well developed, well nourished white male in no acute distress.



X3 are obtained. A repeat chest x-ray is to be obtained. Routine urinalysis

Period covered by this report:  From 10-2-89 to 1-1-90

SIGNIFICANT FINDINGS:

    CT scan of the chest performed on 8-28-89 shows a mass density in the
left paraesophageal area to superior mediastinum.  There is also 1 mm. nodule
seen in the lateral aspect of the right lung on image 12 that could represent
a metastatic focus.  Also a lesion seen in the right middle lobe laterally on
image 16.  Abdominal CT scan performed on 8-28-89 shows multiple surgical
clips in the region of the right adrenal bed and in the right
retroperitoneum.  These obscure details seriously in this area.  There is a
low attenuation area in the right lobe of the liver and also a mass around
the celiac access anterior the inferior vena cava.

    MRI of the chest with T1 and T2 weighted sequences revealed the superior
mediastinal mass described on the chest CT.  They were unable to see any lung
lesions that were seen on the CT scan.  MRI of the abdomen showed the head of
the pancreas area to be not as prominent as on the CT scan.  There was some
prominent signal seen in the middle portion of the right lobe of the liver
corresponding to the area of well attenuation on the CT scan.  All the foci
of abnormality, including that anterior to the inferior vena cava, that in
the middle portion of the right lobe of the liver, and the lesion in the
mediastinum have the extremely bright signal on T2 weighted image that
suggest pheochromocytoma.  Incidentally, there are some mottle changes in the
vertebral bodies which could represent some foci of metastatic disease.

    Blood tests performed on 12-10-89 show a full blood picture consistent
with recent chemotherapy.  Urea, electrolytes, creatinine, LDH, calcium
phosphate, uric acid, albumin and total protein were all within normal
limits.  Alkaline phosphatase was 49, bilirubin 0.7, ALT 116, and AST 42.
Urinary catecholamines included norepinephrine, 418; epinephrine, less than
5; dopamine, 279; VMA, 13.6; metanephrine, 2.5.  Of those results the urinary
norepinephrine, VMA and metanephrine are abnormal.

    An MIBG adrenal scan was performed on 8-28-89.  Spot scintiphotos were
obtained at 24 and 48 hours after tracer administration.  There is a focal
area of increased uptake in the left upper hemithorax close to the midline
which corresponds with the abnormalities seen on the CT scan of the chest.
There is a large focal area of increased uptake in the liver slightly to the
left of the midline which appears to correspond to abnormality in the
patient's liver scan.  There was a third focal area of increased uptake which
is very close to the midline and this corresponds to a level just inferior to
the umbilicus.  There is no corresponding abnormality on CT scan.

---

Period covered by this report:          OUTPATIENT SUMMARY
  From 10-2-89 to 1-1-90

..ient Identification                                    The Clinical Center
                                                         National Institutes of Health
Spelke, Robert A.        22-44-56 1                       Outpatient Record
                                                         NIH-532 (Rev. 10-84)
                              -1-                         PA: 09-25-0099

COURSE OF OUTPATIENT CARE/TREATMENT:

Mr. Spelke is a 32-year-old Justice Department Lawyer with probable Carney's syndrome. He originally presented in 1976 with hematemesis. He was found to have gastric leiomyosarcoma and this was removed in two operations. In 1978, he developed a right carotid body tumor which was removed and carotid graph performed. Biopsy revealed this tumor to be pheochromocytoma. Postoperatively, he remained hypertensive and was found to have increased catecholamines metabolites in both blood and urine. In 1979, a pheochromocytoma was removed from the right adrenal gland and he became normotensive. Chest x-ray at the time showed a left paratracheal mass. In 1981, he developed a left glomus jugular tumor which caused him to have a symptom of tinnitus. This was treated at Memorial Sloan Kettering with irradiation with a side affect that he has a greater than 80% hearing loss in the left ear.

In 1986, he developed hoarseness and was found to have left vocal cord paralysis. On chest x-ray, there was no increase in size of the left paratracheal mass, but catecholamines were said to have risen.

He was initially seen in the National Cancer Institute Clinic on 10-2-89 at which time he was extremely well complaining of only very occasional episodes of palpitations and headache which were associated with rise in his blood pressure. He was seen by Dr. Antonio T. Fojo and commenced on an old protocol MB-197 for malignant pheochromocytoma. This consisted of intermittent treatment with DTIC, vincristine and cyclophosphamide. To date, e has received four courses of treatment and after the first two cycles the ᴅTIC and cyclophosphamide doses were increased by 33%. The dose of vincristine was reduced to 2 mg. total because of symptoms of peripheral neuritis. He has tolerated the treatment extremely well, although requiring the cycle to be changed from three to four weeks with the increased doses of therapy. His urinary catecholamines have been fluctuating but if anything have gradually increased since he has commenced treatment. He is due to have a CT scan of the chest and abdomen performed on 1-2-89 and as long as there is not evidence of progressive disease will go on for a further six courses of treatment.

OPERATIONS AND DATES PERFORMED:

Nil.

CLINICAL DIAGNOSES:

1.  Malignant pheochromocytoma currently receiving combination chemotherapy with DTIC, vincristine and cyclophosphamide.
2.  Hypertension.

Period covered by this report:          OUTPATIENT SUMMARY
From 10-2-89 to 1-1-90

ent Identification

Spelke, Robert A.          22-44-56 1

-2-

The Clinical Center
National Institutes of Health
Outpatient Record
NIH-532 (Rev. 10-84)
PA: 09-25-0099

3. Status-post partial gastrectomy to remove gastric leiomyosarcoma.
4. Status-post right carotid body tumor removal and carotid graft.
5. Status-post removal of pheochromocytoma from right adrenal gland.
6. Status-post irradiation of left glomus jugular tumor.
7. Left vocal cord paralysis.
8. 80% Hearing loss in left ear.

INSTRUCTIONS TO PATIENT:

    Continue current medications.

    No limitation on diet or physical activity.

DISPOSITION:

    The patient is discharged to home and will be followed in the 12th Floor
Outpatient Clinic. His next course of chemotherapy will be due on 1-16-90.


Sign & Date: _____    1|2|90
             Gary E. Richardson, M.D./C/12-18-89   (Dictated)
             GER:mrc:90123                12-28-89   (Transcribed)


Period covered by this report:    OUTPATIENT SUMMARY
    From 10-2-89 to 1-1-90


ient Identification

Spelke, Robert A.        22-44-56 1

                                          The Clinical Center
                                          National Institutes of Health
                                          Outpatient Record
                                          NIH-532 (Rev. 10-84)
                                          PA: 09-25-0099

# Exhibit 17

<u>Spelke v. Gonzales</u>, Civil No.  06-1887 (RJL)

<u>Exhibit 17</u> to Defendant's January 2007
Motion to Dismiss or, in the Alternative, for Summary Judgment

LAW OFFICES

# WADE & BYRNES P.C.

616 NORTH WASHINGTON STREET
ALEXANDRIA, VIRGINIA 22314-1991
Phone: (703) 836-9030
Fax: (703) 683-1543
Web-site: www.WadeandByrnes.com

Gregory M. Wade (VA, DC, MD)                                          E-Mail: gwade@wblawpc.com
Kevin Byrnes (VA, DC)                                                E-Mail: kbyrnes@wblawpc.com
Matthew T. Sutter (VA)                                               E-Mail: msutter@wblawpc.com

October 6, 2005

**By Fax: 202/307-3569 and Mail**
The Honorable Kenneth L. Wainstein
United States Attorney for the District of Columbia
Judiciary Center
555 Fourth Street, NW
Washington, D.C. 20530

Re: Robert A. Spelke

Dear Mr. Wainstein:

We are writing to request that you review the application for employment of Robert A. Spelke, who has applied to return to the U.S. Attorneys Office.

Mr. Spelke, who has had a long and distinguished career in the federal service and who has previously served as a U.S. Attorney handling criminal cases, has submitted an application to work in the U.S. Attorney's Office for the District of Columbia's Civil Division. That application was submitted more than a year ago and resulted in Mr. Spelke receiving an interview with the Civil Division.

The interview as conducted by Mr. Craig Lawrence and Mr. Spelke believed that the interview went well. At the time of the interview and continuing to the present day, Mr. Spelke has been employed in the Narcotics and Dangerous Drug section of Main Justice as a trial attorney. Mr. Spelke has always received the highest possible performance ratings while at Justice.

Over the past year, Mr. Spelke became aware that several applicants to the Civil Division were granted positions. To Mr. Spelke's knowledge only one of these applicants had prior civil litigation and another had previously been an Assistant U.S. Attorneys. All of the accepted applicants were substantially younger and had less litigation experience than Mr. Spelke.

As you are no doubt aware, Mr. Spelke is over forty and a cancer survivor who has battled the disease and its attendant conditions since the age of 18. Mr. Spelke is concerned that due to his age and physical disability he is being overlooked for a position in the Civil Division and that his objective qualifications are not being fully taken into account.

We recognize that it is unusual for an applicant to use an attorney to sponsor an inquiry into the status of his application. Mr. Spelke, however, feels that inappropriate criteria may be being used for his non-selection and has asked us to try to address the matter in the most informal and collegial way possible.

We ask that you request a review of Mr. Spelke's application and determine whether Mr. Spelke should be granted additional consideration for the assignment his is requesting and if not, whether the grounds for that denial are truly based on legitimate, non-discriminatory business justifications.

Please feel free to contact the undersigned at any time to discuss these issues.

Sincerely,

Kevin Byrnes